The Arbitration Institute of the
Stockholm Chamber of Commerce

**30/04/2020**

Arbitration no. V 2019/066

Doc. no. 2019/066-64



# ARBITRATION INSTITUTE
### OF THE STOCKHOLM CHAMBER OF COMMERCE

Box 16050, 103 21 Stockholm, Sweden

Phone: +46 8 555 100 00, E-mail: arbitration@chamber.se

www.sccinstitute.com

## FINAL AWARD

Made on 30 April 2020

The seat of arbitration is Stockholm, Sweden

### Arbitration No.: SCC V 2019/066

**Claimant:**    State Joint Stock Holding Company Artem (Artem or
Claimant)
2/10 Melnikova Street
Kyiv 04050
Ukraine

**Claimant's counsel:**    Mr. Vasyl Vashchenko
Managing Partner
Law Firm Comparis, LLC
120 Saksaganskogo Str., 7th Floor
Group of office premises No 23
Kyiv 02031
Ukraine
vashchenko@comparis.com.ua

**Respondent:**    Gray Fox Aviation and Logistics, Inc., doing business as
Gray Fox Logistics (Gray Fox or Respondent)
110 SE 6th Street, 17th Floor
Fort Lauderdale, FL 33301
USA

and



ARBITRATION INSTITUTE OF THE
STOCKHOLM CHAMBER OF COMMERCE
Certified true copy of original

Date 27 July 2020

Christoffer Coello Hedberg

1615 South Congress Avenue, Suite 103
Delray Beach, FL 33445
USA

**Respondent's counsel:**    DLA Piper Weiss-Tessbach Rechtsanwälte GmbH
Schottenring 14
AT-1010 Vienna
Austria
Mr. Andreas Daxberger
andreas.daxberger@dlapiper.com
and
Ms. Jasna Zwitter-Tehovnik
jasna.zwitter-tehovnik@dlapiper.com

**Arbitral Tribunal:**    Mr. Claes Zettermarck
Advocate
Advokatfirman Lundblad & Zettermarck HB
Västra Trädgårdsgatan 15
SE-111 53 Stockholm
Sweden
clz@lunzet.com

Mr. Peter J. Pettibone
Independent Arbitrator
Pettibone International ADR LLC
1158 Fifth Avenue
New York, NY 10029
USA
peter.pettibone@peterpettibone.com

Mr. James Castello
Partner
King & Spalding International LLP
12 Cours Albert 1er
FR-75008 Paris
France
jcastello@kslaw.com



## PROCEDURAL HISTORY

1.      On 14 May 2019 Artem filed its request for arbitration (RfA) with the SCC. In the RfA Artem requested, among other things, that SCC should decide that the arbitral tribunal should consist of a sole arbitrator.

2.      Following requests from the Respondent the SCC granted Respondent additional time for the submission of its answer (the Answer) to the RfA.

3.      On 12 June 2019 Respondent filed the Answer. In the Answer Respondent, among other things, requested that the SCC should decide that the arbitral tribunal should consist of three arbitrators.

4.      On 14 June 2019, the SCC decided that the arbitral tribunal shall consist of three arbitrators.

5.      On 21 June 2019 Artem nominated Peter J. Pettibone as arbitrator.

6.      On 1 July 2019 Gray Fox nominated James Castello as arbitrator.

7.      On 19 July 2019, the SCC appointed Claes Zettermarck as chairperson of the arbitral tribunal.

8.      On 19 July 2019, the SCC referred the case to the arbitral tribunal and noted that the award shall be made no later than 20 January 2020.

9.      On 1 August 2019, the arbitral tribunal and counsel participated, by way of conference telephone, in a case management conference (CMC).

10.     At the CMC, a draft procedural order was discussed.

11.     Following comments from counsel to a revised draft procedural order, procedural order no 1 (PO 1) was issued on 5 August 2019.

12.     Following a request from the arbitral tribunal, based on the procedural calendar set forth in PO 1, the SCC decided that the award shall be rendered by 27 April 2020.

13.     On 27 September 2019 Claimant submitted its Statement of Claim (the SoC).

14.     On 15 November 2019 Respondent submitted its Statement of Defense (the SoD).

15.     On 25 November 2019, pursuant to a schedule previously established by the tribunal, Claimant and Respondent each submitted a request that the tribunal order production of certain documents from the other party.

16.     On 2 December 2019, Claimant and Respondent submitted responses to the previous requests for an order to produce documents.



ARBITRATION INSTITUTE
THE STOCKHOLM CHAMBER OF COMMERCE

3

17. On 10 December 2019, the tribunal issued its decision on each party's request for an order to produce documents.

18. On 13 December 2019 Claimant filed its reply.

19. On 20 January 2020 Respondent filed its rejoinder.

20. On 24 January 2020, the parties filed their submissions proposing persons to be examined or cross examined during the final hearing.

21. On 27 January 2020, the tribunal held a telephone conference with counsel regarding the final hearing in Stockholm.

22. As the parties failed to agree on various issues regarding the final hearing, the tribunal issued on 30 January 2020 a decision with directions for the parties. Based on such directions the tribunal asked counsel to submit a joint proposal for the hearing.

23. On 5 February 2020, the tribunal approved a hearing schedule for the hearing.

24. The final hearing was held in Stockholm on 11 and 12 February 2020.

25. Claimant had called Mr. Choi Myong Ho to give testimony as an expert and relied on his expert report, C20. Respondent requested the tribunal to declare the report inadmissible and not to allow Mr. Choi to testify on the ground, among others, that he was not impartial.

26. Following arguments from the parties, the tribunal decided to let Mr. Choi testify and denied Respondent's request to declare the report, C20, inadmissible but noted that it would take into account the Respondent's arguments with respect to Mr. Choi when determining the relevance, materiality and weight of his report and his testimony.

27. On Claimant's request the following persons were examined: Ms. Gryshchenko Maryna Anatoliyivna and Mr. Choi Myong Ho.

28. On Respondent's request the following persons were examined: Mr. Charles R. Provini, Mr. Carl Lorentzen (by video link) and Mr. Manuele Wernli.

29. It was decided that cost submissions should be filed on 24 February 2020 with an opportunity to comment on the cost submission from the other party no later than 28 February 2020. It was also decided that post hearing briefs should be filed on 28 February 2020. Briefs were filed accordingly by Respondent. The briefs from Claimant due on 28 February 2020 were filed on 29 February 2020 at 4.16 a.m. and at 5.21 a.m. CET. Respondent therefore requested the tribunal to dismiss the briefs as they were filed too late.



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

30.     The tribunal declared the proceedings closed pursuant to Article 40 in the SCC Rules on 2 April 2020; following a request from the tribunal on 23 April 2020, the SCC decided that the final award shall be rendered by 11 May 2020.

## BACKGROUND

31.     On 12 March 2018 Claimant and Respondent signed contract # GFA-180312 ("the Contract").

32.     According to the Contract, para 1.1, Respondent undertook to "manufacture a semi-automatic machine for production of 152/155 mm projectile shells with rotating bands and set of spare parts, as specified in Appendix 9 and Appendix 11", defined as the Equipment.

33.     According to para 1.1, first subpara, the Equipment must meet the technical conditions, as they have been approved for performance and stipulated in Appendix 3, which is an integral part of the present Contract.

34.     According to para 2.2 in the Contract the total amount of the Contract was USD 16,579,000.00 CIF – the seaport of Odessa. In para 2.3 it was further stipulated as follows:

*"According to this this Contract after signing the contract by both Parties prices for Equipment and Works shall be fixed and shall not be subject to change. The total amount of this Contract is subject to proportional change only in the event of a change in the list of the supplied Equipment, technical parameters, changes in technical documentation made by the Buyer in written manner, that entailed a change in the prices for the Equipment.*

*Any changes in prices or total amount of the contract shall be executed with an additional agreement signed by both Parties."*

35.     According to para 3.2 the term of supply of the Equipment was set at ten (10) months from receipt by Respondent of the advance payment.

36.     Claimant undertook, pursuant to para 4.4.1, to pay an advance payment of USD 8,289,500.00 to Respondent 15 calendar days after coming into force of the contract.

37.     It is common ground that the Contract came into force during early May of 2018 and that Claimant paid USD 8,289,500.00 as stipulated in the preceding item on 16 May 2018.

38.     In paras 12.1 and 12.2, Respondent guaranteed delivery pursuant to para 3.2 and that the Equipment would be in compliance with the technical conditions in Appendix 3.



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

39.     Under the heading Arbitration the Contract stipulated as follows:

"*15.1. All disputes and disagreements, which may arise out of the present Contract or in connection with it, will be settled, if possible, by means of negotiations between the Parties.*

*15.2. If it appears impossible for both Parties to come to an agreement, the disputes are to be settled in The Arbitration Institute of the Chamber of Commerce in Stockholm in compatibility with its procedure.*

*Place of arbitration is Stockholm, Sweden. In case arbitration decision is neglected rules of New York convention "On recognition and enforcement of foreign arbitration decisions", 1958 should be applied.*

*15.3 The language of judicial procedure is English.*

*15.4 The judicial decisions are final and binding upon both parties.*

*15.5 All the aspects, not stipulated in the present Contract, are regulated by the UNO Convention of 1980 on Contracts for the International Sales of Goods and accepted in accordance with CIF Odessa port delivery terms, Incoterms 2010.*"

40.     Under the heading General it was stipulated in para 18.1 that all amendments and addendum to the present Contract will be valid in case of being made in writing and signed by the both Parties.

41.     According to the Contract the Seller was Gray Fox Logistics.

42.     On 22 August 2018, the parties signed Additional Agreement 1. It contained a new version of Appendix 2, Planned Schedule. Among other things such schedule indicated delivery of the Equipment on a CIF Odessa port delivery basis, to be executed by Seller, during March and April 2019. Additional Agreement 1 is part of and included in the Contract.

43.     During the performance of the Contract the Parties discussed various changes in the Equipment and additions to the Contract. The dispute between the Parties concerns, among other things, Claimant's allegation, disputed by Respondent, that Respondent has fundamentally breached the contract.

44.     The Contract signed on 12 March 2018, including Appendices and Additional Agreement 1 signed on 22 August 2018, form the Contract according to Claimant. Respondent accepts Claimant's position but adds that Additional Agreement 2 as well as Additional Agreement 3 form part of the contract. Claimant does not accept that Additional Agreements 2 and 3 are part of the contract.

45.     Claimant requested arbitration on 14 May 2019. Respondent denies the relief sought by Claimant but accepts that the dispute is to be resolved in this arbitration.

6



## PRAYERS FOR RELIEF

*Claimant*

46.     The Claimant seeks:

>   a) To recover from Respondent in favor of Claimant the amount of
>      USD 8,289,500.00 (eight million two hundred and eighty-nine thousand five
>      hundred) constituting the amount paid by Claimant to Respondent under the
>      Contract;
>
>   b) In accordance with the Article 84(1) of the Convention to recover from
>      Respondent in favor of Claimant the amount of interest pursuant to the USD
>      LIBOR 12-month rate fixed as of 12 February 2020 accrued on the advance
>      payment of USD 8,289,500.00 for the period from 16 May 2018, when the
>      advance payment was made, until the date of the Award.
>
>   c) to recover from Respondent all of Claimant's expenses related to this arbitration
>      proceeding, EUR 87,530, and all fees and costs of the tribunal and of the SCC
>      Arbitration Institute.

*Respondent*

47.     There has been no breach of the contract by Respondent. Quite the opposite, Claimant
        acted in the absence of good faith with such intensity and duration that it prevented
        Respondent from fulfilling the contractual obligations.

48.     Consequently, Claimant has no legal grounds to avoid the contract and its declaration in
        the SoC that the contract is avoided in its entirety should be disregarded.

49.     Therefore, Respondent asks the tribunal to:

>   a) declare that there has been no breach by Respondent;
>
>   b) declare that the contract, as defined by Respondent, remains in force;
>
>   c) dismiss the Claim as unfounded in its entirety.

50.     Respondent does not object to Claimant's quantification, as such, of either the advance
        payment it seeks to have repaid, namely USD 8,289,500.00, or of the interest rate that
        Claimant seeks to have applied. With respect to the starting date for interest Respondent
        accepts 15 May 2019, the day after this arbitration was filed.

51.     The Respondent asks the tribunal to issue an order that the Claimant shall make
        payment to the Respondent as compensation for all costs incurred by the Respondent in
        these proceedings, in the total amount of EUR 305,655.21, as well as its share of all fees
        and costs of the Tribunal and of the SCC Arbitration Institute together with interest on



7

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

all such amounts in accordance with sections 4 and 6 of the Swedish Interest Act from the date of the award until full payment has been made.

## LEGAL GROUNDS

### Party to the contract

*Claimant*

52.   Gray Fox Logistics is registered as a "fictious name" owned by Gray Fox Aviation and Logistics Inc, with the State of Florida's Division of Corporation under registration number P16000036508. The fictious name Gray Fox Logistics is not a company or legal entity, but is used by Gray Fox Aviation and Logistics, Inc to conduct business. Claimant therefore considers that the proper Respondent is Gray Fox Aviation and Logistics, Inc, doing business as Gray Fox Logistics.

*Respondent*

53.   Gray Fox Logistics is party to the disputed contract and thus the only possible counterparty in the arbitral proceedings. The Respondent thus asked the tribunal to dismiss the request to change the party.

### Dispute in general

*Claimant*

54.   Respondent's delay of manufacturing and delivery of the Equipment as well as Respondent's unilateral refusal to perform its contractual obligation to manufacture and deliver the Equipment with the components provided for by the contract constitute a fundamental breach of the contract by the Respondent.

55.   Respondent breached its obligations and guarantees set out in paras 3.2., 12.1., 12.2. of the contract and Planned Schedule (Appendix 2 to the contract) with regard to delivery of the Equipment by the end of April 2019 according to the technical conditions approved in Appendix 3 to the contract.

56.   Pursuant to the para 15.5. of the Contract, all the aspects not stipulated in the present Contract are regulated by the UN Convention of 1980 on Contracts for the International Sales of Goods, hereinafter referred to as "the Convention" or "CISG".

57.   Article 7 of the Convention stipulates that in the interpretation of this Convention, regard is to be had to its international character and to the need to promote uniformity in its application and the observance of good faith in international trade.

58.   Article 25 of the Convention provides "A breach of contract committed by one of the parties is fundamental if it results in such detriment to the other party as substantially to



deprive him of what he is entitled to expect under the contract". Respondent's refusal to deliver the Equipment, the list of which is approved by Appendix 3 to the Contract, is a fundamental breach of the contract, which causes detriment to the Claimant and deprives the Claimant of the Equipment specified in the contract, on which the Claimant was entitled to rely, having fulfilled all its obligations and paid 50 per cent of the contract price.

59.    Pursuant to Article 29(2) of the Convention, "A contract in writing which contains a provision requiring any modification or termination by agreement to be in writing may not be otherwise modified or terminated by agreement".

60.    Article 30 of the Convention stipulates that "The seller must deliver the goods, hand over any documents relating to them and transfer the property in the goods, as required by the contract and this Convention". Article 33 of the Convention provides that "The seller must deliver the goods: a) if a date is fixed by or determinable from the contract, on that date". Pursuant to Article 35(1) of the Convention, "The seller must deliver goods which are of the quantity, quality and description required by the contract and which are contained or packaged in the manner required by the contract". The Respondent committed a fundamental breach of its obligation of the seller to deliver the Equipment to the Claimant on the terms and within the time limits stipulated by the contract.

61.    Article 45(1) of the Convention stipulates that "If the seller fails to perform any of his obligations under the contract or this Convention, the buyer may: a) exercise the rights provided in articles 46 to 52; b) claim damages as provided in articles 74 to 77". In turn, pursuant to the Article 49(1) of the Convention "The buyer may declare the contract avoided: a) if the failure by the seller to perform any of his obligations under the contract or this Convention amounts to a fundamental breach of contract; or b) in case of non-delivery". Article 74 of the Convention stipulates that "Damages for breach of contract by one party consist of a sum equal to the loss, including loss of profit, suffered by the other party as a consequence of the breach". As a result of the Respondent's fundamental breach of contract the Claimant suffered loss amounting to USD 8,289,500.00 paid in favor of the Respondent, which has not delivered the Equipment.

62.    Pursuant to the Article 81 of the Convention, "Avoidance of the contract releases both parties from their obligations under it, subject to any damages which may be due. Avoidance does not affect any provision of the contract for the settlement of disputes or any other provision of the contract governing the rights and obligations of the parties consequent upon the avoidance of the contract." "A party who has performed the contract either wholly or in part may claim restitution from the other party of whatever the first party has supplied or paid under the contract.". Article 84(1) of the Convention stipulates that "If the seller is bound to refund the price, he must also pay interest on it, from the date on which the price was paid."



63. Based on Respondent's commission of a fundamental breach of contract, starting from 1 May 2019, the Claimant has been entitled to declare the contract avoided.

64. In accordance with Article 49(1)(a) of the Convention, the Claimant, in the SoC, declared the contract avoided in its entirety due to Respondent's fundamental breach of the Contract.

65. The Respondent has not provided any evidence that its proposal to change the contracted Equipment was caused by circumstances outside its control.

66. The Respondent's allegations that the Contract was amended by the draft Additional Agreement 2 and by the draft Additional Agreement 3 are false due to the following reasons:

67. As stated in paragraph 42 of the Statement of Claim, pursuant to Article 29(2) of the Convention "*A contract in writing which contains a provision requiring any modification or termination by agreement to be in writing may not be otherwise modified or terminated by agreement*". Clause 18.1. of the Contract provides that "*All the amendments and addendum to the present Contract will be valid in case of being made in writing and signed by both Parties*". In addition, it has to be stressed that Ukraine (as Contracting State to the CISG) declared, in accordance with Articles 12 and 96 of the Convention, that any provision of Article 11, Article 29 or Part II of the Convention that allowed a contract of sale or its modification or termination by agreement or any offer, acceptance or other indication of intention to be made in any form other than in writing, would not apply where any party had its place of business in Ukraine (see "Ukraine" line and Note (a) at the bottom of the chart summarising the Convention's adoption at
https://uncitral.un.org/en/texts/salegoods/conventions/sale_of_goods/cisg/status) So, if a Ukrainian entity is a party to international contract and such contract is governed by the Convention and contains a provision requiring any modification by agreement to be in writing, then such contract may not be otherwise modified. Thus, the draft Additional Agreement 2 and the draft Additional Agreement 3 have no legal effect because they were not signed by the Claimant.

68. Accordingly, the Contract was never amended by the draft Additional Agreement 2 and by the draft Additional Agreement 3. Therefore, Respondent's unilateral refusal to fulfil its obligations in accordance with the provisions of the initial wording of the Contract constitutes the fundamental breach of the Contract and entitles the Claimant to declare the Contract avoided in its entirety and to claim restitution (damages) from the Respondent of what the Claimant has paid under the Contract.


ARBITRATION INSTITUTE
OF THE STOCKHO    HAMBER OF COMMERCE

10

*Respondent*

69. Claimant has an obligation to act in good faith under the Contract. That obligation follows from the CISG, *lex mercatoria*, UNIDROIT Principles and/or general principles of law.

70. Claimant acted with a lack of good faith for an extended period of time starting, to some extent, as early as October 2018 and continuing to at least November 2019. The Claimant effectively prevented the Respondent from fulfilling its contractual obligations. It was the Claimant who acted in bad faith amounting to a breach of contract. The actions of Claimant are manifestly non-compliant with the principle of good faith and its related standards. The non-compliance is so evident and grave that it amounts to a fundamental breach of contract under Article 49(1) of CISG.

71. The central legal norm for assessing the alleged breach of the Respondent, the estoppel principle, is found in Article 80 of CISG. According to that norm a party may not rely on a failure of the other party to perform, to the extent that such failure was caused by the first party's act or omission.

72. The party responsible for the wrongful act may not assert any claim relating to the non-performance, and the other party is excused from all the consequences of such non-performance. To clarify, the wrongdoing party is not only prohibited from claiming damages, but also from making any other claims such as claiming performance, avoidance, price reduction or any interest claim. Furthermore, the wrongdoing party loses any defence it may have due to non-performance of the other party.

73. The Claimant relies on its own fundamental breach of the contract in order to terminate it. It follows from the estoppel principle that Claimant cannot be allowed to make any claim relating to non-performance (delayed manufacturing) of the Respondent.

74. It is true that the Contract included para 18.1 regarding formalities for changing the contract. It is also true that Ukraine made a declaration with respect to the Convention which means that any provision of Article 11, Article 29 or Part II does not apply where any party has his place of business in Ukraine. That provision is, however, complementary to that of Article 9 of CISG that states that the parties are bound by any usage to which they have agreed and by any practices which they have established between themselves.

75. The parties evidently and consciously decided to amend the rules on formality as they changed the contract on several occasions in many different ways. Not only that, the technicality of these changes gave rise to an established practice which became part of their contractual relationship. Furthermore, the manner of this new procedure was introduced by Claimant. Thus, by returning the signed copy of Additional Agreement 3 as instructed by Claimant, the Additional Agreement 3 was validly concluded and immediately became binding upon both Parties.



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

**DEVELOPMENT OF CLAIMANT'S CASE**

76.     The presentation of Claimant's case in this section reflects, with only slight adaption, the legal claims and factual allegations set forth in Claimant's written pleadings in this arbitration.

77.     State Joint Stock Holding Company Artem, (the "Claimant") and Gray Fox Logistics (the "Respondent") entered into the Contract as amended (Exhibits C-3 and C-4), for the total price of USD 16,579,000.00. The Contract was signed by the Claimant in order to fulfil the state defence order of the Government of Ukraine.

78.     According to the para 1.1. of the Contract, the Respondent (the Seller) is obliged to manufacture and to deliver to the Claimant (the Buyer) a "semi-automatic machine for production of projectile shells" (hereinafter referred to as the "Equipment") and to fulfil a work package on supervision and debugging of the Equipment as well as training of the Claimant's personnel. The Equipment must contain the agreed components produced by specified manufacturers as indicated in Appendix No. 3 to the Contract.

79.     In accordance with the terms of the Contract on 16 May 2018 the Claimant made a timely transfer to the Respondent of advance payment in the amount of USD 8,289,500.00 (Exhibit C-5) being 50 per cent of the total value of the Contract.

80.     On 22 August 2018 the Claimant and the Respondent signed Additional Agreement 1 to the Contract (Exhibit C-4), which is part of the Contract and approved the corrected Planned Schedule of the Contract fulfilment pursuant to which the Respondent was obliged to manufacture the Equipment by the end of February 2019 and to deliver the Equipment to the Claimant by the end of April 2019. As of 27 September 2019, the Equipment has not been delivered to the Claimant and it has not even been fully manufactured.

81.     In accordance with the Planned Schedule by the end of August 2018 the Respondent had to perform its first obligation under the Contract, namely, to submit the technical documents in a scope required for designing the foundations and matching the mating facilities. Instead of that, on 29 August 2018 the Respondent sent to the Claimant an email with technical Equipment specification in which some part of the Equipment components (provided for by the Contract) were replaced with other components. In the email dated 3 September 2018 the Claimant noted to the Respondent about such replacement and about the relevant consequences of such replacement. On 4 September 2018, the Claimant also sent a list of questions to the Respondent, in particular, a question about the apparent replacement of the four Bliss 1,800T presses (costing about USD 6,000,000) with one hydraulic press (the mentioned email correspondence is contained in Exhibit C-6).

82.     On 5 September 2018 during the Skype Meeting, while answering the Claimant's question about replacement of the Bliss 1,800T presses, Mr. Provini (the Respondent's



12

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

President) stated that no changes would be made and they were using the 'original' press and the same technology production and promised (by 10 September 2018) to provide the Claimant with the Respondent's 'Official Confirmation' that no changes would be made and the 'Original' Press (under the Contract) would be used (see clause 2 on the first page and first Action Item on the second page of the Skype Meeting Minutes dated 5 September 2018 contained in Exhibit C-7).

83.     Instead of providing the Claimant with the promised 'Official Confirmation' that no changes would be made and the 'Original' Press would be used, on 18 September 2018 the Respondent submitted to the Claimant another updated list of Equipment, which was discussed during the Skype Meeting on 19 September 2018 (the Minutes of the Meeting is contained in the Exhibit C-8). Taking into account the Claimant's concerns regarding the proposed replacement of Equipment, the Respondent undertook to provide by 24 September 2018 a well-grounded substantiation of introduced changes.

84.     On 21 September 2018, the Claimant received a letter from the Respondent (Exhibit C-9) with unsound substantiation of introduced changes of the components of the Equipment, including the replacement of the 'original' Bliss 1,800T press. According to the results of the examination of the above proposals by the Claimant, it was found that the Respondent proposed to replace almost 70 per cent of the components of the Equipment, while reducing the total number of components of the Equipment.

85.     During the Skype Meeting on 7 November 2018 (the Minutes of the Meeting is contained in the Exhibit C-10) the Respondent again undertook to provide substantiation of introduced changes in the Equipment, in particular, to provide calculations of productivity and complete information on the characteristics of the press.

86.     On 13 November 2018, the Claimant received another letter from the Respondent (Exhibit C-11) again with unsound substantiation of introduced changes of the components of the Equipment, including the replacement of the 'original' Bliss 1,800T press. The newly introduced changes differed from those introduced on 21 September 2018.

87.     On 13 December 2018, the Claimant received the Respondent's letter with a draft Additional Agreement 2 (Exhibit C-12), under which it was proposed to accept the replacement Equipment and to postpone its delivery. This draft was similar to what the parties later denominated Additional Agreement 3.

88.     During the Skype Meeting on 14 December 2018 (the Minutes of the Meeting is contained in the Exhibit C-13) the Respondent again undertook to provide (by 17 December 2018) a legal justification for changes in the Equipment list according to the Contract.

89.     In summary, in the period from September 2018 till February 2019 the Respondent did not give any grounded response to numerous Claimant's inquiries regarding the reasons



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

of the Equipment components' replacement, the price of the proposed new components of the Equipment and the confirmation of retention of the quality and productivity of the Equipment with the replaced components. In turn, the Claimant carefully considered all of the Respondent's proposals and sought to find a mutually acceptable solution.

90.    On 14 March 2019, the Claimant received the draft Additional Agreement 3 to the Contract (Exhibit C-14) signed by the Respondent to amend the Equipment List. After reviewing draft Additional Agreement 3 to the Contract, the Claimant sent a letter dated 21 March 2019 (Exhibit C-15) to the Respondent with the request to provide the information needed by Claimant's Supervisory Board to make a decision whether also to approve it.

91.    From April 2 to April 6, 2019, within the framework of the Contract, the Claimant's representatives had a working visit to the United States, as a result of which (and taking into account the lack of Respondent's grounded confirmation with regard to quality, cost and productivity of the proposed replaced Equipment) the Claimant came to a final conclusion on unacceptability of replacement of the Equipment specified in the Contract. In addition, the Claimant had reasonable doubts (which were subsequently confirmed) regarding the good faith of the Respondent, the reasons for the Respondent's proposal to replace the Equipment, and in general the Respondent's ability to fulfil its obligations under the Contract. Naturally, the Claimant refused to sign the Contract amendment providing replacement of agreed components of the Equipment by other components of unknown quality and price.

92.    In its turn, on 16 April 2019 the Respondent sent its complaint to the Claimant (Exhibit C-16), alleging breach of the Contract by the Claimant and with the requirement to ensure the fulfilment of the Contract taking into account unacceptable changes (proposed by the Respondent) of the Equipment's components.

93.    On 23 April 2019, the Claimant submitted its response to the Respondent (Exhibit C-17) and rejected, as groundless, accusations of the alleged breach of the Contract by the Claimant and required from the Respondent to provide a guarantee of timely delivery of the Equipment with the components stipulated by the Contract.

94.    By its letter dated 30 April 2019 (Exhibit C-18) the Respondent again tried to accuse the Claimant of a non-existent breach of the Contract and demanded to sign the draft Additional Agreement 3 to the Contract regarding replacement of the Equipment's components. Thus, in fact the Respondent refused to perform its obligations relating to manufacturing and delivery of the Equipment with the components provided for by the Contract.

95.    The Claimant considers that the Respondent's demand to sign the draft Additional Agreement 3 to the Contract regarding unacceptable (for the Claimant) replacement of the Equipment's components is groundless and inconsistent with the provisions of the



Contract. In turn, item 18.1. of the Contract stipulates that all the amendments to the Contract will be valid in case of being made in writing and signed by both Parties.

96. As on the date of submitting this Statement of Claim the Contractual time of the Equipment manufacturing (by the end of February 2019) and the Equipment delivery (by the end of April 2019) has expired.

97. The Claimant considers that the Respondent's delay of manufacturing and delivery of the Equipment, as well as the Respondent's unilateral refusal to perform its Contractual obligations to manufacture and deliver the Equipment with the components provided for by the Contract, constitute the fundamental breach of the Contract by the Respondent.

98. It has to be noted that the Claimant was unpleasantly astonished when it received from the Security Service of Ukraine (hereinafter referred to as "the SSU") a letter dated 26 July 2019 No. 2/4/4-21901 (Exhibit C-19), in accordance with which on 29 July 2019 the representatives of the SSU and of the US Federal Bureau of Investigation visited the Claimant's office to interview the employees of the Claimant, who were directly involved in the conclusion of the Contract and communication with representatives of the Respondent.

99. In order to obtain the opinion of an independent expert on the replacement of the Equipment proposed by the Respondent, the Claimant hired SKGC Co., Ltd, which is an experienced manufacturer of similar production equipment.

100. SKGC Co., Ltd's Expert Report of 20 September 2019 (hereinafter referred to as "the Expert Report", Exhibit C-20) contains the results of comparing the list of Equipment approved by the Contract ("Equipment No. 1") with the new list of equipment proposed by the Respondent according to the draft Additional Agreement 3 to the Contract ("Equipment No. 2"). These results are as follows:

1) Production technology will completely change if Equipment No. 1 is substituted for Equipment No. 2.

2) The approximate cost of Equipment No. 1 is USD 16,760,000 and the approximate cost of Equipment No. 2 is USD 13,350,000, which is 25 per cent less than the cost of Equipment No. 1 agreed to in the Contract. It should be noted that the approximate cost is established on the terms of the FCA (Incoterms 2010), that is, without taking into account the cost of the Works (installation, debugging and instruction), which according to the item 2.2.2. of the Contract is USD 500,000, the cost of shipping, insurance, and Respondent's profit.

3) The productivity of Equipment No. 1 and of Equipment No. 2 is less than agreed to in the Contract.

4) One of the main components of Equipment No. 1, the Bliss 1,800T press, is no longer produced for over 20 years.



15

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

101. So, the Expert Report evidences on the following:

    1) Due to its lack of good faith or incompetence, under the Contract, the Respondent has assumed a commitment that it definitely could not fulfil because the Contract price (para 2.2.) is USD 16,579,000.00 and the real cost of its execution is at least USD 17,760,000 (approximate cost under FCA USD 16,760,000 plus the cost of Works, transportation and insurance). In addition, the Respondent has committed itself to supply Equipment that includes the Bliss 1,800T press, which has not been produced for over 20 years. However, at the date of the Contract, the Respondent knew or should have known about the cost of the Equipment and the inability to purchase it from the manufacturers.

    2) Almost immediately after receiving the advance payment from the Claimant, the Respondent began to make the proposals to the Claimant regarding the replacement of the Equipment in connection with alleged circumstances that arose out of its control, which is refuted by the Expert Report. Obviously, the reason for the Respondent's proposals for replacement of the Equipment is the lack of good faith or incompetence of the Respondent, but in no case does it justify the Respondent's inability to supply the Equipment, the list of which was approved by the Contract.

    3) The non-compliance of the new equipment proposed by the Respondent with the requirements of the Contract regarding its technology, cost and production capacity is a reasonable ground for the Claimant's refusal to agree to such replacement of the Equipment and to sign the draft Additional Agreement 3 to the Contract.

102. On 24 September 2019, the Claimant received an inquiry from the SSU No. 6/7145 (hereinafter referred to as "the Inquiry", Exhibit C-21) to provide, in particular, the original documents related to the conclusion and execution of the Contract in connection with the pre-trial investigation in criminal proceedings instituted on 5 June 2019.

103. The mentioned SSU's Inquiry also contains the following information:

    1) In the course of the pre-trial investigation, it was found that upon receiving under the Contract on 16 May 2018 from the Claimant an advance payment of USD 8,289,500, the Respondent on the following day, on 17 May 2018, unreasonably transferred USD 8,289,996 to the account of related company Gray Fox International LLC (an extract from the official website of the State of Florida is contained in Exhibit C-22), whose director is Charles Provini, who is also the Chairman of the Board and the President of the Claimant.

    2) Subsequently, from the account of Gray Fox International LLC the following payments were made:



- On 18 May 2018, the amount of USD 900,000 was transferred to bank account No. CZ972060000000001140910 of "Rich Trading S.R.O." (registration number 05547181, address: Praha - Pitkovice, Kremenacova 90/6, PSC 104 00, director - OLENA ZAICHENKO), opened at "Citfin, sporitelni druzstvo" (address: Radlicka 751 / 113e, 158 00 Praha 5, Czech Republic);

- On 18 May 2018, the amount of USD 250,000 was transferred to the bank account No. 002290858565 of the US citizen Dale S. Wood, opened at Bank of America, N.A.;

- On 18 May 2018, the amount of USD 100,000 was transferred to the bank Account No. 000974122505 of the US citizens Elizabeth and Charles Provini, opened at Bank of America, N.A.;

- On 18 May 2018, the amount of USD 75,000 was transferred to the bank account No. 9138119077 of the US citizen Ali Tarkan Ocal, opened at Citibank, N.A. (Address: 399 Park Ave. New York, NY 10022);

- On 21 May 2018, the amount of USD 1,352,340 was transferred to the bank account No. 1866715970 of MJC Engineering and Technology, Inc. (Registration No. C1735322, address: 15401 Assembly Ln Huntington Beach CA 92649, USA), opened at "Wells Fargo Bank, NA» (address: 420 Montgomery Street San Francisco, CA 94104, San Francisco, CA, United States;

- On 21 May 2018, the amount of USD 100,000 was transferred to the bank account No. HU73117751353085701800000000 of a citizen Giorgi Kalandadze, opened at OTP Bank PLC (address: Nador Street 16 Budapest 1051, Hungary);

- On 23 May 2018, the amount of USD 950,000 was transferred to the bank account No. GE59BG0000000101020495 of «Esco Ltd», opened at Bank of Georgia (address: 29 a Gagarin Str., Tbilisi 0160, Georgia);

- On 23 May 2018, the amount of USD 75,000 was transferred to the US citizen Edouard Haik Vahram's bank account No. 898092387011, opened at Bank of America, N.A;

- On 24 May 2018, the amount of USD 400,000 was transferred to the bank account No. 000974122505 of the US citizen Elizabeth Provini, opened at Bank of America, N.A.;

- On 29 May 2018, the amount of USD 600,000 was transferred to the bank account No. CZ972060000000001140910 of "Rich Trading S.R.O." (registration number 05547181, address: Praha - Pitkovice, Kremenacova 90/6,



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

17

PSC 104 00, director – OLENA ZAICHENKO), opened in "Citfin, sporitelni druzstvo" (address: Radlicka 751 / 113e, 158 00 Praha 5, Czech Republic).

3) The operating director of the Respondent Dale Scott Wood, who negotiated with the Claimant with regard to conclusion of the Contract, in April 2019 was sentenced to 12 years in the United States prison with an obligation to pay USD 7 million compensations for financial fraud.

104. So, the information contained in the SSU's Inquiry explicitly evidences the following:

1) In order to perform the Contract, the Respondent made no payment to any of its subcontractors, as the entire advance received from the Claimant was transferred to the account of related company Gray Fox International LLC, which in turn transferred USD 3,450,000 to the accounts of the officers of the Respondent and of Gray Fox International LLC itself, as well as to the accounts of other recipients not in any way related to the performance of the Contract. Only USD 1,352,340 was transferred by Gray Fox International LLC to MJC Engineering and Technology, Inc., which was represented to the Claimant as a subcontractor of the Respondent.

2) At least a half of the advance received from the Claimant the Respondent spent on purposes unrelated to the performance of the Contract, which evidences about the Respondent's lack of good faith.

3) The second Respondent's officer was sentenced to long term imprisonment for another fraud of financial resources.

105. The contents of the Expert Report and of the SSU's Inquiry confirmed the Claimant's prior suspicions of the Respondent's technical qualification and financial inability to fulfil its obligations under the Contract and to deliver the Equipment.

106. The Respondent did not provide any document confirming that Gray Fox Logistics is a corporate entity validly established in accordance with the laws of the State of Florida. The Respondent just referred to the Extract (contained in the Claimant's Exhibit C-1) demonstrating that Gray Fox Logistics is a fictitious name owned by Gray Fox Aviation and Logistics, Inc.

107. The Respondent did not provide any evidence that its proposal to change the contracted Equipment was caused by circumstances out of Respondent's control. The Respondent even did not provide any document (letter, contract etc.) evidencing that any subcontractor of the Respondent was committed to manufacture or deliver the Equipment and then advised the Respondent about its inability to fulfil obligation.

108. The Respondent did not deny the authenticity of the payments information contained in paragraph 35 of the Statement of Claim. The Respondent also did not give any explanation of misuse of the funds received from the Claimant, but the Respondent



18

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

expressed deep disturbance about the fact that the payments information became legally known to the Claimant.

109.   The Respondent tried to deny the conclusions of SKGC Co., Ltd's Expert Report of 20 September 2019 (hereinafter referred to as "the Claimant's Expert Report", Exhibit C-20). However, Respondent was not able to provide any sound argument for such denial.

110.   Needless to say, any expert report must be rebutted by another expert's report. The Respondent's comments to the Claimant's Expert Report are preconceived. Therefore, the Claimant's Expert Report may be opposed only by report of another independent and objective expert, experienced in ammunition production technologies, financial analysis, business and price valuation.

111.   The Respondent only could provide so called "Expert report by S.I.Borbulev dated 15 May 2019" (Exhibit R-5) commissioned by a third party before commencement of this arbitration. It has to be stressed that "Expert report by S.I.Borbulev dated 15 May 2019":

  1)   contains no information why the "Expert" was commissioned by a third party;

  2)   does not say what documents were reviewed by the "Expert";

  3)   does not refer to the Contract or to this arbitration;

  4)   was originally prepared in Russian language and its English translation does not correspond to Russian text in particular, Russian text does not contain the provisions of the lines 6-14 on the first page of English text. It can be clearly seen because the first page of Russian language text does not contain any dates, but the English "translation" of the first page contains three dates: "2017", "12.03.18" and "16.05.18". Also, almost the whole fifth page of Russian version was not translated into English: it is clearly seen from the fact that Russian text is on six pages, but English text is on five pages.

Thus, "Expert report by S.I.Borbulev dated 15 May 2019" is a quite doubtful document and cannot be seriously considered.

112.   The Respondent's allegation that SKGC Co, Ltd participated as a competitor in the procurement procedure is untrue and is refuted by Rebuttal Witness Statement of Gryshchenko Maryna dated 13 December 2019 (see attached Exhibit C-23). Also, the word "competitors" cannot be applied to SKGC Co, Ltd and to the Respondent, because SKGC Co, Ltd is a worldwide recognized manufacturer of special equipment, but the Respondent is just a fictitious name, which definitely does not have any production facilities.



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

113.  In the paragraphs 44 and 45 of the Statement of Defence the Respondent mentioned that the Claimant several times changed the drawing of the shell. In this regard the Claimant has to state the following.

114.  The drawing of the shell was sent by the Claimant to the Respondent on 12 July 2018 in accordance with the time schedule of the Contract.

115.  On 10 December 2018, the Claimant sent to the Respondent the refined drawing of the shell, which had the same dimensions and fully corresponded to the initial drawing.

116.  On 5 March 2019, the Claimant sent to the Respondent another drawing of the shell with the only one purpose to clarify whether such shell may be produced by the new Equipment. So, that was not changing of the drawing of the shell.

117.  It has to be noted that the drawings of the shell of 10 December 2018 and of 5 March 2019 did not in any way delay the process of manufacturing of the Equipment. Also, it should be stated that the Respondent did not present any claims to the Claimant in connection with the drawings of the shell of 10 December 2018 and of 5 March 2019.

118.  In its Statement of Defence, the Respondent alleged that the "Claimant sabotaging the Project", but the Respondent itself could not define a reason the Claimant does so. It is apparent that the Respondent could not find explanation, because its allegation that the "Claimant sabotaging the Project" is absurd due to the following:

    1)    The Claimant is recognized worldwide as the producer of missiles and has 127 years history of manufacturing;

    2)    It has no reason to sabotage the Project having paid under the Contract an advance amounting to USD 8,289,500.00;

    3)    The Contract was signed in the framework of fulfilment of the state defence order and disruption of the state defence order may cause (and already caused, see paragraph 15 of Ms. Gryshchenko's witness statement) very severe punishment;

    4)    During more than six months the Claimant cooperated with the Respondent with the aim to find a mutually acceptable solution to the Equipment replacement issue;

    5)    Thus, the only reason for commencement of this arbitration is protection of the Claimant's contractual rights, which were infringed by the Respondent due to its incompetence or lack of good faith.

## DEVELOPMENT OF RESPONDENT'S CASE

119.  The presentation of Respondent's case in this section reflects, with only slight adaption, the legal claims and factual allegations set forth in Respondent's written pleadings in this arbitration.



120. In its Claim the Claimant requests that the Respondent should be changed from Gray Fox Logistics to Gray Fox Aviation and Logistics, Inc, doing business as Gray Fox Logistics.

121. The Respondent rejects and opposes such notion. Gray Fox Logistics is party to the disputed Contract and thus the only possible counterparty in the arbitral proceedings. Therefore, the Respondent requests the Tribunal to dismiss the Claimant's request to change the Party.

122. The Claimant and the Respondent (the "Parties") have concluded the sales contract #GFA-180312 dated 12 March 2018 with eleven appendices (each an "Appendix", together the "Main Contract") together with several additional agreements (each an "Additional Agreement", together the "Additional Agreements") for the total price of USD 16,579,000.00 (altogether the "Contract").

123. In accordance with the provisions of para 18.9 of the Contract, the Contract entered into force when the Parties received the relevant permits from one another which has occurred in early May 2018.

124. Consequently, the Claimant transferred the amount of USD 8,289,500.00 to the Respondent as an advance payment as was stipulated in article 4.1.1 of the Contract. The amount represents 50 per cent of the total Contract value.

125. According to para 1.1 of the Contract, the Respondent undertook to "manufacture a semi-automatic machine for production of 152/155mm projectile shells with rotating bands and set of spare parts as specified in Appendix 9 and Appendix 11 (the "Project")". Furthermore, the same article stipulates that the equipment delivered under the Contract must meet the technical conditions as they have been approved for performance and stipulated in Appendix 3.

126. On 22 August 2018, the Parties agreed on the Additional Agreement 1 which changed Appendix 2 to the Main Contract, namely by amending the planned schedule contained therein, while later on they concluded the Additional Agreement 2 to the Main Contract with additional details regarding the electrical appliance.

127. The Contract was awarded to the Respondent on the basis of a tender procedure under the law of Ukraine. The tender clearly stated that the subject of the future contract would be production of 152/155mm artillery shells and 152/155mm artillery casings for a total yearly nominal production of 360,000 parts. Manufacturing of casings was later not included in the Contract. The exact equipment was mentioned only marginally as it was naturally left for the prospective contractor to select the adequate technical solution and also to assume the economic risk of such a selection. No specific press was requested.

128. Subsequently, the Respondent submitted its tender proposal to supply a production line for the production of 152/155mm artillery shells and 152/155mm artillery casings for a



total yearly nominal production of 360,000 parts. In the tender proposal the Respondent envisaged the use of an ERIE forging press as it appeared to be the most feasible choice at that moment due to the market conditions and an offer of the potential subcontractors.

129.    When the final version of the Contract was agreed upon by the Parties and consequently signed on 12 March 2018, the casings were not requested any longer, therefore the Respondent undertook to supply a production line for the production of 152/155mm artillery shells for a total yearly nominal production of 524,000 parts. Similarly, as during the previous phases, the equipment list was of little interest to the Claimant. At that point in time, the situation on the market has, yet again, changed and certain pieces of equipment which were part of the tender proposal were replaced by a more feasible choice. In case of the press, the ERIE forging press was replaced with the Bliss 1,800 Ton press. The Respondent was in contact with its Bliss distributor who assured them that 4 such presses are in stock and can be supplied to the Respondent.

130.    The defence sector is prone to various irregularities and political aspirations and is consequently highly regulated. Thus, it is imperative to minimize every possible risk of corruption. It shall be noted that the main purpose of Appendix 3 containing the list of the supplied equipment is primarily related to the import and licensing of the said equipment. The list of technical conditions is, however, not intended to prevent changing specific components under reasonable circumstances. In such sense, para 2.3 of the Contract mentions the changes to the list of the supplied equipment in the context of changing the price. In our present situation changing the price was not proposed as the Respondent was willing to bear certain extra cost relating to the proposed changes. Nevertheless, this article clearly shows that changes to the list of the supplied equipment were not unexpected. It shall be noted that it was the Claimant who drafted the contract and therefore clearly anticipated the possibility of a change.

131.    As is standard market practice in a contractual relationship with every supplier, the contracts with subcontractors (or suppliers) are concluded only after the main contract has entered into force. In accordance with para 18.9 of the Contract, it entered into force in early May 2018. Subsequently, the Respondent began to undertake the activities required to fulfil its obligations under the Contract.

132.    In August 2018, the Respondent learned that one of the components as described in Appendix 3 was no longer available for purchase. Bliss, a global manufacturer of presses has undergone a reorganisation procedure and was no longer producing or supplying the envisaged Bliss 1,800 Ton press in the USA. As is common in such a reorganisation, the inventories were being cleared and supply to the distributors has stopped. Therefore, four of such presses could no longer be supplied by the Respondent's Bliss distributor (or any other distributor for that matter).

133.    A high tonnage cup press required for the shell production is a specialised and exceptional piece of industrial machinery. Therefore, the number of manufactures producing suitable machines is limited. Furthermore, due to the concerns mentioned



above about importing and licensing the equipment, all components of the production line must be manufactured in the USA. Therefore, importing a suitable press from elsewhere, e.g. from Bliss Germany, was not possible. Similarly, a suitable replacement press manufactured by the Mazak Corporation could not be utilized due to political reasons limiting the export to Ukraine. The state of Ukraine (represented by the State Enterprise Bezpeka) has commissioned an expert report to evaluate the proposed technical solutions of the Respondent. Inability of Mazak to supply to Ukraine has also been reaffirmed in this expert report prepared by the general director S. I. Borbulev of the Modern Institute for Metal Processing.

134.   When the Respondent learned that the distributor could no longer supply a suitable press and that no other USA-based manufacturer could provide one, it became clear that the only possible solution was to manufacture a custom made press. In order to resolve the issue, the Respondent immediately approached MJC Engineering and Technology Inc. ("MJC"), a respected and established Californian manufacturer in the field of metallurgy. Prior to any change, MJC was already the main contractually agreed supplier of several components under the Contract. MJC agreed to develop a new custom press which would be designed especially for the purpose under the Contract. MJC, however, proposed to utilize a different, more efficient and modern type of technology. Most importantly, the four single-stage Bliss presses would be replaced with a single two-stage press. Furthermore, the work would be carried in a single line instead of two parallel ones. Consequently, other changes to minor technical elements were required, such as the robotic arms and similar so that the new press can be integrated in the production line. The quality and technical adequacy were, up until the start of the arbitration procedure, never disputed. In order to carry out all the engineering and designing works, the Respondent was paying an amount of approximately USD 20,000 per month to MJC, in addition to all other payments related to the cost of manufacturing the equipment.

135.   A custom-built machine by definition means a much higher cost for the seller and a higher productivity for the buyer. However, designing a new custom-built machine of such power and required durability is an expensive and difficult undertaking. Nevertheless, the Respondent was willing to assume these extra costs from the very beginning, despite the possibility of adjusting the contractual price in accordance with para 2.3 of the Contract.

136.   The technical solution was defined with great speed and already on 29 August 2018 the Respondent sent to the Claimant the updated list of the equipment where the 4 Bliss presses had been replaced by a 1250/350t combination press (the "New Press"). An exchange of emails and meetings on which such changes were discussed ensued (Exhibit C-6). After the initial confusion, misunderstandings and miscommunications which were described in detail already in the Claim, the Parties reached an agreement as the minutes of a Skype meeting dated 26 September 2018 state that "Artem accepts the updated machine list and draws the attention of Gray Fox Logistics that this is a single



23

change to the Contract and that no more changes of the stipulated Equipment will be accepted". The Parties also agreed to conclude an additional agreement thereof. Furthermore, the Respondent agreed to provide updated technical details of the new configuration, which was sent to the Claimant on 3 October 2018.

137.    Later, the Claimant accepted the updated machine list on 24 October 2018 at a meeting between the Claimant, Respondent and MJC, when they, *inter alia*, agree that (i) MJC will transfer to the Claimant by 30 October 2018 the updated layout of the production line... ...as well as provide estimate foundation drawings for the New Press and the flow-forming machines; and (ii) MJC will prepare a complete list of the New Press' characteristics and calculations of energy usage by each unit of the equipment and (iii) a supplemental agreement regarding these changes shall be concluded. These minutes clearly show that the Claimant has accepted the updated list of equipment. In the following weeks, the Respondent provided the Claimant with a multitude of further technical specifications and similar, as was also agreed.

138.    Following the agreement regarding the new equipment, at a meeting held on 7 November 2018, the Parties made further detailed arrangements on how to proceed with the implementation of the new equipment list. Consequently, in the following weeks, the Respondent provided the Claimant with a multitude of further technical specifications and similar. Furthermore, it was agreed that the delivery dates would be postponed because of these agreed changes.

139.    Interestingly enough, the above meeting seems to have been one of the early occasions on which Ms. Marina Gryshchenko has launched her unnecessary and unreasonable attacks towards the Respondent, as will be further described further on. At the meeting it was, *inter alia*, reaffirmed that direct communication between the Parties' engineers is important. In course of such communication the Respondent's representative received confirmation from the Claimant's people that Ms. Gryshchenko was wrong and misinformed when attacking the Project and the Respondent, clearly showing that Ms. Gryshchenko was pursuing a different agenda.

140.    In a letter dated 13 November 2018 the Respondent sent a document addressing proposed required equipment changes with reasons for each change. This letter provided a clear high level overview of the necessary changes. Some changes were directly related to the New Press while certain components were replaced simply as they have been determined to be better fitting for the Project or more efficient in general. It is important to note that some changes were made based on an explicit request by the Claimant or due to the Claimant's changes of the shell drawing, see paragraphs (44) and (45) in the Statement of Defence for details.

141.    Still later, at a meeting held on 7 December 2018, the Parties agreed that the Respondent should prepare a corrected list of equipment which would be concluded as an additional agreement to the Contract. Furthermore, the timetable for delivery would be changed after the Respondent delivers a report on the Contract status, which happened on



13 December 2018 when the first draft of the Additional Agreement 3 was also circulated. A formal legal explanation of the changes also followed on 17 December 2018.

142. It is only on 10 December 2018 that the Claimant sent to the Respondent the first final drawing of the shell which is to be produced by the contracted production line. While it was agreed that the final drawing of the shell would be provided at a later date, there was no provision allowing the Claimant to change the drawing when they please as they please. It is important to note that the design of the production line could not be finalised before the Claimant had provided the final shell drawing. See paragraphs (44) and (45) in the Statement of Defence for further details.

143. In January and February 2019, the Parties negotiated various details regarding the Additional Agreement 3, the draft was adapted several times by both Parties. The Respondent and MJC kept the Claimant informed about the progress of the production. In these two months numerous descriptions, photos and flowcharts were provided to the Claimant, as is further described under chapter 5.10 (Status of manufacturing) of the Statement of Defence.

144. Finally, on 27 February, the Claimant sent a revised draft to the Respondent with an email containing, *inter alia*, the following instruction (as translated):

> *"In the attachment there is the last version of the Additional Agreement No. 3, with the latest corrections and changes! Read it carefully, (see) whether everything is right in there, and if I missed something! I moved the equipment list installation by ultrasonic control to paragraph 2, where the equipment for manufacturing of the leading belts is, it belongs to it! Still had some inaccuracies and errors, I had them eliminated! If all OK, Chuck can sign and send it to us!"*

As instructed, the Respondent signed the Additional Agreement 3 which was sent to the Claimant and thus concluded.

145. As has been extensively described above, the Respondent acted diligently, in good faith, fulfilled its obligations and accommodated all type of Claimant's requests. After long and careful negotiations between the Parties, an agreement on the replacement equipment was clearly achieved on 27 February 2019. Therefore, the Claimant's assertion in paragraph 21 of the Claim is inaccurate, misleading and untrue. The Respondent kept answering the multitude of Claimant's requests and questions, some of which were more reasonable than the others as well as continually kept submitting the required technical analysis proving the adequacy and even superiority of the new equipment. As for the price of the components, such request was absolutely unnecessary and inappropriate as such details are of no concern to the Claimant who also has no contractual grounds to make a request thereof. As has been repeated at various occasions, the financial arrangements of the Respondent with its subcontractors are strictly confidential and in no way affect the relationship between the Parties. The



25

ARBITRATION INSTITUTE
OF ·STOCKHOLM CHAMBER OF COMMERCE

Respondent's obligation is to deliver the 152/155mm shell production line for the lump sum as per the Contract. Rather surprisingly, in paragraph 21 of the Claim the Claimant seems to admit to its own fault with regard to the origin of the whole problem.

146. After an agreement on how to proceed with the Project was evidently achieved, the Respondent observed an inexplicable change in the Claimant's attitude towards the Respondent and their Project. As will be shown in the following paragraphs, the Claimant started acting unreasonably to the extent that it amounts to acting in bad faith and consequentially constituting a breach of the Contract. While the Respondent was under impression that the issue is settled and that the Project would continue as agreed, the brief moment of optimism was cut short by a series of unwelcome surprises carried out by the Claimant.

147. On 5 March 2019, the Respondent received a letter from the Claimant which confirmed the receipt of the Additional Agreement 3 but in contrast to the established practice between the Parties suddenly proclaimed that their countersignature is conditional on the supervisory board's approval. Therefore, they requested (i) an apostilled copy of the Respondent's Charter; (ii) apostilled copies of "other legal documents" authorising Mr. Charles Provini to act as "The President and Chairman"; and (iii) copies of all contracts with all subcontractors that the Respondent has engaged in the course of performance of the Contract (not limited to MJC). While it has been mentioned at the previous meetings that approval of the supervisory board would be required, this document request and its scope came as a surprise.

148. On 13 March 2019, the Respondent tried to accommodate the request described under the previous paragraph despite it being manifestly unreasonable and unfounded as the Respondent, at that time, still believed in the Claimant's honest intentions with regard to fulfilling the obligations under the Contract. That is why several documents were sent to the Claimant in the attachment of the said letter, including (i) the partnership agreement with MJC and (ii) the status report including photos which proves the progress.

149. Despite the fact that the Respondent provided the requested documents to the extent possible and sensible, the Claimant sent a new letter with new demands on 21 March 2019. In this letter, the Claimant requested several new documents and confirmations, most of which have already been provided at various occasions in the preceding 5 months. For example, the Claimant requested a confirmation that the updated list complies with the performance requirements which had already been given at the meeting held on 14 February 2019. Other requests are similarly unfounded and unreasonable, both legally and commercially, such as the already-mentioned request for disclosing the prices of the individual components. Furthermore, and quite evidently with a malicious intent, the Claimant yet again requested new clarifications regarding the change of the press, despite the fact that these have been, up to this point, provided a countless amount of times, in various shapes and forms. This letter offers further proof



that there was no more any will on behalf of the Claimant to proceed with the Project and that dilatory tactics had been put into practice.

150. Another rather confusing letter followed on 29 March 2019. In this letter the Claimant claimed that the Respondents obligation is to deliver a universal line for manufacturing various types of shells. The reason behind this letter is a mystery as it has been clear throughout the duration of the Project that two types of shells would be produced - 152mm and 155mm, which is also clearly stated in the Contract. Despite this obvious falsehood of such claims, the Respondent was ever-willing to accommodate new requests made by the Claimant. In its response dated 1 April 2019 it was explained that the production line can indeed be adapted in a way to produce other sizes of shells and that the Respondent would naturally be willing to amend the Contract in a way that would reflect this. Similarly, the Claimant has brought up the issue of the Quenching and Tempering Machine which had been discussed and resolved almost 6 months ago in autumn 2018. Yet again, the Claimant has deployed another dilatory strategy aimed at stalling and, on the long run, killing the Project.

151. Regardless of the above complications, it seemed that the purely technical cooperation was still functioning well. On 5 March 2019, the Claimant requested from MJC directly that a different type of shells would be produced - *i.e.* changing the drawing of the shell. Needless to say, the design of the shell was agreed upon in the Contract, namely in Appendix 9 thereof. Instead of requesting lengthy explanations, meetings, documents and overcomplicating the situation, the Respondent and its subcontractor MJC undertook to accommodate such a request. The Respondent understands that certain adjustments are always required when a project is being implemented and sees little reason not to accommodate such wishes if they can be considered reasonable. Therefore, on 1 April 2019 the Respondent undertook to adjust the Project in a way to allow for a production of a different type of shells. Complete unwillingness of the Claimant to show the same level of understanding with regard to the machine list is rather unsettling.

152. However, even more unsettling is that the Claimant began accusing the Respondent of being in delay with its delivery only weeks after submitting the latest final version of the shell design. It has been repeatedly made clear to the Claimant that the final design of the production line cannot be made without such a drawing. Therefore, such accusations by the Claimant are, mildly put, demeaning.

153. There is no doubt that a fundamental change in the Claimant's attitude towards the Project has occurred. No disagreement with regard to actual technical solutions existed any longer - these had been thoroughly and painstakingly discussed and resolved by the Parties, as has been clearly shown above. Therefore, actual reasons for the Claimant's change of attitude and the consequent absence of good faith must be sought elsewhere, as will be further ascribed below.



154.   Despite the clear lack of will on the Claimant's part to implement the Project, the Parties
       rather surprisingly agreed on a working visit of the Claimant's representatives to the
       MJC's facilities in California.

155.   A meeting between the representatives of both Parties and MJC took place between
       2 and 5 April 2019 on the premises of MJC in California. At the meetings, the Claimant
       acted reasonably, was cooperative and the meetings were rather fruitful, as is evident
       from the signed minutes dated 5 April 2019. By signing these minutes, it was agreed
       between the Parties that (i) a new delivery schedule will be signed by the end of
       April 2019, (ii) the Respondent will, once more explain the need for replacing the press
       and provide some other technical explanations, (iii) the Respondent will send certified
       copies of its corporate documents to the Claimant and (iv) as requested by the Claimant,
       a subcontractors checklist was signed by both Parties. These minutes are yet another
       clear example of the Respondent's never-ending willingness to accommodate the
       Claimant's requests as well as the Claimant's seaming readiness to continue with the
       implementation of the Project under the Contract.

156.   As mentioned in the previous paragraph, the Claimant requested that a subcontractors'
       checklist is signed by the Parties. This subcontractors checklist, which was drawn-up as
       early as 12 March 2019, provides details on each individual piece of machinery used in
       the production line and was drawn based on the new equipment list as per the Additional
       Agreement 3. It is important to note that the document was duly signed by Mr. Provini
       on behalf of the Respondent as well as Oleksandr Tymoshko and Volodymyr Zimin on
       behalf of the Claimant. The Parties inspected the engineering work done by MJC, the
       production of the equipment as well as familiarized themselves with the premises and
       the employees in order to understand that the Project is well underway in quite an
       advanced stage. By signing this subcontractors' checklist which was also discussed in
       detail by the Parties and MJC, the Claimant yet again confirmed and accepted the
       change of the equipment. Not only that, by signing this checklist the Claimant also
       implicitly acknowledged the existence, validity and the binding nature of the Additional
       Agreement 3.

157.   Paragraph 22 of the Claim contains further false claims regarding these meetings. The
       Claimant supposedly "came to final conclusion on unacceptability of replacement of the
       Equipment" which could not be further from the truth - in reality the Claimant was
       absolutely satisfied with the replacement technology and recognised its superiority. This
       is clearly evident from the fact that the Parties agreed on how to proceed by signing the
       minutes of the meeting and the subcontractors' checklist.

158.   Despite the positive outcome during the visits in early April 2019, it became clear that
       the Claimant's management is no longer in position to realise the Project as the interests
       of other persons gained the upper hand. A change in the management was pending as
       Mr. Anton Karpenko, the Claimant's CEO has lost the political support and was to be
       replaced by Ms. Marina Gryshchenko (vice president at the time), who strongly opposed



the Project from the beginning and seems to have been particularly interested in signing the same contract with the Korean company of SKGC Co. Ltd (Republic of Korea) ("SKGC"), as will be further described below. With the disposal of Mr. Karpenko, Mrs. Gryshchenko assumed control of the Claimant. Officially, his tenure ended on 16 May 2019 when Mrs. Gryshchenko officially applied for the position of the President of the Company-Chairman of the Board. However, the unofficial transfer of power happened even earlier. Thereafter, it became crystal clear that the "new management" of the Claimant had no intention of implementing the Project and has only been seeking ways to disrupt it.

159.    In light of the negative outlook, the Respondent tried once more to push the Claimant into cooperation by sending an official letter of complaint dated 16 April 2019. At this point in time, it had become clear that the never-ending and repeating requests and excuses which had lasted for more than half a year would not cease, especially as the management the Claimant was assumed by Mrs. Gryshchenko who was openly opposing the Project from the start. Regardless, the Respondent sent a letter to the Claimant in which they reminded the Claimant to respect the obligation under the Contract and a warning that acting in absence of good faith on the side of Claimant is amounting to a serious breach of the Contract.

160.    Despite the constant pushback by the Claimant, the Respondent was determined (and still is) to implement the Project as the production was approaching a critical phase. In order to do so, on 17 April 2019 the Respondent sent a letter to the Claimant in which it announced the visit and the inspection of the Claimant's site by the representatives of the Respondent. According to clause 11.6 of the Contract, such an inspection must happen two weeks before the mounting of the equipment and within 10 days after receiving such notice. In this letter the Respondent clearly set out the reasons and the scope of such inspection.

161.    In one of its letters dated 23 April 2019 (No 037-1127) the Claimant repeated its ever-present accusation that the Respondent never offered an explanation for replacing some parts of the equipment and any evidence of such replacement's adequacy. As has been repeated and clearly demonstrated throughout this submission, the Respondent has, with an almost unreasonable level of patience, tried to indulge the Claimant with its request relating to the legal and factual reasons for the replacement as well as to the technical aspects of the new setup. Some of the requests in this letter are, however, plainly pushing the limits of tastefulness, such as is the request for a bank guarantee that would secure the Respondent's obligations. On the one hand the Claimant has been actively blocking the implementation of the Project, on the other hand it requests that the implementation is secured by a bank guarantee. It is quite plain that such a request is actually just the Claimant searching for an excuse to terminate the Contract. Financial guarantees are one of the main issues which are always negotiated between the prospective parties prior to signing a contract, not a year after. The distasteful tone of the accusations and demands continues throughout the letter. *Inter alia*, the letter also



29

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

claims that at the meetings in California it became clear that the Respondent is in delay with its production which should have been finished by this time and that the delay cannot be avoided. Again, the Respondent has been tirelessly trying to implement the Project and accustom all Claimant's requests up to a certain limit of reasonability. This letter is, clearly, pushing such limit too far as it has been the Claimant who was (and still is) causing the delays.

162. The Claimant kept accusing (and still does) the Respondent that they never offered an explanation for replacing some parts of the equipment and any evidence of such replacement's adequacy, as described in chapter 5.7 of the Statement of Defence. In that chapter is a list of selected 33 occasions when such explanations and evidence were presented to the Claimant. As is evident from this list, the Claimant's allegations are demonstrably incorrect.

163. That list proves that the Respondent has been as responsive and indulging as humanly possible to the Claimant and its repetitive requests.

164. In its second letter also dated 23 April 2019 (No 037-1126) the Claimant rejected the Respondent's request for inspection. The apparent reason is the abovementioned assessment that the production was still in initial phases at the beginning of April 2019 and that they doubt that timely delivery is possible. While such justification clearly contradicts all the evidence presented throughout this submission, it also relies on an assumption that no work was being done in that exact period. And yet again, the Claimant blames the Respondent for the delay that has been caused by the Claimant's irresponsible actions. Furthermore, the Claimant conveniently ignores all the meetings and discussions that took place in the preceding 8 months. At one of such meetings (Paragraph 13 of the minutes dated 24 October 2018 - see paragraph (30) of the Statement of Defence) the Parties already agreed that the timeline for delivery will be extended while observing the contractual deadline for delivery of December 2019.

165. The Respondent is convinced that the actual reason for rejecting the inspection as described in the preceding paragraph lies elsewhere. It has come to our attention that the Claimant's intended facility is (i) completely inappropriate and inadequate for the installation of the production line, (ii) the Claimant has not undertaken any work whatsoever to accommodate the production line and to adapt the existing facility in a way to allow for a safe operation of the production line and (iii) the existing utilities (electricity, transport capabilities etc.) at the facility are inadequate for the intended production line under the Project. Therefore, it is clear that the visit to the Claimant's facility was rejected solely to hide these facts, which would, if pursued further, likely amount to a breach of the contract.

166. On 30 April 2019, the Respondent tried for the one last time to reason with the Claimant. In this last letter prior to the initiation of arbitration proceedings, the Respondent replied at length. However, the Claimant's management has at the time of



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

receiving this letter evidently decided to abandon the Project and initiate the arbitration proceedings.

167. The Claimant acquired an expert report from the representative of SKGC, a major Korean corporation (the "Expert Report"). According to the information on the company's website, SKGC intends to become the world's leading company in the field of aluminium forging, titanium aerospace industry and defence forging industry. However, as the most crucial piece of information, it has also come to our attention, that SKGC also participated in the procurement procedure for concluding the Contract. However, the Respondent won the tender procedure and concluded the Contract with the Claimant. It is Respondent's understanding that the negotiations with SKGC were ongoing for an extended period of time before the decision of the Claimant's management was made. Suddenly, a pattern emerges as this situation closely resembles that of the Respondent. This is just another confirmation, that the good faith of the Claimant's management to fulfil their obligations to the Respondent under the Contract is highly questionable. Despite requesting the documentation thereof from the Claimant, Respondent has not received any documents thereof before submitting the Statement of Defence.

168. Although SKGC claims to act as an independent and objective expert, they are in actual fact a direct competitor of the Respondent and cannot be neutral or objective in their assessment of the subject matter. That being said, the Claimant had no grounds to disclose to SKGC the essence and content of the Contract, as well as to transfer them the list of equipment, and also the technical and commercial information of the Respondent. This is a direct violation of the terms of para 18.8 of the Contract and is also a serious offence.

169. Such illegal actions of the Claimant cause irreparable economic and reputational damage to the Respondent, as they disclosed developed and integrated technical solutions to their direct competitors in the narrowest sense of the term. Subsequently, this disclosure may lead to the loss of clients in the defence industry market as well as negatively impacts the profits and increases the losses of the Respondent. In addition, Respondent's business partners involved in the supply refuse to cooperate further due to the leakage of commercial secrets which is an inexcusable direct consequence of a willing and intentional breach by the Claimant.

170. The Expert Report focuses mainly on the difference between the equipment before and after change. Regardless of the fact that the SKGC is the absolute archetype of a non-independent and highly partial expert, their findings are nevertheless inaccurate and misleading. Firstly, they dispute the productivity and thus adequacy of the contractually agreed setup before and also after the change. For such a claim they offer no proof or argumentation but rely solely on creating a bottleneck in the production line by assuming an unreasonably low productivity of one of the components which was never even problematic between the Parties. It goes without saying that the Respondent is



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

obliged to deliver a production line with the contractually agreed productivity and the contract also provides an elaborate testing mechanism to ensure that. The Respondent fully understands and appreciates the nature of its obligations under the Contract and is keen on fulfilling them. Also, it is beyond our comprehension how SKGC feels qualified to assume the productivity of the equipment which was custom designed and manufactured especially for this very Project.

171. Secondly, the Expert Report provides the SKGC's estimates of the price of individual components. Respondent fails to see any legal or practical value of such an exercise. The Respondent has the responsibility to deliver a production line which will be able to produce the agreed shells with the requested technical parameters. Also, an equipment list is not part of the Contract for the Claimant to assign arbitrary values to specific components and to derive its conclusions therefrom. As was mentioned under the previous paragraph, the methodology of evaluating custom made equipment which was designed and produced to meet the specific requirements of this Project is beyond our understanding. It has been mentioned on various occasions that agreements with the subcontractors are the core of business of any defence industry expert. Not only that the Respondent has no obligation to share such information with anyone, the contractual arrangements with its subcontractors specifically prohibit any such disclosures. Furthermore, by disclosing business secrets to the most direct competitor of the Respondent, the Claimant has clearly manifested its disregard of the fundamental business ethics. Therefore, the Respondent has absolutely no intention to share any further confidential information with the Claimant. To sum up, due to the SKGC's questionable methods, tainted reputation and lack of any impartiality, the Expert Report offers no valuable insight into the matter and should be disregarded in its entirety.

172. In paragraphs 35 and 36 of the Claim, the Claimant writes about the criminal conduct of Dale Scott Wood, who briefly worked for the Respondent. Any such actions and behaviour of Mr. Wood is unrelated to the business of the Respondent and was committed several years before his association with the Respondent. It goes without saying that immediately upon becoming aware of Mr. Wood's past, he was effectively excluded from the operations of the Respondent. Furthermore, the Respondent fully distances itself from any and all action of Mr. Wood and ensures that his involvement has caused no disruption on the side of the Respondent.

173. Upon receiving the Claim, the Respondent was unpleasantly surprised by the fact that the Claimant has somehow received the highly confidential information from the Respondent, namely the excerpts from its current accounts as listed in paragraphs 35 and 36 of the Claim. There is a narrow list of people and entities which would have access to such information. Excluding the people directly linked to the Respondent, one could be inclined to come to a conclusion that the Security Service of Ukraine is sharing information with the Claimant to aid in a commercial dispute. It is beyond our comprehension how a company such as the Claimant could have the access to intelligence information that the Security Service of Ukraine obtained from an allied



country's secret service. The Respondent remains confident this is not the case and that the information found its way to the Claimant via another, less dubious channel. However, if true, it goes without saying that such a stream of information would give rise to criminal liability of those involved and would, furthermore, be disregarded by any tribunal that adheres to the most basic covenants of any procedural law. Furthermore, Respondent finds itself slightly confused by the expressed astonishment on the Claimant's part. According to the letter dated 26 July 2019 sent by the Security Service of Ukraine to the Claimant, the investigation seems to have been initiated as per explicit request of the Claimant. In this letter, the Security Service of Ukraine clearly states that the investigation is a response to the Claimant's letter dated 26 April 2019. This second letter has not been submitted to the Respondent so Respondent cannot comment on its content in detail. However, it is safe to assume that it was the Claimant who employed the services of the Security Service of Ukraine, which is a highly worrying assumption which dangerously blurs the line between the commercial and governmental nature of this dispute.

174.    Irrespective of and putting aside the manner of obtaining the excerpts from the Respondent's current account, the Respondent fails to see how it can be relevant for this dispute. The obligation of the Respondent is limited to delivering the production line as defined in the Contract. The Respondent is not restricted in any way with regards to the use of its funds. Money, by definition, is not capable of being individualised as certain goods may be. Similarly, the Respondent may freely transfer its money to its subcontractors to compensate them for its services and is by no mean obliged to use any specific money in any certain way. The business of every company, including the Respondent, extends well beyond an individual agreement. It is completely unreasonable to claim that the Respondent was under obligation to use the Claimant's payment for any specific purpose. Such views have been surpassed in law and economics a long time ago. The money transferred from the Respondent's account was thus Respondent's own money and such transfers cannot be of any concern to the Claimant. Taking a small portion of the Respondent's cash flow to create a story can hardly be considered as an act of honesty.

175.    The Respondent, as every responsible project manager, adheres to the principle of the "critical path" planning. In its essence, the critical path is a method that allows for effective project management when a project consists of various phases with various time implications. The Claimant was well aware of this fact as the subcontractor's checklist (see paragraph (49) of the Statement of Defence) follows this principle. In practice it means, that, for example, the items that can be purchased "off the shelf" will be purchased when actually required and an item that takes, for example, 2 months to manufacture will be ordered 2 months before actually required. The intention of this paragraph is to explain why the Respondent did not invest directly into equipment at an earlier stage. It paid just the minimum needed amount to its subcontractors to start all necessary activities, while all other payments would follow at a much later date, when such payments would actually be required. Needless to say, the Claimant's dilatory



33

tactics have had great effect on the otherwise carefully prepared Project plan. The other transfers cannot be of any interest to the Claimant and are justified merely by being the Respondent's private property. This brings us back to the central question with regards to the payment - the origin of such information. It is clear that such information is of no value to the proceedings and does not allow for more than mere speculations, that is why the Respondent sees no other option but to classify it as political intimidation.

176. It should be noted that the Respondent is under considerable pressure from its subcontractors to complete the Project. The already designed and produced equipment has cost them money and is now taking up large amounts of space. However, without the Claimant's cooperation it is impossible to make any further progress without risking an even larger loss as has already been incurred by the Respondent.

177. The progress regarding the manufacturing of the equipment under the Contract is evidently known to the Claimant as it inspected the MJC's facility and consequently signed the respective minutes as well as the subcontractor's checklist (see paragraph (49) of the Statement of Defence). Also, as has been mentioned throughout this submission, the Respondent has progressed as far as possible and reasonable given the current circumstances - before it is understood by the Claimant that the Additional Agreement 3 was validly concluded and is binding upon Parties, it makes little sense for the Respondent to risk further damages due to the Claimant's unreasonable and unexpected behaviour.

178. As early as on 11 November 2018, MJC confirmed to the Respondent that the production is already in an advanced state and indicated the leading delivery times for the central components. By this time, the custom-made New Press was almost fully designed, various machines and parts have been ordered and deliveries have been negotiated. At that time, it was planned and feasible to have equipment delivered as agreed in the Contract. However, as described in detail in this Defence, the actions of the Claimant effectively prevented this.

179. The engineering and manufacturing work continued and MJC provided regular updates to the Respondent, who in turn kept the Claimant informed by sending photos of machinery, diagrams of the production line and by offering descriptions of the progress.

180. As the Project came to a halt due to described Claimant's actions, the Respondent's subcontractors grew impatient. After the Claimant has been preventing any progress for more than half a year, MJC finally addressed this issue in a letter dated 15 September 2019 which was addressed to the State Enterprise Bezpeka and the Ministry of Economic Development, the two key governmental stakeholders in the Project. In this letter, MJC too has recognised the pattern of deceit and insincerity as they realised that the Claimant does not wish to implement the project any longer. It is clear, that many components have already been produced a while ago and that their storage is wasteful as well as contrary to good business practice. The letter refers to the meeting of 21 April 2019 which is not completely accurate as this meeting took place on



34

3-5 April 2019, as is described in detail under chapter 5.5 (Second meeting in California) of the Statement of Defence.

181.  Evidently, the Respondent with its subcontractors has done a great amount of planning, designing and manufacturing to fulfil its obligations under the Contract. Just as evidently, the Claimant has employed various dilatory tactics which have effectively crippled the Project and made further progress impossible. However, despite the unnecessary delay, the production is ready to continue as soon as the legal disputes are resolved.

182.  In an attempt to resolve the issues and continue with the Project, the Respondent and its subcontractor MJC attended the meeting with all relevant Ukrainian parties, including the Claimant, which took place on 4 June 2019 in Kiev. The Claimant, however, had no intention to discuss the technical issues as none of their engineers were even present - apparently all were sick. The meeting was only an arena for Ms. Gryshchenko to launch her attacks at the Respondent, as is quite evident from the minutes. On the next day, a technical meeting was supposed to take place. The Claimant never showed up.

183.  Before addressing the Claimant's accusations and claims, the question of the applicable law has to be resolved. As will be shown in the following chapters, the Parties have not foreseen all possible legal challenges and consequently have not defined a legal framework covering all relevant matters.

184.  For all matters which are not regulated by the Contract, the Parties have contractually stipulated that the UN Convention on Contracts for the International Sale of Goods ("CISG" or the "Convention") should be the applicable law (Paragraph 15.5. of the Contract). The CISG is regularly transposed into national legal systems but is generally not considered an independent applicable law. Furthermore, CISG covers only certain topics relating to the purchase of goods and cannot be compared with an entire legal system. In the absence of relevant provisions in CISG concerning certain questions, the rules of international private law would apply. Consequently, in order to solve more advanced and subtle legal matters, an application of a more developed system is required, such as a national law or the international commerce rules (*lex mercatoria*) or even the general principles of law.

185.  The Respondent finds it quite interesting that the Claimant chose to draw attention to the principle of good faith, which is one of the most significant legal principles, not only in international commerce but in any developed legal system in general. The Respondent fully agrees that the principle of good faith plays the central role in this dispute. This principle allows the parties to rely on the actions and decisions of their counterparties by prescribing that other party's interests must be respected and taken into account. The importance of the principle of good faith is clearly shown by the fact that under *lex mercatoria* its application cannot be contractually excluded or limited.



186.   It is generally accepted that the standards relating to principle of good faith cannot be
       derived from the domestic legal systems, but the answer to this question should be
       reflected in the international conventions or practices. Although the UNIDROIT
       principles are not binding in our case as they are not specifically referred to and they do
       not carry the prevailing factor as CISG, the UNIDROIT principles are meant to be the
       "culmination of international law" and should assist in the interpretation of the CISG.
       Neither CISG nor its related theory and case law are as detailed as the UNIDROIT
       principles which basically represent the *lex mercatoria* or even the general principles of
       law.

187.   Moreover, (according to the article "Uniform Law Review, Volume 23, Issue 1, March
       2018, Pages 15-41") the High Commercial Court of Ukraine stated that the UNIDROIT
       Principles "enshrine the trade customs applied in Ukraine" and are therefore applicable
       if they do not conflict with the terms of a contract or the mandatory provisions of
       Ukrainian law. This indicates that the Claimant is bound to act in accordance with these
       principles in general, not only in a specific instance where they may apply in addition to
       CISG.

188.   The duty of good faith plays an important role in the domestic contract law of many
       states. The same duty extends to international agreements and international contract law
       where the principle of good faith can be regarded as the fundamental principle of the
       entire system. As it happens with the other principles embodied in Art.7 (1) of CISG,
       good faith plays also an important role in the Convention. To this regard, according to
       the dynamic approach of the CISG and its adaptation to present times, the observance of
       good faith in international trade ought to be considered a moral or ethical standard to be
       followed by all businesspersons in international sales contracts. The principle of good
       faith permeates the whole text of the Convention, deriving from it specific duties and
       rights to the parties. As pointed out, the confidence and expectations generated between
       the Parties are guided by the contractual principle of good faith.

189.   As the principle of good faith provides grounds for the expectation that the contractual
       obligations will be duly performed, in terms of CISG, it imposes a behaviour of both
       parties to consider the interests of the other. Therefore, this principle influences also the
       contractual relationship between the Parties and is as such coherent with its
       interpretation under the international commercial law. While the intention of the drafters
       of the CISG may not have been to elevate the principle of good faith to the level of a
       substantive principle, the ever-dynamic interpretation of CISG together with the
       evolution of the international commercial law justifies the detachment of this principle
       from the domestic law. The principle of good faith in its international context is thus
       determined not only by CISG but also by the relevant case law and the legal theory.

190.   The principle of good faith has to be concerned in a contractual relation between the
       parties. The obligation of good faith is the duty to act reasonably and to avoid a breach
       of the trusting relationship that exists between contracting parties.



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

191.    Case law has recognized that the principle of good faith not only plays a role within the Convention for interpretation, but also plays an important role throughout the Convention to modulate its content and be used as a standard of conduct for the parties during their contractual relation.

192.    The good faith duty in contract performance is measured against an objective standard. This objective standard is based on the decency, fairness or reasonableness of the community, commercial or otherwise, of which one is a member. Therefore, the particular community of the parties needs to be defined in order to evaluate the specific actions of a party. While actions of a party may be acceptable in a domestic environment, those same action may amount to a breach of the principle of good faith in an international setting. Therefore, it is the duty of each party to adjust its behaviour, actions and expectations to the standards of the community in which a contract concluded.

193.    The standard of reasonableness is a particularly important element of the principle of good faith, especially as it is one of the few elements which can be measured with an objective test. In such a test, one is to assume the position of a neutral person who knows the background of the dispute and all the facts that have objectively been available to the parties at a given time. Such reasonable person would have the qualities of a good businessman, *i.e.* attention, knowledge, intelligence, and judgment. It is common that the tribunal deciding on the merits of a case is the manifestation of such a reasonable person.

194.    According to the principle of good faith neither party shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract. While acting on one's own interests is naturally permissible and may incidentally affect the other party's gains under a commercial agreement, such actions must remain firmly within the standards enshrining the principle of good faith.

195.    Other widely accepted standards arising under the principle of good faith are the duty to notify and its complementary counterpart - the duty to cooperate. While conflicting interests are understandable for most parties, one should not forget that in order to achieve the common goal the parties must also cooperate. The exact scope of these duties naturally depends on the specifics of the case and must be established individually.

196.    Further to the duties described in the previous paragraph, the parties also have a duty to pursue the goal of promoting and advancing the contractual performance. To comply with such duty, it is not enough only to privately try to further the contractual relationship and to achieve its goals but to show sincere efforts thereof. In other words, the appearance of acting in good faith is also an important aspect of this principle.

197.    According to international legal theory the principle of good faith extends even further and instructs the parties to act against their short-term goals if pursuing such goals could



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

endanger the implementation of a contract. Naturally, such duty has its limits in form of the standard of legitimate expectations and the standard of reasonableness.

198.  Specific manifestations of good faith are also found within the CISG, as it encourages parties to act in good faith, thus evidencing that good faith is also a substantive provision and not only a mere interpretative principle of the CISG. Manifestations of good faith as a standard of conduct are found in Arts 8, 16(2)(b), 29(2) and 80 that reflect the estoppel principle also known as the venire contra factum proprium, which is also a general principle of the *lex mercatoria*. It is also found in Art. 40 and in the recognition of other general principles such as the prohibition of abuse of rights stemmed from Art. 46(1), the loyalty principle, the duty not to impair each other's expectations that the contract will be performed which is often interpreted as requiring the parties' continuous commitment to the bargain, and the principle of mitigation of damages in Art. 77.

199.  It is contrary to the intention and the purpose of the principle of good faith to embody it in a single definition or a phrase. Rather, it consists of a cluster of elements that can vary from case to case and are based on fact. Consequently, while each action on its own may not always amount to breaching the principle of good faith, a broader cluster of such actions relating to the same matter would be considered much differently. Therefore, to demonstrate that the Claimant has acted without good faith, the most expressive examples will be shown below.

200.  In this and following paragraphs it will be shown that the Claimant acted with a lack of good faith for an extended period of time starting (to some extent) as early as October 2018 and continuing to the date of the Statement of Defence. Consequently, the Claimant effectively prevented the Respondent from fulfilling its contractual obligations. Furthermore, as will be shown below, it was the Claimant who acted in bad faith amounting to a breach of the Contract. Below are some indications of only most manifestly malicious and dishonest acts of the Claimant.

201.  As has been shown under chapters 5.4 and 5.6 of the Statement of Defence, the Claimant kept requesting the same or even unnecessary documents over and over again. As has been shown specifically under paragraph (55) of the Statement of Defence, the Respondent had to provide all types of explanations at about 40 different occasions. While the technical adequacy of the proposed production line was confirmed many times by Artem's engineers, it is evident that the Artem's management decided to stall the Project. Thus, they employed various dilatory tactics under the false pretences of ensuring the technical quality. Not only that, the Claimant's management did not pursue implementing the Project under the Contract, it actively tried to prevent the Respondent from making any sort of progress. Clearly, such actions do not adhere to the duty of promoting and advancing the contractual performance (paragraph (89) of the Statement of Defence) and thus present an evident example of lacking good faith.



202.    Another example of the absence of good faith are the Claimant's actions regarding the various amendments to the Contract. There has been no uniform approach on the Claimant's side who has regretfully (ab)used the contractual provisions to pursue its agenda to terminate the Project. The Parties have employed various methods of amending the Contract. Most commonly, simple agreement at a meeting was deemed adequate. In this way they amended various details in various appendices and considered this change valid and binding. Even more informally, a simple exchange of emails was considered as adequate to change the whole annex at various times. In yet other cases the Parties concluded an additional agreement. The manner of concluding such an agreement was again far from uniform. After various approaches, the Parties concluded the Additional Agreement 3. Only after these many and various changes to the Contract the Claimant announced that various formalistic internal procedures need to be observed and that they also require approval from their supervisory board. Not only that, the supervisory board also needs a variety of documents to make such a decision and the exact list of required documents can change without much notice. Yet again, it is quite evident that such actions can hardly be considered as compliant with the principle of good faith. They are neither reasonable nor inspire trust between the Parties - a complete and inexplicable unpredictability of the Claimant's actions is a clear example of acting without the necessary good faith.

203.    As has been ascribed above, the Claimant changed the design of the shell rather unilaterally on several occasions. To be precise, the shell design was submitted to the Respondent as early as July 2018. However, the Claimant kept changing it continuously as it was only by 20 December 2018 that it submitted a new final draft (paragraph (35) of the Statement of Defence) and then again proposed a new design on 5 March 2019 which was confirmed by the Parties on 1 April 2019 (paragraphs (44) and (45) of the Statement of Defence). Obviously, the design of the shell is an important detail that affects the whole production line and requires additional engineering efforts to be accounted for. Regardless, only 3 weeks later, on 23 April 2019 (chapter 5.7 of the Statement of Defence) the Claimant started accusing the Respondent of being in a delay with its performance. Mr. Baraboi was the person who negotiated the new design and then only a few days later also visited the facility of MJC. However, in this letter of 23 April 2019 the Claimant accuses that not enough progress has been done until the visit. Only 4 days after changing the design of the final product the Claimant supposedly identified a delay in the Project, completely ignoring the fact that the opposite was established by signing the minutes of 5 April 2019! Evidently, such actions are noncompliant with any concept of good faith as they are dishonest, unfair, and completely unreasonable.

204.    In connection to the previous point, the Claimant casually ignored the fact they already agreed to push the delivery schedule as early as in October 2018 while also reaffirming thus by signing the minutes on 5 April 2019 (paragraph (48) of the Statement of Defence). The Claimant evidently acts completely arbitrarily with regards to its rights and obligations - it chooses to respect only those that fit its current purpose. Ignoring an



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

agreement such as this is clearly disrupting the trusting relationship between the Parties and not only breaches the principle of good faith but also one of the primary legal principles - pacta sunt servanda.

205.   Furthermore, the Claimant kept bringing up the issues that have been resolved a long time ago (see paragraph (43) of the Statement of Defence). The only purpose of such a request is to waste the time and resources of the Respondent and to manufacture the sense of the Respondent's non-compliance. Clearly, such actions cannot be considered as acting in good faith.

206.   One of the prominent examples of the Claimant's bad faith were the events regarding the denied visit to the Claimant's site (see paragraphs (53) and (57) of the Statement of Defence). Similarly, to the actions described above by which the Claimant sought to change the shell design in March 2019 but then soon accused the Respondent of delay, it took the Claimant only a few weeks to change its attitude when it refused the proposed site visit. As described in chapter 5.5 of the Statement of Defence, there was clear agreement as to the way forward on 5 April 2019. Only 2 weeks later the Claimant denied its cooperation yet again by denying the inspection of its premises by accusing the Respondent of not being able to deliver in time even though the Claimant clearly acknowledged the progress by signing the minutes on 5 April 2019. Such claims are manifestly malicious and contrary to fact and one can only guess what the actual reason for the denial was. Irrespective of and putting aside such speculations, the Claimant has once again shown the lack of good faith in its actions.

207.   Another instance of the Claimant's lack of good faith is manifested in the repeated accusations that no required explanations regarding to the changed equipment have been provided (see paragraph (55) of the Statement of Defence). As evidenced under this same paragraph, the Respondent has, conservatively counting, provided explanations, descriptions, clarifications, updates and answers on no less than 33 occasions in a period of 8 months. While it has been established many times over that the Respondent's new technical solutions are not only adequate but even superior to the originally proposed ones, such requests of the Claimant are obviously made with an intention to unreasonably stall the Project, thus amounting to a clear breach of the principle of good faith.

208.   Shortly after initiating this arbitration procedure the Claimant organised a meeting in Kiev where, *inter alia*, the technical issues and possible solutions relating to the Contract should have been discussed. To achieve such purpose, the Respondent organised a strong delegation consisting also of the MJC's representative to ensure that all technical matters can be discussed competently. On the other side, the Claimant did not bother bringing any person with any technical knowledge. There was no sign of any decency, fairness or reasonableness. On the contrary, the meeting's only purpose turned out to be a full-on attack of the Respondent's management by the Claimant's delegation. Yet another clear example of the Claimant's dishonest acts.



40

209. After the arbitration has started the Claimant has disposed itself of the last remnants of any basic decency and fairness. As described under chapter 5.8 of the Statement of Defence, the Claimant has shared confidential information with the Respondent's direct competitor under false pretences of obtaining an expert report. Even worse, this same competitor has been negotiating this same Contract with the Claimant. Such actions are truly unfathomably dishonest and amount not only to a breach of the principle of good faith but also to a direct breach of the confidentiality clause in the Contract.

210. Lastly, as explained under chapter 5.9 of the Statement of Defence, the involvement of Security Service of Ukraine is highly worrisome. Despite our request we have not received the evidence confirming or rejecting such a claim. However, based on the available information we cannot resist the impression that the Claimant has actively employed the services of the Security Service of Ukraine to obtain confidential financial information regarding the Respondent. Despite the fact that such information turned out to bear no actual value, it shows the complete disregard of any standards of fairness and decency by the Claimant. As has been mentioned above, these standards depend on the type of community in which they are applied. In this present case, the Parties are members of the international commercial community and are thus bound by its standards. In other words, while involving the security service may be acceptable in a domestic commercial dispute between Ukrainian parties, such actions would be deemed as nothing but despicable and condemnable in any other environment.

211. In chapter 6.2.2.1 of the Statement of Defence we have listed 10 (clusters of) examples that evidently show that the Claimant has not only failed to uphold the basic elements of the principle of good faith, such as decency, fairness, honesty and reasonableness, but also actively acted in adverse to such principles.

212. The Claimant failed to display the expected behaviour towards the Respondent, *i.e.* the behaviour that would not harm the Respondent, and also failed to take into account the expectations of the Respondent. Despite the fact that honesty and sincerity only have to be exhibited to a reasonable extent that is required for safeguarding the other party's interests, the Claimant has manifestly failed to act so, either by leaking its commercial secrets to the competitors, engaging the state secret service in a commercial dispute or simply by unduly preventing the execution of the Contract.

213. Furthermore, the expected behaviour should prohibit a party to act in a way which has a potential to unduly surprise or inflict damages on the other party. Again, the Claimant has provided the Respondent with a handful of surprises, such as completely changing its behaviour within weeks or by endangering the Respondents relationship with its subcontractors due to apparent leaks of confidential information.

214. Quite clearly, the Claimant's actions are manifestly non-compliant with the principle of good faith and its related standards. The non-compliance is so evident and grave that it amounts to a fundamental breach of Contract under Article 49(1) of CISG.



41

215. The central legal norm for assessing the alleged breach of the Respondent, the estoppel principle is found in Article 80 of CISG. As the Contract contains no relevant provisions thereof, this article applies to the relationship between the Parties directly and in full together with the theoretical and practical implications.

216. The norm itself reads *a party may not rely on a failure of the other party to perform, to the extent that such failure was caused by the first party's act or omission.* In other words, it would be contrary to the good faith principle if the party could resort to a remedy if non-performance is triggered by an act or omission of this same party. Every party has to bear the consequences of its own actions and cannot benefit from its wrongdoing.

217. The rule in Article 80 is absolute - the party cannot assert any kind of remedy if the non-performance of the counterparty is due to an act or omission of the first party, regardless of how manifest the non-performance is.

218. There are certain prerequisites that have to be met if the exemption from liability for non-performance is to be applied. Firstly, the reasons for non-performance must be attributable to the relevant party. If the causality (as explained below) is also given, then conduct of any third person engaged by such party is not relevant and does not affect the application of this exception. Furthermore, a violation of a contract is not required in order to apply this exception, even though that is usually the case. The duty to cooperate (as already defined above) also plays a role as the exception can apply mostly if the duty to cooperate also exists. The theory explains that such duty may arise under the contract itself, the CISG, the usage or practice established between the parties or from the principle of good faith in international trade.

219. The second element required for the exemption from non-performance liability is the causality of act for non-performance. The act of the relevant party has to stand in causal connection to the non-performance of the other party, to such extent that it can be considered *condition sine qua non* for the non-performance. In other words, the breach of the contract must be a consequence of the behaviour of the other party. According to certain views, indirect causality is sufficient in some cases. Moreover, it is not required that such relevant act amounts to a breach of the contract in order for it to trigger the estoppel principle. A much lesser act can achieve such purpose. Therefore, if acts of a party amount to a fundamental breach of a contract, it is relatively simple to establish the causality. Furthermore, the need for the wronged party to try to overcome the impediment caused by the wrongful act is very limited and does not extend past the duty of cooperation which was already discussed above.

220. The legal consequences are rather straightforward. The party responsible for the wrongful act may not assert any claim relating to the non-performance, and the other party is excused from all the consequences of such non-performance. To clarify, the wrongdoing party is not only prohibited from claiming damages, but also from making any other claims such as claiming performance, avoidance, price reduction, or any



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

interest claim. Furthermore, the wrongdoing party loses any defence it may have due to non-performance of the other party.

221.  The burden of proof lies on the party claiming that it could not perform due to an act by the other party, therefore the elements described in previous paragraphs need to be shown.

222.  The Claimant is under impression that the Respondent has breached the Contract by not delivering as agreed under the Contract. Such notion is false and misleading, as will be shown in the following paragraphs.

223.  The Respondent has been repeatedly inviting the Claimant to cooperate and work together on performing the Contract and respecting the obligations arising therefrom. On the other hand, the Claimant acted in breach of principle of good faith and its related standards and consequently in breach of the Contract. Not only that, after breaching the Contract it also decided to bring an action before the arbitral tribunal.

224.  It has been convincingly demonstrated that the Claimant has lost the interest of implementing the Project a long time ago. While the motivations for such a decision cannot be assessed with absolute certainty, its manifestations in the acts of the Claimant can be. Unfortunately, the Claimant acted against all Respondent's attempts to advance with the implementation of the Project with great determination which disabled the Respondent from continuing with the development and manufacturing of the production line.

225.  The Claimant goes as far as to claim that the Respondent *refused* to deliver under the Contract which cannot be further from truth. As has been described in detail throughout the Statement of Defence, the Respondent has been (and still is) determined to deliver under the Contract. That is, however, impossible without the most basic collaboration from the Claimant. It has been mentioned that the duty to cooperate is one of the standards forming the principle of good faith. Here we can clearly see the consequence of ignoring such duties.

226.  If one considers the behaviour of the Claimant, it cannot be assumed at all that the principle of good faith has been adhered to. The lawsuit contradicts the behaviour set by Claimant diametrically. In view of this, Claimant's conduct of legal action is not admissible and therefore the claim is not to be granted in further consequence.

227.  Furthermore, the Claimant relies of its own fundamental breach of the Contract in order to terminate it. As has been mentioned in paragraph (91), the estoppel principle is one of the general principles of *lex mercatoria* or any other legal system for that matter. In the following few paragraphs, it will be explained how the prerequisites for applying the estoppel principle are met.



228.    Firstly, the reason for non-performance, or in this present case rather the inability of the Respondent to continue with the manufacturing process, is evidently attributable to the Claimant. Just the fact that the Claimant acted in absence of good faith suffices to fulfil this criterion. However, several further examples will be given to reaffirm the notion. One of the most common examples of such action is failing to provide the cooperation necessary for successful performance. Other examples are failure to receive the goods or preventing the access to the premises to prevent the delivery - in our case both are given by denying inspection of the premises. Another commonly accepted example is unjustifiably rejecting the offer of the seller to cure non-conformity of the goods which closely resembles the unreasonable attempts of the Claimant to prevent changing the equipment. Furthermore, giving contradictory requests is also a commonly recognised example. In the present case, the Claimant kept changing the shape of the shell, the billet and various other details, kept requesting all sorts of documents over and over again without much reason and kept changing its mind on almost daily basis, thus severely crippling any predictability. Lastly, it has already been ascertained that the Claimant was breaching its duty to cooperate on a multitude of occasions which is closely connected to the question of attributability. In addition to all of these examples, by acting in absence of good faith as has been established in detail, the reasons for non-performance are clearly attributable to the Claimant.

229.    Secondly, the causality between the Claimants actions and the non-performance needs to be established. Therefore, the delay in the delivery must be directly linked to the actions of Claimant. In other words, without the actions of the Claimant, the Respondent should be in position to fulfil its obligation. Under chapter 6.2.2.1 of the Statement of Defence we listed 10 (clusters of) examples of the Claimant actively acting against the implementation of the Project. Each of them may be sufficient to fulfil this criterion, while all of them together require no further argumentation. Furthermore, despite all the Claimant's wrongdoings, the Respondent was determined to overcome these issues, far surpassing the required duty of cooperation. Unfortunately, to no avail. Thus, the causation is also evidently present.

230.    As a legal consequence, the Claimant is not allowed to make any claim relating to the non-performance (delayed manufacturing) of the Respondent. If such a claim would be allowed, the Claimant would gain the fruits of its own transgression.

231.    Quite evidently, the Claim is manifestly ungrounded and should thus be disregarded in its entirety.

232.    The Claimant rather unnecessarily insists that the Respondent did not provide proof of its valid incorporation. The Respondent fails to understand why a registry excerpt is not considered as adequate proof by the Claimant. Furthermore, Respondent sees little importance of such unfounded insinuations. As the Claimant is undoubtably aware, the corporate rules and laws differ from one country to the other, therefore the documents and procedures cannot be compared directly.



233.    With regard to continued accusations of the misplaced use of funds, as the tribunal has indicated by denying the Claimant's Document Production Request no. 4 in the Procedural Order no. 2 dated 10 December 2019, the financial dealings of the Respondent are irrelevant to this dispute. In its lack of compelling arguments, the Claimant continuously tries to emphasise the supposed importance of such information.

234.    The brief involvement of Dale Wood in the Project has been a major reason for concern of the Respondent as certain condemnable facts and practices have been identified. However, it has come to the Respondent's attention only recently that Dale Wood was actually an agent of the Claimant, contracted as a lobbyist for various lobbying activities.

235.    The Respondent had its suspicions regarding the role of Dale Wood and inquired thereof with the Claimant on several occasions. For example, the Respondent asked the Claimant to present the documents regarding this relationship during the informal document production phase. In its response to such an inquiry the Claimant denied that such relationship existed.

236.    Despite the Claimant trying to hide these disconcerting facts, the Respondent recently managed to recover certain documents from the archives relating to Dale Wood. Amongst those is an executed copy of the lobbying agreement concluded between Dale Wood and the Claimant dated 17 January 2018 (the "Lobbying Agreement"), *i.e.* prior to the conclusion of the Contract. In this Lobbying Agreement the Claimant obliged itself to pay for the services of Dale Wood as a lobbyist. While this is not the place to resolve the legality and ethics of such an arrangement, it certainly shows that the story presented by the Claimant is heavily redacted and misleading.

237.    Similarly, the Claimant keeps denying that the author of its Expert Report, the Korean company SKGC, has been involved in the tender procedure. When we inquired about the relevant documents in our Document Production Request, the Claimant denied that SKGC, a member of the SKGC-HBE group participated in the tender. The Claimant's witness Ms. Marina Gryshchenko, also the Claimant's CEO denied these facts as well. By upholding our request, the Tribunal evidently shares the Respondent's view that the truth about these facts is of major importance in this dispute.

238.    In the archives dating back to 2018, the Respondent has been able to locate the draft contract which was negotiated between SKGC-HBE and the Claimant but was never executed. The implications will be further discussed in the following paragraphs.

239.    The Claimant commissioned its Expert Report from the representative of SKGC, a major Korean corporation. The Expert Report was prepared by an expert Choi Myoung Ho from SKGC Co., Ltd. As is stated in the Expert Report, he is the president of the HBE company since 1992 and the president of SKGC Co., Ltd since 2012. The report was, as is evident on the Expert Report's first page, approved by the CEO of SKGC Co.,



Ltd. Kang Duk Soo. It is also stated in the report, that SKGC Co., Ltd is a part of SKGC-HBE group (Republic of Korea).

240. Kang Duk Soo is a Korean businessman. He also currently serves as the chairman of STX Group, a South Korean conglomerate company (Chaebol), formerly known as SsangYong Heavy Industries. He was sentenced to 6 years in prison for fraud, and in 2015, a court commuted his punishment to three years in prison term and four years of probation period.

241. On the Korean Company Report available at www.en.kisreport.com Respondent found the company HBE PRESS CO., LTD which has the 7000Ton Press, 2000Ton Press and 300Ton Press registered as its main products. The CEO of the company is Choe, Myeong Ho. (In this regard, the Respondent notes that transcription of the Korean alphabet can vary somewhat.)

242. The website of SKGC Co., Ltd available at www.sk-gc.com, referenced in the footer of the Expert Report, is in the Korean language and presents a range of their products. When selecting a different language, the visitor is diverted to the website of SKGC HBE PRESS that has no information about the company, just an introduction, a reference list, some videos and information about the company HBE PRESS. We thus conclude that SKGC Co., Ltd is part of SKGC-HBE.

243. The Respondent recovered a draft contract with several references to abovementioned Korean company. While the document is a draft and without the indication of the parties, the intended signatory on the seller's side is Choi Myoung Ho, also the author of the Expert Report.

244. Furthermore, HBE is mentioned 18 times throughout the document, mostly as a maker of the parameters.

245. Which exact entity from the SKGC-HBE group was supposed to be the contracting entity is pure semantics and is not really relevant. Forming a so called "special purpose vehicle" is standard practice in any major project and does not make the shareholders hidden or irrelevant. We have clearly shown that the same individuals (some of doubtful reputation) have been involved in the tender and also signed the Expert Report. Furthermore, we have shown that these individuals are engaged in the activities of (at least) two companies that are part of the SKGC-HBE group. Thus, the same corporate entity, SKGC-HBE group was engaged in the Projects first as an unsuccessful bidder and later as an expert.

246. The Claimant is evidently attempting to hide the facts about their relationship with the SKGC-HBE group and its affiliates. A direct (and disappointed) competitor cannot possibly be considered an independent and impartial expert. Therefore, disregarding this supposed Expert Report is merely a requirement of moral hygiene.



247.    The importance and relevance of the expert report by S. I. Borbulev (the "Bezpeka Report") is evidently shown by the fact that the Claimant attacked its form rather than the substance. It is clear that the Claimant is discontent with the conclusions in the Bezpeka Report and thus attempted to rebut them by pointing out the translation issues. Unfortunately, it is true that one of the pages was lost and that initially the translation was done on a working purposes level. However, content-wise, no significant discrepancies occurred, and all the important findings remain unchanged. For the sake of good order, the Respondent produced a new translation to address this matter.

248.    The Claimant keeps pointing out that the Bezpeka Report was not prepared for the purpose of this arbitration. However, that is precisely the source of its relevance and impartiality - the Bezpeka Report was not ordered and paid by the Respondent but rather by Bezpeka - a Ukrainian governmental entity. Thus, it is clear that the Respondent had no influence on its content and the findings. To the contrary, it can be assumed that the findings of an expert paid by the Respondent would be even more favourable, if at all possible.

249.    As for the "issues" that the Claimant has raised regarding the Bezpeka Report, we deem that the Expert Report addressed these issues sufficiently and provides the necessary answers. As regards the question of "why Bezpeka commissioned this report", it is quite obvious that the government of Ukraine was unhappy about the progress of the Project and wanted to know the facts before engaging any further.

250.    The Bezpeka Report has shown what the Respondent has claimed from the very beginning of the Project - the intended premises in its current form are manifestly unsuitable for the implementation of the Project. Firstly, the expert explained that the Respondent requested a production area of 7000 m2 and a warehouse of 6000 m2. The Claimant provided a facility with the total area of 3440 m2 (Bezpeka Report, p. 4). Consequently, the equipment would have to be put too closely together which would lead to premature failure (Bezpeka Report, p. 4). A cooling tower would have to be erected, stable electricity power would have to be ensured (current power at the premises is not sufficient), the foundation would have to be enhanced etc. An additional warehouse for incoming and outgoing material and products with ramps and cranes would also be required. The Claimant apparently even intended to perform hot stamping at 1200 degrees Celsius in the same building as the painting, which is a fire explosive production. It does not take an expert to understand that the risks would be enormous and completely unacceptable.

251.    The Claimant's premises are located in a highly populated area with little area for expansion. There are not empty spaces on the premises which could be used for the purpose of the Project. The only possibility to ensure suitable premises for the implementation of the Project would be to acquire one of the nearby buildings and modify it for the purposes of the Project. This possibility has been discussed between the parties. However, according to the available information in the registry kept by the



State Architectural and Construction Inspection, the Claimant did not apply for any kind of construction permit or notify any preparatory or construction works. It is evident that the Claimant has undertaken no steps to acquire and vacate the building, never mind to begin the adaptation works.

252.   Furthermore, on 26 June 2018 Tarkan Ocal inspected the premises on behalf of the Respondent. In her witness statement, Ms. Marina Gryshchenko wrote that the mounting site was selected at this inspection. That may, in a certain way, be true. However, what Tarkan Ocal wrote that day in an email and Ms. Marina Gryshchenko forgot to mention is that the "[b]uilding is not sufficient enough to accommodate all production equipment. We will extend and renovate the walls towards back of the building." Clearly, extensive works would have to be undertaken to accommodate the equipment.

253.   In her witness statement, Ms. Marina Gryshchenko claims that the premises and the foundation can be ready within 2 months and thus no delay would be possible in this regard. While it is virtually impossible to effectively carry out all the above tasks in such a tight timeframe, the expert points out that the foundation must stand for 60 days without the equipment to ensure that it can withstand the pressure of the production line. Therefore, the adaptation works would have to be finished at least 2 months in advance of mounting the equipment in order to ensure compliance with the technical and safety standards.

254.   All the facts presented above are the reason why the Respondent wanted to inspect the premises in April 2019. It is also why the Claimant refused such inspection. And finally, it is also the reason that that production of the equipment finally came to a halt as it became evident that the Claimant has undertaken no work which is mandatory for ensuring that the equipment can be safely mounted. The required work would take a very long time, much more than only 2 months. That is why the Claimant was evidently in delay with its preparation of the premises.

255.   As has been established throughout these proceedings and in the Respondent's Defence, the Claimant is trying to evade its obligation under the Contract and is desperately searching for very formalistic legal grounds that do not reflect the reality. The Respondent cannot accept that the Claimant refuses to observe the basic principles of international commercial law, most evidently the principles of good faith, and established practice.

256.   The Claimant seems to be labouring under the delusion that the Contract has not been amended, with the exception of the Additional Agreement 1 dated 22 August 2018. Such a notion is misleading and contrary to fact, as will be shown in the following paragraphs. It has been clearly established that the Parties have amended the Contract in various manners, such as (i) adopting an additional agreement, (ii) replacing a whole annex by an agreement via email exchange or (iii) changing individual provisions by an agreement via email exchange or by signing the minutes of meetings.



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

**Additional Agreements**

257.   Firstly, the Contract was amended 3 times with the additional agreements, namely:

Additional Agreement 1 - new delivery schedule (a new Appendix 2);

Additional Agreement 2 - maximum electricity consumption;

Additional Agreement 3 - revised list of equipment (Appendix 3).

258.   Especially the claim that the Additional Agreement 2 was not concluded is quite perplexing. Firstly, it was the Claimant who insisted that Additional Agreement 2 should be adopted, and the Respondent willingly obliged and signed the draft prepared by the Claimant. The draft was sent to the Respondent by Mykola Baraboi on 19 November 2018 with an instruction to have it signed if there are no objections. It became established practice that such official communications are sent by Mykola Baraboi with Artem's management in copy (Anton Karpenko and Vladimir Zimin). After the signed version was sent to the Claimant, the issue of the Additional Agreement 2 was never raised again until receiving the Claimant's Reply more than a year later. Inventing the claim that the Additional Agreement 2 was not concluded is contrary to the fact and most fundamental principle of good faith.

259.   Secondly, later on the Parties adopted the Additional Agreement 3. Why would the Claimant negotiate a third amendment if the second one was not adopted? Such an argument eludes all reason. By drafting the Additional Agreement 3 and naming it accordingly, the Claimant acknowledged the existence of Additional Agreement 2. As it was the Claimant who wanted to have a written confirmation of the maximum electricity consumption, it is illogical for the Claimant to suddenly announce that such an agreement was not concluded. It certainly seems that the Claimant is making such an argument solely for the purpose of this arbitration as it does not reflect its own past actions as well as its own intentions.

260.   On a separate note, the Additional Agreement 2 and Additional Agreement 3 are, as the names suggest, not the first additional agreements to the Contract. Previously, the Parties already amended the Contract by concluding the Additional Agreement 1. At that occasion, no additional requests as already described in chapter 5.4 of the Statement of Defence were made to the Respondent, despite the fact that especially changing the planned delivery schedule was no minor amendment. It is worth mentioning that the alleged approval of the Claimant's supervisory board is purely an internal affair of the Claimant which was conveniently mentioned for the first time only after the Additional Agreement 3 has already been concluded. Not only that the Claimant's internal matters are unknown to the Respondent, such considerations are not highly relevant for the case. All European jurisdictions (Ukraine included) provide a rule according to which a transaction is valid towards a third party despite the lack of the supervisory board's approval.



261. Regardless, it is evident that by requesting such documents the Claimant no longer acted with the intention to proceed with the Project. The Claimant had no legal grounds or factual reason to request the corporate documents of the Respondent (see paragraph 40 of the Statement of Defence). Since the Parties already validly concluded the Main Contract while ensuring compliance with the Claimant's internal procedures, it is inexplicable why the Claimant would require additional Respondent's constitutive corporate documents.

262. Furthermore, in the email dated 20 February 2019 it is quite evident that the Claimant was also certain that the Additional Agreement 2 was validly concluded.

263. To continue, in the Claimant's letter dated 5 March 2019 originates the repeating and ever present request for the Respondent to deliver the contracts with the subcontractors. Such a request comes as a surprise as the Claimant has always been aware of the substantial part of the process that MJC undertakes as well as the fact that a substantial amount of money (see paragraph (39) of the Statement of Defence) for further details and documents) had already been paid to MJC. These requests are evidently further examples of the Claimant's dilatory tactic as clearly no intention to proceed with the Project existed on the side of the Claimant's management.

264. The Claimant's email dated 27 February 2019 (see paragraph 37 of the Statement of Defence and R-17), transmitting a revised version of Additional Amendment no. 3 for the Respondent's review and signature, was sent according to the established practice between the Parties. It has become customary that similar official communications are sent by Mykola Baraboi with Artem's top management in copy. In case of this particular email, the people in the copy were Anton Karpenko, Sergey Khomiakov, Ms. Marina Grischenko and Vladimir Zimin. The relevant part of the email reads:

*"If everything is OK, sign with Chuck and send it to us!"*

A similar pattern and wording can be observed in emails dated 24 September 2018 (cover email regarding the signing of the minutes of meeting):

*"If you are satisfied, please sign and send to us!"*

and 19 November 2018 (see also paragraph (30) of this Rejoinder):

*"Please take a look, if there will be no objections I suggest we sign!"*

It is clear that Mykola Baraboi simply executed the will of the management and was not acting on his own behalf. Clearly, the Claimant thus validly and according to its own established practice expressed its will to have the Additional Agreement 3 executed.

265. Finally, the Claimant tries to create an impression that the changes to the list of the equipment were needed due to the Respondent. However, in reality, the Claimant also requested several changes to that list. For example, the Claimant requested the change of



50

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

the billet (also evident from the Bezpeka Report) as the minutes of 19 September 2018 (the "September Minutes") stated:

*"Artem company notified Gray Fox Logistics that in production of 152/155mm shells 130 square billets will be used..."*

and the minutes of 24 October 2018 stated:

*"It was accorded by the Parties that the hot flow-formed Ø 150 mm round billet is considered to be the best option for the production of 152/155mm shells."*

To avoid any misunderstandings, changing the billet was an idea of the Claimant as is evident from the email of Mykola Baraboi dated 19 February 2019 stating:

*"...replacing the square [billet] with a round [billet] was my idea and they supported it."*

Consequently, different machines were needed, and certain machines were not needed anymore etc. Some of these changes are further described in the Bezpeka Report.

266.   To sum up, the Respondent was diligently following the Claimant's instructions regarding these amendments. The various formalities were duly observed in order to progress with the Project. When the Claimant wanted to reinforce its position by concluding the Additional Agreement 2, the Respondent, in the spirit of good faith, obliged. The same can be said for Additional Agreement 3. As it has been convincingly shown in the Statement of Defence, the Respondent indulged the Claimant and its many requests, changes to the billet changes to the drawing of the shell (affecting the whole configuration), until finally, an updated configuration of the equipment was defined to the mutual satisfaction of the Parties. It is worth mentioning that the total cost of the equipment was increased by USD 270,000.00 (as per Bezpeka Report) the Additional Agreement 3 was concluded when received by the Claimant on 5 March 2019. It surely seems that the Claimant has its ulterior motives and seeks to prevent the Project from being implemented.

267.   Furthermore, and in addition to our explanations in paragraphs 69-75 of the Statement of Defence (Status of manufacturing), the Respondent submitted further documents that prove the Respondent's efforts and investments in the Project, namely the purchase orders and the invoices issued by MJC for the manufacturing and engineering. These documents, *inter alia*, show that an advance payment of 30 per cent or USD 1,352,340.00 was paid by the Respondent for the 2 CNC spinning machines, that regular payments for the engineering were made and that an advance payment of 10 per cent or USD 230,000.00 for the custom-made New Press was made. The work had been progressing according to plan up until the point when the Claimant began with its irrational and inexplicable actions. Evidently, the Claimant willingly ignores all the work that has been done by the Respondent and its subcontractors which can hardly be



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

described as acting in good faith. The Respondent has its own obligations towards its subcontractors, and undue delays have serious consequences on the established relationships.

268. As the Claimant likes to point out, the Appendices are an integral part of the Contract. As a matter of fact, changing the drawing of the shell (as described in paragraphs 44 and 45 of the Statement of Defence) is quite comparable to changing part of the equipment that would be used to produce such shells. The Claimant wrote in paragraphs 13-17 of its Reply that these changes were actually not changes. The magnitude of changes is quite beside the point here, and it makes little sense to argue how big of a change "a refined drawing" or "another drawing" actually are. The fact remains that the Appendix with the drawing which is an integral part of the Contract was amended. We fail to understand why no need for enhanced formalities on the side of the Claimant arose. The most likely explanation is that the Claimant understood that the certain changes to the Appendices are reasonable and normal. As will be explained below, a certain practice was thus established. The Parties clearly agreed that the Appendices and consequently the Contract may be amended by a simple exchange of emails.

**Amending the Contract via signed minutes of meetings and email correspondence**

269. The third modality of changing the Contract was by simply signing the minutes of a meeting. We can observe such an occurrence at several occasion, e.g. by signing the minutes of meeting dated 24 October 2018, when the shape of the billet was changed from square to round (as described in detail under paragraph (37) of the Statement of Defence), which consequently required further changes to the production line. Furthermore, additional revisions to the equipment list in Appendix 3 were made, namely:

*"By mutual consent of the Parties it was decided that conveyors should be used to transfer hot billets to the cooling area after stamping and hot flow forming procedures."*

Thus, Appendix 3, an integral part of the Contract, was amended. Furthermore, in these same minutes the Parties amended another Appendix as the changed the delivery time by stating that "the equipment should be delivered to Ukraine at the utmost by the end of 2019".

270. Similarly, the Parties signed the minutes of meeting dated 21 August 2018 where they, *inter alia*, amended the Appendix 3 of the Contract. At the request of the Claimant, a different hardness tester index was specified, namely the BRINELL hardness test. Consequently, the Wilson Instruments Rockwell Hardness Tester was replaced by the Wilson Instruments Brinell Hardness Tester. This change is evidenced in the letter dated 13 November 2018.

271. As the Claimant has pointed out, the Parties included a provision regarding the required formalities for changing the Contract, namely in para 18.1 of the Contract stating that



52

"all the amendments and addendum to the present Contract will be valid in case of being made in writing and signed by the both Parties". Furthermore, it is true that Ukraine made a declaration in accordance with article 12 that any provision of article 11, article 29, or Part II of this Convention, that allows a contract of sale or its modification or termination by agreement or any offer, acceptance, or other indication of intention to be made in any form other than in writing, does not apply where any party has his place of business in that State.

272.  However, this rather straightforward provision is complementary to that of Article 9 of CISG stating that "the parties are bound by any usage to which they have agreed and by any practices which they have established between themselves".

273.  It is the Claimant's responsibility to ensure the compliance with its internal corporate or other organisational rules arising under Ukrainian law. The Respondent cannot and is under no obligation to foresee the various formalities of internal Ukrainian nature. Perhaps the Claimant was not allowed to amend the Contract without observing all the formalities of the Ukrainian law. While this is a matter of the Claimant's organisation and should be sanctioned accordingly by the relevant Ukrainian authorities, it does not and must not affect the contractual relationship between the Parties.

274.  By waving various formalities as described in chapter 7.1 of the Statement of Defence, a certain practice was established between the Parties. To be precise, we have identified at least 2 previous identical occasions where the Claimant communicated its acceptance of the draft by having Mykola Baraboi sent such draft with an instruction to have it signed, namely on (i) 24 September 2018 and (ii) 19 November 2018. A countersigned copy was never returned, and the Parties tacitly agreed that the document is validly executed. There is no definitive rule as to what comprises an established practice. Many commentaries and courts put emphasis on the qualificative requirement for an established practice "which the parties can then assume in good faith will be observed again in a similar instance". Other sources cite quantifiable requirements, *i.e.* (i) a certain frequency (ii) over a certain period of time. As for the frequency, most sources agree a certain number cannot be defined as it depends greatly on the circumstances of the case. However, a sales agreement with continuous purchase orders will naturally require a greater number than another "less active" relationship. The scholars have written that a single occurrence cannot be considered enough to raise the status of established practice. As for the time period, the scholars deem that a couple of months would generally suffice, which is, in the present case, also a given fact.

275.  Thus, a binding practice was established between the Parties regarding the execution of the documents. The Claimant was firmly in the lead with regard to the necessary formalities, as described in chapter 7.1.2 of the Statement of Defence. When concluding the Additional Agreement 2 and signing the September Minutes, the Claimant waived some of the formalities regarding the execution of these documents. It is without doubt that both Parties deemed the Additional Agreement 2 and the September Minutes to be



concluded. Therefore, when concluding the Additional Agreement 3, the Parties adhered to that same procedure, as had become an established practice between the Parties. The Claimant used the same instructions and the same wording as previously when instructing the Respondent to sign the Additional Agreement 2 and the September Minutes. Consequently, the Respondent undertook the same steps and correctly understood that the Additional Agreement 3 had then been concluded. Not only that it was the Claimant who introduced such a procedure, but the situation could not be unilaterally changed by one Party. Consequently, the Respondent understood that the Additional Agreement 3 was then concluded and was ready to resume the work on the Project. In the legal commentaries the formalities regarding the conclusion of the contract are regularly cited as an accepted example of established practice.

276.    In addition, it also became clear that the Contract may be changed in various ways that do not require an executed amendment, even a whole appendix was changed based on mere email agreement. It perhaps does not amount to an established practice on its own, but it clearly shows the Claimant's tendencies regarding the formalities, up until the point when the decision to halt the Project was made.

277.    As has been mentioned above, the established practice between the Parties becomes part of the Contract and is binding upon the Parties. Consequently, the established practice also prevails over the provisions of the Convention. Therefore, the new established practice regarding the execution formalities has priority over the rules under the Convention, its interpretation, reservations etc.

278.    The notion that certain additional actions and document are needed by the Claimant from the Respondent was completely new, unexpected and unexplained. The Claimant wanted to unilaterally and retroactively change the established practice between the Parties. One-sided cancellation of an established practice may only affect the future contracts. Furthermore, allowing such an action and its consequences would be a serious threat to the principle of legal predictability which is one of the core legal principles of national and international law.

279.    According to the provision of Article 9 of CISG, the Parties are bound to use the practice established between them. Therefore, the Claimant is bound to observe the practice established when signing the Additional Agreement 2. A clear and direct instruction to have the draft signed, followed by the Respondent sending the executed version to the Claimant was established as the practice between the Parties.

280.    The Claimant does not have the right to unilaterally change such established practice, even less so with a retroactive effect. If any additional actions had been required by the Claimant in relation to its internal obligations, such matters should have been taken care of before giving the green light for executing an agreement. A signing of one Party should be followed by a countersignature of the other in a timely manner. It is not acceptable that further lengthy procedures take place after a Party was led to believe that the negotiations are concluded and has consequently provided its signature. However,



54

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

this was not the case in the present dispute. As has been established between the Parties and based on the actions of the Claimant, the Claimant's explicit instruction to "have the draft signed" in actual fact replaces its signature. Therefore, it was when the Claimant received the signed Additional Agreement 3 that this agreement was concluded and binding on both Parties.

281. Furthermore, as has been elaborated in chapter 6.2.3.1 of the Statement of Defence, the estoppel principle must be observed and can be applied to this situation as well. Allowing the Claimant to rely on its own omissions to launch its claims would be in breach of Article 80 of CISG.

282. An established practice can only be changed by an agreement between the parties, be it implied or explicit, but cannot be excluded by an abrupt cancellation from one party. It shall be noted that the binding force of an established practice also derives from the estoppel principle. There is no dispute between the scholars that the rules on the established practice are an expression of the general prohibition of venire contra factum proprium and are as such closely related to the trust between the parties.

283. The Parties evidently and consciously decided to amend the rules on formality as they changed the Contract on several occasion in many different ways. Not only that, the technicality of these changes gave rise to an established practice which became part of their contractual relationship. Furthermore, the manner of this new procedure was introduced by the Claimant. Thus, by returning the signed copy of Additional Agreement 3 as instructed by the Claimant, the Additional Agreement 3 was validly concluded and immediately became binding upon both Parties.

284. The Claimant and the Respondent amended the initial schedule on several occasions. The most recent was the amendment concluded on 24 October 2018 at the meeting in Huntington Beach, California, USA, when the signed minutes, *inter alia*, stated that:

*"the equipment should be delivered to Ukraine at the utmost by the end of 2019".*

Therefore, by claiming that the Respondent was in delay as early as in April 2019, more than 8 months before the contractually agreed deadline, is simply preposterous.

285. Further to the previous paragraph, not only that the Respondent was not and could not be in delay in April 2019, it was the decision on the Claimant to unnecessarily initiate the arbitration proceedings that effectively prevented the Respondent from implementing the Project. The potential delay occurring after the date when the arbitration proceedings were initiated cannot be material for the case.

286. As there was no delay by the Respondent, the Claimant decided to enforce its claim prematurely as the claim itself could not be due. In fact, it was the Claimant who was in delay with the performance of its contractual obligations as well as unable to perform



them and seemingly attempted to hide such facts by initiating this arbitration proceedings.

287.  In her witness statement Ms. Marina Gryshchenko provided various statements most of which contradict the reality and the presented evidence. While some of the allegations have been commented on throughout the Rejoinder, in the following few paragraphs the Respondent addresses an additional few of these unfounded claims.

288.  The Respondent allegedly did not explain the reasons for the change or prove the adequacy of the new equipment. Despite the lengthy clarification in the Statement of Defence of all the actions and explanations that have been undertaken by the Respondent to clarify the technical matters with the Claimant, Ms. Marina Gryshchenko apparently continues to refuse accepting the reality.

289.  On 14 and 15 February 2019 the Respondent confirmed with the Claimant that that the new equipment is better, more progressive and quicker while the management had different reasons for opposing the Project. Needless to say, such attitude from the Claimant is deeply dishonest and shows grave lack of good faith.

290.  Similarly, a few days later Mykola Baraboi wrote an email explaining that he does not understand why the management acts in such a way. For him it is clear that the new technology is better than the old one. He explained that he is under the instructions of the management to act against the Project, but he does not understand why exactly.

291.  Quite evidently, the Reply is manifestly ungrounded and should thus be disregarded in its entirety.

## REASONS

### Introduction

292.  The tribunal has reviewed and considered all circumstances invoked by the parties in all their submissions and during the hearing in February 2020. If a circumstance invoked by a party is not reflected in the award, that is so because the tribunal deemed it unnecessary to address it in view of the conclusions expressly reached and the outcome of this award.

### Abbreviations

293.  Under this heading, REASONS, the tribunal will use the following abbreviations:

294.  Statement of Claim, SoC

295.  Reply from Claimant, C II

296.  Exhibits to the SoC and C II, C 1 up to and including C 23



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

297. Statement of Defence, SoD

298. Rejoinder, R II

299. Exhibits to the SoD and R II, R 1 up to and including R 72 as well as legal authorities RL 1 up to and including RL 5

300. Parties, Claimant and Respondent

301. Transcripts from hearing day 1, TD 1 plus page and line

302. Transcripts from hearing day 2, TD 2 plus page and line

### Admissibility of Claimant's briefs filed on 29 February 2020

303. The Respondent is correct that the briefs from Claimant due on 28 February 2020 were filed on 29 February 2020, see item 29 above.

304. On 29 February 2020, the tribunal had not declared the proceedings closed pursuant to Article 40 in the SCC Rules. Pursuant to Article 30 a party may amend or supplement its case under certain conditions. From Article 23 (2) follows that each party shall have an equal and reasonable opportunity to present its case.

305. In the opinion of the tribunal Claimant's delay of about 5,5 hours during the night between the 28 and 29 February 2020, in submitting its post hearing brief and its comments to Respondent's cost submission does not prejudice Respondent. Neither does the delay create inequality of arms between the Parties since, among other points, the slight delay in Claimant's submission of the arbitration's final, concurrent filing had no impact on any subsequent obligation from the Respondent. The tribunal therefore concludes that the two submissions filed by Claimant on 29 February 2020 shall be allowed as part of the record. Respondent's request for dismissal of the two submissions is denied.

### Gray Fox Logistics or Gray Fox Aviation and Logistics, Inc, doing business as Gray Fox Logistics

306. Gray Fox Logistics is a registered fictitious name (C 1). The owner of the name is Gray Fox Aviation and Logistics, Inc, FEI/EIN Number 81-2451630, (C 2). According to the Contract, Gray Fox Logistics was defined as the seller. In the SoC, item 6, Claimant requested that the company name should be inserted as the Respondent with the addition "doing business as Gray Fox Logistics". Respondent objected to Claimant's request, SoD, item 13 and 14. Based on the information supplied by Claimant (C 1 and C 2), the tribunal finds that Claimant's request shall be granted. At the hearing, the Respondent stated "We would stay with what we said so far", TD 2, 202/16. However, the Respondent was then asked how they would respond should the tribunal decide that an actual company should be the respondent party in order to ensure the rendering of an



57

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

enforceable award. Respondent said that it would not be opposed to this, TD 2, 202/22. The tribunal has therefore concluded that Gray Fox Aviation and Logistics, Inc, doing business as Gray Fox Logistics is the Respondent in this arbitration.

**The case in a nutshell**

307. In support of its avoidance of the contract the Claimant relies on Respondent's delay of manufacturing and delivery of the Equipment, as defined in the Contract, as well as Respondent's failure to deliver the Equipment with the components provided for by the Contract, SoC 29 and 47. Respondent invokes that Claimant has not acted in good faith during part of the performance of the contract. Among other things the estoppel principle in Article 80 of CISG, RL 2, prohibits a party from relying on such non-performance if that party's own conduct has prevented performance. As an alternative, Respondent argues that the practice developed between the parties during the execution of the contract was such that Additional Agreement 2 and Additional Agreement 3 actually were concluded and became part of the parties' contractual relationship. That follows from Article 9 (1) of CISG according to the Respondent.

308. Should the tribunal accept the argument advanced by Respondent to the effect that the practice between the parties entailed that amendment 2 and amendment 3 were concluded, then it is logical to accept Respondent's claim that the tribunal shall declare that the contract, as defined by Respondent, remains in force. The tribunal will, if need be, revisit this issue.

309. The dispute in front of the tribunal includes an assessment of the facts, as presented by the parties. The tribunal will start with a review of the facts and testimony. Following that review the tribunal will evaluate those circumstances pursuant to the legal norms that, in the opinion of the tribunal, are applicable.

**The Contract**

310. In the opinion of the tribunal the starting point for the resolution of the dispute is the Contract. According to the Contract Respondent undertook to manufacture a production line for 152/155 mm projectile shells. The undertaking also included manufacturing certain products specified in appendices 9 and 11 to the Contract. In the Contract, Respondent's delivery was defined as Equipment. The price for the Equipment amounted to USD 16,079,000.00, appendix 1 to the Contract, plus USD 500,000 for certain works to be performed by Respondent, appendix 1 to the Contract. The price was fixed, and any change required an additional agreement signed by both parties (Contract 2.3).

311. According to the planned schedule, included as appendix 2 to the Contract, Respondent undertook to deliver the Equipment CIF Odessa in February 2019. Appendix 3 has the heading Technical Conditions and says among other things that the production line should be designed for a serial production with annual capacity of 524 thousand pieces



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

relying on a 3-shift production process. Part of the Equipment consisted of 4 Bliss presses (table 1, item 1.4 under the heading 2 Equipment list in appendix 3 to the Contract). The individual Bliss Press was described in more detail in table 7 under item 3.5 Bliss press in appendix 3 to the Contract.

312. Para 1 of the Contract further stated that the Equipment must meet the technical conditions as they have been approved for performance and stipulated in Appendix 3 to the Contract.

313. According to para 4.4.1. in the Contract Claimant undertook to pay 50 per cent of the total value of the Contract to Respondent as an advance payment. Claimant has paid that amount, USD 8,289,500.00 to Respondent. On that the parties agree.

314. Pursuant to the Contract, para 5 Acceptance of Equipment, Claimant undertook to accept the Equipment with respect to quality according to the conditions as stipulated in appendix 3 to the Contract.

315. Respondent undertook, according to para 6.2 in the Contract, to deliver technical requirements and installation drawing of Equipment to Claimant one month after receipt of the advance payment according to para 4.4.1. in the Contract. It is undisputed that Claimant paid the amount pursuant to para 4.4.1. on 16 May 2018.

316. It follows from para 11.6 in the Contract that Claimant undertook to finish all works related to production premises for the Equipment and other works required for start of the mounting of the Equipment within terms stipulated in appendix 2 to the Contract. Appendix 2 to the Contract says that mounting of Equipment shall start in May 2019.

317. Under the heading Warranties and Claims, para 12.1, Respondent guaranteed a quality of the manufactured equipment and its compliance with the technical conditions, specified in appendix 3 to the Contract. The Respondent also issued a guarantee, para 12.2, for delivery of the Equipment according to appendix 2 to the Contract.

318. The Contract included a force majeure clause, para 15, and a paragraph setting forth various penalties if either party did not fulfil its obligations in time, para 16.

319. According to para 17.1 either party could terminate the Contract without any damage for any party if, after written notice of a breach of obligation under either para 3.2 (Respondent's duty to supply the Equipment within 10 months of receipt of advance payment) or para 4.4 (Claimant's duty to make each partial payment by specified dates), the breach was not corrected within 60 days.

320. Pursuant to para 18.1 in the Contract all amendments and addendum to the Contract "will be valid in case of being made in writing and signed by the both Parties".

321. The Contract contained an entire agreement clause, para 18.5.



322.    The arbitration clause as well as the choice of law provision were included in the
        Contract at para 15, which is quoted above in item 39.

323.    Finally, it should be mentioned that appendix 11 to the Contract contained drawings of
        the projectile.

324.    To sum up. In the opinion of the tribunal Respondent undertook to deliver a plant for
        manufacturing of a certain number of pieces. Respondent had to deliver that capacity
        based on the equipment included in the Contract and defined as the Equipment. To put it
        differently, Respondent was not at liberty to unilaterally change the Equipment. A
        change required that the Parties sign a written document. Claimant had to pay on time
        for the Equipment and to provide a site that could house the production facility.

**Other circumstances**

325.    Both parties have invoked various circumstances that help the tribunal to understand
        some of the background to the Contract but circumstances that in the opinion of the
        tribunal are not directly relevant for the outcome of the dispute. Respondent has for
        example invoked the connections between Claimant and another government owned
        entity Bezpeka. Another circumstance invoked by Respondent concerns the consultancy
        agreement, (R 57), between Claimant and Dale Wood as well as the draft agreement
        between Claimant and the Korean company SKGC (R 58). Claimant has emphasized
        that Respondent did not have its own factory, had no subcontracts with suppliers when
        the Contract was signed, and appears to have used much of the advance payment from
        Claimant for other purposes than the fulfilment of the Contract. According to Claimant,
        Respondent also had an offset agreement with Bezpeka which it did not fulfil. In the
        opinion of the tribunal those circumstances do not cut to the heart of the current dispute
        and are therefore left without further comments from the tribunal.

**Additional Agreement 1**

326.    Following receipt of necessary permits including the relevant permit from the
        Supervisory Board, see para 18.9 in Contract, the Contract came into force, Claimant
        subsequently transferred the advance payment on 16 May 2018 (C 5). The Parties agree
        that the Contract came into force prior to the middle of May 2018.

327.    On 21 August 2018, the Parties met and discussed the terms and conditions of the
        Contract (R 70). Of interest for this dispute is that the Parties agreed to use a certain
        hardness index Brinell (R 70 item 9) and agreed to approve the new calendar plan
        Appendix 2 till 22.08.18 (R 70 item 10). The minutes from this meeting were signed by
        the Parties.

328.    Additional Agreement 1 was signed by the Parties on 22 August 2018. In essence the
        agreement entailed that appendix 2 from the Contract, *i.e.* the planned schedule was
        replaced with a new planned schedule. Among other things the new schedule postponed



delivery of the Equipment in Odessa from February 2019 to March and April 2019 (C 4 item 18).

**Events from 23 August 2018 to 4 June 2019**

329.  The tribunal notes that the revised reference to the Brinell index did not immediately generate a new written agreement in the same fashion as the time schedule that became Additional Agreement 1.

330.  During the end of August and beginning of September 2018 Respondent introduced a different press in lieu of the Bliss presses by way of new technical specification of equipment. Based on the email loop from this period (C 6) the tribunal can find no explanation from Respondent for this change. The introduction of a new press solution triggered questions from Claimant but not any explanation from Respondent as far as the tribunal can tell.

331.  The Parties held a meeting on 5 September 2018. The minutes (C 7) have not been signed but it appears as if they have been drawn up by Respondent. According to the minutes the Respondent declared "No changes will be made - we are using the 'original'-press and the same technology production". Claimant was looking for a confirmation that no changes would be made. Respondent undertook to send an official confirmation from Respondent that no changes would be made with a deadline for such a confirmation by 10 September 2018.

332.  In the opinion of the tribunal the minutes (C 7) demonstrate that Claimant did not accept a press solution other than the original one and that Respondent confirmed that the original press should be used in the project.

333.  Based on the written evidence produced by the Parties in this case the tribunal cannot find a confirmation of the kind that, according to the 5 September minutes, Claimant requested by no later than 10 September 2018.

334.  The next meeting occurred 19 September 2018. Claimant produced the minutes (C 8 and R 67). They were signed by the Parties. The minutes show that Respondent had submitted a new machine list. As the new list deviated from the list in the Contract Claimant asked Respondent to provide "a well-grounded substantiation of introduced changes" by 24 September 2018.

335.  On 21 September 2018 Respondent answered the various questions from Claimant that the new machine list had triggered (C 9). With respect to the new press solution Respondent explained that it was a better solution than the solution with the Bliss presses. According to Respondent the changes ensured a more streamlined production process with guaranteed results for the end product.

336.  On 25 September 2018 Respondent issued a purchase order to MJC for a Forging/Ironing Press (R 69). MJC had on 24 September 2018 sent an invoice to



Respondent for the 10 per cent down payment pursuant to the purchase order for the press (R 69).

337.  The Parties met on 26 September 2018. According to the minutes (R 8) Claimant accepted the updated machine list and stressed that this was a single change to the Contract and that no more variations of the stipulated equipment would be accepted. The Parties also agreed to draw up an Attachment to the Contract regarding amendments to the machine list. Respondent undertook, among other things, to provide by 2 October 2018 a revised layout of the equipment. R 8 is not signed by the Parties.

338.  A list of all machines was sent from Respondent to Claimant on 3 October 2018.

339.  The Parties met on 24 October 2018 in California. The meeting was held at the premises of Respondent's subcontractor MJC. The minutes signed by Claimant (R 68) say that MJC undertook to deliver by 30 October 2018 the updated layout of the production line and by 7 November 2018 a complete list of the press characteristics. It was also noted that the final date of contract implementation should meet the dates to be stated in the Supplementary Agreement, which would be coordinated by the Parties after presentation of the updated press specifications, but that the delivery to Ukraine "should be at the utmost by the end of 2019".

340.  Based on the information above it seems to the tribunal that the information to be delivered by the Respondent by 2 October (see paragraph 339 above) had not been provided, that discussions regarding the new press continued, that the manufacturer, MJC, undertook to supply information about the press by 30 October 2018 and 7 November 2018, and that the new delivery date should be set once the new press specifications had been presented.

341.  On 6 November 2018 MJC sent a status report to Respondent. Among other things the letter stated that the design work for the press was in full force.

342.  On 7 November 2018, the parties met. According to the minutes (C 10) signed by Claimant by Anton Karpenko, Maryna Gryshchenko participated, Respondent undertook to provide a new layout for the line as well as various calculations. The Respondent also undertook to prepare "complete information on the characteristics of the press, as well as drawing off the foundation for the press" and to transmit that information within a week. In item 7 in the minutes the following was noted "Till 14.11.2018, GFL undertakes to prepare a justification for postponement of equipment delivery to Ukraine, as well as to approve the final list of the equipment and submit for approval a schedule for implementation of obligations in a timetable form (appendix 1 to the Contact)."

343.  In the opinion of the tribunal, the attitude in the discussions between the parties, especially as reflected in item 7 of the 7 November minutes, appears different from that



of 26 September, which did not record any request for justification of the changed delivery.

344.  The changed attitude generated an email exchange between Stan Galver, Respondent, and Mr. Baraboi, Claimant, later the same day (R 12). According to Mr. Baraboi, Ms. Gryshchenko was "off topic with the schedule, …[B]ut the main point was that she wants a proper justification as to why the equipment is arriving later".

345.  On 13 November 2018 Respondent sent a letter to Claimant (C 11). The letter concerned proposed required equipment changes and reflected that Respondent had decided to change certain equipment that would result in a more streamlined and optimized production line. The tribunal notes that the letter is similar to the letter from Respondent on 21 September 2018 (C 9).

346.  On 15 November 2018 Respondent sent a letter to Claimant (R 32). According to the letter an accompanying email would transmit materials justifying the replacement of the equipment and proposing the new delivery dates. It is the tribunal's understanding that the additional information referred to is found in R 33, which begins with a transmittal email followed by 70 pages of attachments. Among other things, a new Appendix 1 to Additional Agreement 1 is transmitted, evidently intended to become yet another version of Appendix 2 to the Contract. According to this planned schedule, Equipment delivery CIF Odessa was now planned for May-November 2019. Moreover, installation, start-up, and acceptance testing of the production line (including the replacement press) – activities that were expected to require seven months in the Contract – would now be condensed (somewhat improbably) into three months, extending well into February 2020 (R 33, pp. 16-17).

347.  On 19 November 2018 Claimant, represented by Mr. Baraboi, sends a draft of the supplementary agreement on power consumption to Respondent, Mr. Galver (R 64). The email says, "Please take a look, if there will be no objections I suggest we sign!". Additional Agreement 2 is signed by Respondent (R 63).

348.  On 7 December 2018, the Parties met. According to the minutes (R 13), not signed by the Parties, Respondent undertook to prepare by 12.10.18 a draft Additional Contract for the correction of the list of equipment used in the line (what would ultimately be referred to as an Appendix 3 to the Contract). Respondent undertook to prepare a report on the status of implementation of the contract within the next week. The Parties agreed that the signing of the additional agreement on the adjustment of the planned schedule is possible only after Respondent's report on the status of implementation of the contract. On the same date, Respondent sent an email to Claimant regarding proposed required equipment changes (R 34). The reasons for the changes overlap with the reasons given in September (C 9) and November (C 11) by again asserting that the new Equipment will provide for "a more streamlined and optimised production line", but here, for the first time, Respondent also says that it cannot deliver a Bliss press. Respondent states, "Due to the fact that a U.S. based company Bliss was purchased by a German company



after we have provided the original quote, the purchasing company has ended production of presses by Bliss. Thus, after not being able to procure those presses we have decided to build a custom made system specifically for this project".

349.    On 10 December 2018 Claimant sent what it denominated as "final" drawings of the 155 mm shell to Respondent.

350.    On 13 December 2018 (C 12) Respondent sent to the Claimant a draft Additional Agreement 2 (which would later come to be called Additional Agreement 3), containing revisions to Appendix 3 of the Contract to reflect the new list of Equipment. In the cover letter Respondent repeated that a Bliss press was not available due to a corporate reorganisation and that Respondent therefore had decided to develop another press together with MJC. According to the letter, "delivery of the entire line" was postponed from April 2019 to November 2019 (C 12, p. 2).

351.    On the following day, 14 December 2018 the Parties met. According to the minutes (C 13), not signed by the Parties, Respondent undertook by 17 December 2018 to provide legal justification for changes in the equipment list and to, together with Claimant, draw up a contract implementation status report.

352.    On 17 December 2018 Respondent sent a letter to Claimant headed Justification for Equipment Changes (R 15). In the letter, Respondent argued and explained that the unavailability of the Bliss presses was a circumstance beyond Respondent's control. Therefore, in the opinion of the Respondent, it was necessary to carry out the settlement of contractual relations in accordance with the changed circumstances. Respondent referred to Articles 25, 79 and 47 of the CISG.

353.    On 20 December 2018 Respondent sent a screen shot from the website of Sutherland Presses to Claimant (R 36). According to the screen shot "No new presses are being built at this time by Bliss, Clearing or Niagara", referring to a merged corporate entity called "BCN", which apparently was the successor of the Bliss Co. (A reduced size of this screen shot had already been inserted in Respondent's 13 December, transmittal letter.)

354.    On 21 December 2018, the Parties met. According to the minutes (R 37), not signed by the Parties, Respondent undertook to provide comments on various issues to Claimant. It was also noted that the letter of justification from Respondent as well as the additional agreement about it was under consideration by Claimant.

355.    Technical specifications are forwarded to Claimant by Respondent on 22 December 2018 (R 38).

356.    Respondent has submitted a letter from MJC to Claimant dated 3 January 2018 (R 39) confirming that Gray Fox is an authorized dealer in Ukraine for MJC. According to Respondent (SoD item 55) the correct date of the letter is 3 January 2019. However, the



64

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

letter discusses, as conditions for MJC's successfully producing the "flow forming line for 152/155 projectiles", the following developments: "if contract executed with Artem with Gray Fox, an export license is obtained by Gray Fox in USA and funds are transferred duly to Gray Fox." Therefore, the tribunal rather holds that the January 2018 date is correct. However, this is of no importance for the outcome of the dispute.

357.   On 13 January 2019 Respondent sends a status report as of January to Claimant.

358.   On 24 January 2019, the Parties met. According to the minutes (R 41), not signed by the Parties, Claimant offered to discuss the planned schedule and changes in it, changed equipment list and approval of the planned schedule in order to present it to the supervisory board. The Parties agreed to discuss all technical issues as well as other issues with Mr. Baraboi on 28 January 2018.

359.   On 24 January 2019 Respondent forwarded pictures showing the current status of various parts of the equipment (R 42).

360.   On 31 January 2019 Respondent forwarded a link to a layout, updated, to Claimant (R 43).

361.   On 6 February 2019 Respondent sent to Claimant a paint line layout as well as another draft of the Additional Agreement 2 first sent on 13 December (R 44). It is the tribunal's understanding that this draft was again prepared by Respondent.

362.   On 14 February 2019, the Parties met. According to the minutes (R 21), not signed by the Parties, the Parties further discussed the "possible change of the list of equipment", proposed by Respondent. Respondent also focused on the necessity of the earliest possible signing of the additional agreement in order to improve progress according to the Contract.

363.   Later the same day Mr. Baraboi and Stan Galver had a WhatsApp chat (R 71). The conversation shows that Mr. Baraboi was in favor of the changes proposed by Respondent and a quicker signing of the new list and new deadlines. In addition, Mr. Baraboi mentioned that his superiors were "looking for some snags" and later explained that these persons "are simply afraid to sign the alteration of the deadlines and connect this to the changes in the list of equipment".

364.   On 19 February 2019 Mr. Baraboi sent an email to Respondent's "Eugene" (R 72). Mr. Baraboi stressed that he is a technician and that, in his opinion, there was no other way but to sign off an additional agreement on equipment changes and a new schedule with shifted dates.

365.   On 20 February 2019 Respondent again forwarded pictures to Claimant showing the status of various pieces of equipment (R 45).



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

366. On 20 February 2019 Mr. Baraboi sent an email to "Eugene" (R 65), Respondent's principal representative in Kyiv. According to the email Mr. Baraboi was preparing an Additional Agreement 3. He also said, "I think when my bosses return from a business trip I'll persuade them to sign it!"

367. On 27 February 2019 Mr. Baraboi, with copy to among others Karpenko and Gryshchenko, sent the last version of what was now Additional Agreement 3 (revising the Contract's Appendix 3 to reflect the new list of Equipment) to Respondent (R 17). Mr. Baraboi said "If everything is OK, sign with Chuck and sent (it) to us".

368. On 5 March 2019 Respondent forwarded an electronic version of Additional Agreement 3 to Claimant signed by Respondent (R 46).

369. On 5 March 2019 Claimant sent a letter, signed by Karpenko, confirming receipt of the signed additional agreement (R 18). Karpenko wrote "As we have informed you earlier during our conference calls prior to signing this additional contract we require granting approval from our Supervisory Board". Claimant requested Respondent to provide them with

    a) Apostilled copy of Gray Fox Logistics' charter

    b) Apostilled copies of other legal documents authorizing Mr. Provini to act as the president and chairman of Gray Fox Logistics Company

    c) Copies of all contracts signed by Gray Fox Logistics Company with main subcontractors (MJC Engineering & Technology Inc. and others) in the course of the execution of the contract.

370. On 5 March 2019 and again on 1 April 2019, emails were exchanged between Mr. Baraboi and MJC regarding equipment characteristics (R 24).

371. On 7 March 2019 Respondent confirmed that Mr. Manuele Wernli was authorized to represent Respondent (R 47).

372. On 13 March 2019 (R 19), Respondent forwarded pictures to Claimant showing the status of various pieces of equipment.

373. On 21 March 2019, Claimant wrote to Respondent confirming its receipt on 14 March of the hard copy of the Additional Agreement 3 signed by Respondent and explaining that it had begun the preparation of the documents in order to have the changes in the Contract approved by the Supervisory Board (C 15 and R 20). Among other things, Claimant requested a new calendar plan according to the form provided in Appendix 2 to the Contract.

374. On 21 March 2019, Respondent mentioned that some of the requested information, number of stamps and punches, had been forwarded to Claimant (R 48).



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

375. On 29 March 2019, Claimant sent a letter to Respondent (R 22) stating that it was appropriate to include two pieces of the Quenching and Tempering Machine from JL Becker in the equipment list.

376. On 1 April 2019 Respondent replied to the letter mentioned in the previous paragraph (R 23). Respondent explained that the signed additional agreement received on 14 March 2019 was not a draft for consideration but an agreed supplementary agreement.

377. During the beginning of April 2019 representatives of Claimant visited the U.S. and again met with representatives of Respondent on the premises of Respondent's principal subcontractor, MJC in Huntington Beach, California. According to meeting minutes dated 5 April 2019 (R 25), signed by the Parties, Respondent undertook, among other things, to provide a new delivery schedule with stipulations that the Additional Agreement 3 would be signed by Claimant by the end of April 2019. Respondent undertook to provide an executive summary summarising the benefits of the new press vs the old set up with 4 sequential presses. In addition, Respondent undertook to provide justification for tooling that will be utilised by the press and other machinery. A subcontractor's checklist was signed by Respondent as requested by Claimant (R 26).

378. On 16 April 2019 Respondent sent a letter to Claimant (C 16 and R 29). The heading of the letter is COMPLAINT. According to the letter it had been necessary due to the reorganization of Bliss to replace the press. That was communicated to Claimant on 29 August 2018, as evidenced by a reply from Mr. Baraboi on 3 September 2018, according to Respondent. The letter further states that Claimant agreed to the changes in equipment, in particular with respect to the new press, during a visit to the US. That agreement was recorded in minutes dated 24 October 2018 and signed by Claimant's CEO, Mr. Karpenko. Respondent explains that, since October 2018, the company has not received any confirmation of the relevant changes in terms of schedule and updated specifications of equipment. Respondent questions the good will of Claimant and stresses the need for earliest possible agreement on replacing presses with the improved press developed by MJC. Respondent declares that its signing of the Additional Agreement 3 forwarded by Mr. Baraboi on 27 February 2019 means that Additional Agreement 3 has been agreed and concluded. Finally, Respondent states that unless Claimant fulfils the contract taking into account the latest version of the supplementary agreement Respondent would consider that a material breach of contract.

379. On 17 April 2019 Respondent wrote to Claimant and asked Claimant to arrange an inspection of the building where Respondent's manufacturing line for the shells will be installed for Claimant. Respondent stated that it was planning to visit the facilities from 24 April to 26 April 2019. The letter contained a list specifying what Respondent intended to inspect during the site visit.

380. On 23 April 2019 Claimant replied to Respondent's letter of 16 April (C 17, R 31). In the letter, Claimant denied any breach of contract and said that no additional agreement



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

regarding replacement of equipment had been agreed - rather, the Contract set out the Equipment to be provided. Claimant further stated that the delay in performance of Respondent's obligations was unacceptable. Claimant stated that it was a real threat that Artem would not be able to fulfil the State Defense Order and that the defence capacity of the State of Ukraine would be undermined. The letter further stated that from 16 May 2019 the tax authorities would charge Claimant a penalty of 0.3 per cent per day from the sum of the advance payment in connection with exceeding of one year maximum term for importation of goods from the date of advance payment in favor of foreign seller. Finally, Claimant demanded information and documents from Respondent within seven (7) days and stated that unless Respondent fulfilled the requirements Claimant would undertake a package of legal actions in order to protect its rights. What Claimant requested were copies of all subcontracts, documents showing payments to such subcontractors as well as detailed information about the status of such subcontractors' performance. Claimant also asked for written assurance that Respondent would secure timely performance of its obligations under the Contract, as well as bank or third-party guarantees of return of the advance payment in case of the Equipment delivery delay. Finally, Claimant requested documents evidencing the conclusion of the contract for performance of offset obligations as required by Ukrainian legislation.

381. On 23 April 2019 Claimant also responded separately to Respondent's letter of 17 April (R 51), rejecting the proposed visit to Claimant's site for the production line on the grounds that this would be "premature" given that the Contract foresaw such a visit near the time of the equipment's being mounted at the site, whereas the equipment's manufacture was far from completed.

382. On 30 April 2019 Respondent wrote to Claimant (C 18 and R 49). The Respondent explained in detail its disagreement with Claimant's version of events in the letter dated 23 April 2019 as well as the requirements set forth by Claimant in that letter. In the letter Respondent repeated its request that the latest version of the supplementary agreement, including the already agreed upon changes of presses, should be signed by Claimant.

383. On 15 May 2019, a director general of ISOM LLC, S.I. Borbulev, sent a report to Director of the State Enterprise "Ukrainian Center" "SECURITY/BEZPEKA" (R 5 and R 61). The heading of the report says, "Study of the situation around the contract of the plant "Artem" and Gray Fox Logistics". According to the report "The new production line project is capable of fully completing its tasks. It can produce both the body of the projectile and the coating. From our perspective the line should be supplemented by five robotic manipulators and a volume hardening furnace, which will lead to slightly higher costs for the project, however, not applying these options could substantially lower productivity. The facility provided by ARTEM will not ensure the normal operation of the line; it is necessary to find more suitable premises and create conditions for launching the line in accordance with its technical requirements". According to the report "The costs of installing five additional robotic manipulators would amount to



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

approximately USD 1 million; but precisely this option is essential in order to enable the production line to work faster and to reduce the time required for each single process compared to installing the workpieces manually".

384.    On 4 June 2019, the Parties met in Kiev. The minutes, not signed by the Parties (R 50), show that the Parties did not find a solution to the current dispute.

## LEGAL CONSIDERATIONS

### Claimant's avoidance of the Contract

385.    Claimant has terminated the Contract on the basis of fundamental breach by giving notice in the SoC item 47. Claimant relies on the inability of Respondent to deliver equipment pursuant to the Equipment list included in the Contract as well as the delay of delivery (SoC item 29). Pursuant to Additional Agreement 1 delivery in Odessa should occur during March and April 2019. It did not.

386.    In the opinion of the tribunal, it has been demonstrated that Respondent cannot deliver equipment pursuant to the Equipment list in the Contract and that delivery in Odessa did not occur pursuant to Additional Agreement 1.

387.    The press and the flow forming equipment are the key machines according to Mr. Lorentzen (TD 2, 185/17). The tribunal has no reason to have another opinion about the importance of a press or presses for the manufacturing facility. With respect to delivery of the replacement Equipment, Respondent originally proposed in November 2018 a rolling schedule of delivery between May and November 2019, paragraph 346 above, which is a delay of more than six months in comparison with Additional Agreement 1. In December, the Respondent appeared to revise the plan for rolling delivery starting in May, so that "delivery of the entire line" would instead occur in November (C 12, p. 2), which was more consistent with the dates when the equipment became available to Respondent through its subcontractor. According to the subcontractors' chart signed by the parties in April (C 26, pp. 1-2), the "big-ticket items" that had already been ordered were not available for shipment until either August or September, and most other machines had not yet been ordered. Although the schedule further envisioned the subsequent period for installation, start-up, and acceptance testing of the replacement equipment to finish in February 2020 (R 33, pp. 16-17), these activities were originally scheduled in the Contract's Appendix 2 for seven months beginning in May 2019 and ending prior to the Contract's termination in December 2019.

388.    Claimant relies on Article 49 (1) (a) CISG. According to that Article a party may avoid a contract, if there is a fundamental breach of the contract. A fundamental breach is defined in Article 25 of CISG. From that article, it follows that a breaching party will not be exposed to avoidance of the contract if he did not foresee and a reasonable person of the same kind in the same circumstances would not have foreseen such a result.



389.    The result in this case, *i.e.* delay and a press solution other than Bliss presses, are mainly caused by the unavailability of the Bliss presses. If, in fact, Bliss presses were unavailable prior to the signing of the contract, the current situation could have been avoided, if Respondent, prior to entering the Contract, had declared that Bliss presses were unavailable and that the Contract therefore must include another press solution. If, on the other hand, the unavailability of the Bliss presses occurred after the signing of the Contract in March 2018 one might conclude that Respondent could not have foreseen the current result, *i.e.* delay and a new press solution.

390.    To similar effect is Article 79(1) of the CISG, which Respondent invoked (*e.g.*, in the Complaint it sent to Claimant in April 2019) as a justification for changing the Equipment. That CISG provision states, "A party is not liable for a failure to perform any of his obligations if he proves that the failure was due to an impediment beyond his control and that he could not reasonably be expected to have taken the impediment into account at the time of the conclusion of the contract or to have avoided or overcome it, or its consequences".

391.    From what is stated in the preceding paragraphs follows that it is important to establish if the unavailability of the Bliss presses occurred after the signing of the Contract. The burden of proof lies on Respondent.

392.    According to the record the issue of a new press surfaced at the end of August beginning of September 2018 (C 6). At the meeting on 5 September 2018 (C 7), Respondent confirmed that no changes would be made to the press. In its letter 16 April 2019 (C 16) Respondent says that the change of press due to the reorganization of Bliss was communicated to Claimant on 29 August 2018. According to the tribunal the record does not show that. What the record shows is that Respondent wished to change the press solution, that no reasons were given and that Claimant expressed concern during a Skype meeting on 5 September 2018 that, instead of the Bliss press, Respondent now proposed a press having "very different characteristics and [that] needs a special foundation for a depth of more than 6 meters". According to the same minutes of meeting Respondent's chairman replied, "No changes will be made - we are using the "original" press and the same technology production" (C 7).

393.    The new press solution was discussed again on 19 September 2018. Claimant asked for the reasons for a new press solution (C 8). In its reply, (C 9) on 21 September 2018 Respondent basically argued that the proposed solution was a better solution.

394.    On 13 November 2018 (C 11) Respondent repeated its argument for a change along the lines set out in its 21 September 2018 letter (C 9).

395.    In the opinion of the tribunal, the first time Respondent invoked the unavailability of the Bliss press is in its letter of 7 December 2018 (R 34). That letter explained that the Bliss press needed to be replaced under the Contract "[d]ue to the fact that a U.S, based company Bliss was purchased by a German company after we have provided the



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

original quote, [and] the purchasing company has ended production of presses by Bliss." This was followed by an extract from a website of an entity called "Sutherland Presses," pasted into the letter, containing a one-paragraph summary of how the historic Bliss company had, through various corporate transformations, become part of "BCN / Bliss-Clearing Niagara." According to this summary, the assets of the former Bliss company "are owned by what is now called BCN / Bliss-Clearing Niagara which is now owned by Schuler Presses." The only bankruptcy mentioned in the summary was suffered by BCN's predecessor, known as "CNB/Clearing Niagara Bliss" (R 36). Although this same text goes on to state that no Bliss presses were then being built, it does not say when production stopped, when Bliss presses became unavailable on the market, when the bankruptcy of BCN's predecessor occurred, when BCN was purchased by Schuler, or whether either of these last two events precipitated unavailability of presses.

396.    None of the witness testimony at the hearing offered further clarification on the points left unresolved by the 7 December 2018 letter. Indeed, if anything, the hearing testimony tended not to support Respondent's assertion in that letter that it was the company purchasing BCN, *i.e.*, the German company Schuler, that "ended production of presses by Bliss." Mr. Wernli, Head of Audit and Technology for Respondent, testified that "Bliss went in ... Chapter 11 procedure, I don't know, in 2014, whatever, in the States and that doesn't mean that they are not producing in Chapter 11, they are in bankruptcy process but they can continue to produce and then they were bought recently by the Germans, Schuler, or whatever ... Now, I contacted the Germans. Bliss in America was bought by the Germans and they are constructing again presses, but only the small presses." (TD 2 147/11-20). Mr. Wernli's statement that Chapter 11 "doesn't mean that they are not producing in Chapter 11, ... they can continue to produce" suggested that he did not actually know whether production had continued following entry into Chapter 11, and his further statement that, following BCN's /Bliss' purchase by Schuler, "they are constructing again presses, but only small ones" tends not to support the assertion that Schuler "***ended*** production of presses by Bliss" (emphasis added), as stated in the December 7th letter to Claimant. In any event, much like the extract that Respondent provided from the Sutherland Presses website, Mr. Wernli's testimony failed to clarify when Schuler's purchase of BCN occurred and whether it predated the Contract's signing in March 2018. However, Mr. Wernli did state that he was first contacted by the Respondent to work on the Artem contract only in January 2019, TD 2 101/3, which suggests that his reconnaissance about a German press shipment to Ukraine could not have precipitated the change in proposed equipment, since the change was first presented to Claimant in August 2018 (although Mr. Provini implied that Mr. Wernli may have rendered some assistance before his services were formally retained, TD 2 72/2-4).

397.    The testimony of Mr. Provini, Respondent's Chairman and President, similarly failed to clarify any of the unresolved questions. When asked by Claimant's counsel what precipitating factor "beyond the control of Gray Fox Logistics ... caused the necessity to change the equipment," Mr. Provini initially cited "[t]he Bliss press bankruptcy [which]



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

ended up with another owner … that had restrictions on where to ship it," TD 2 46/19 – 47/1. However, when counsel pressed Mr. Provini to agree that the bankruptcy had actually occurred before the Contract was signed, Mr. Provini responded as follows: "So when the bankruptcy happened, you know, I don't know the date, but I know that when we were signing the contract we felt that we could have access to Bliss presses to meet and fulfil the contract because of the new supplier" (TD 2 50/4-8). The reference to "the new supplier" appears to be to Schuler, the German owner of BCN, and suggests that not only the bankruptcy but also Schuler's purchase of BCN occurred before the Contract was signed.

398.    Later in his testimony, Mr. Provini speculated that the reason Schuler was barred from shipping a press for producing artillery shells to Ukraine was that Germany did not wish to appear to take sides in the ongoing military conflict between Ukraine and the Russian Federation (TD 2 82/23 – 83/11). But there was no suggestion that this policy was a recent development, and indeed Ukraine's armed conflict with Russia has persisted since 2014. In any event, Mr. Provini's statement that when Respondent signed the contract "we felt we could have access to Bliss presses … because of the new supplier" implies (by use of the verb "felt") that Respondent may not have confirmed such availability prior to signing the Contract but that such shipment to Ukraine may already have been barred. The tribunal need not make any finding on that point. It is sufficient simply to note that Respondent bears the burden to demonstrate that one or more developments that occurred after it signed the Contract and that were unforeseeable and beyond its control prevented it from supplying the Bliss Press to Claimant. Respondent has not carried that burden.

399.    Finally, Mr. Provini testified that he believed it was the Claimant, rather than Respondent, that put the specification of the Bliss press in the Contract, TD 2, 9/10. In the opinion of the tribunal, that is not relevant. What is relevant is that Respondent signed a contract including an obligation to deliver four (4) Bliss presses.

400.    On 20 December 2018, Respondent forwarded to Claimant a full-page copy of the same screen shot extracted from Sutherland Presses' web site (R 36) that had been pasted into its 7 December letter. The extract is captioned "Bliss Presses – History, Technology & Service". The first two sentences thereunder state: "This profile and subsequent chart [no chart is included in the screen shot] are intended to provide a high level overview of press providers. The intent is to educate users of all type of presses on the options you have when selecting your next, stamping, forming, mechanical, hydraulic or forge press." Thus, although Respondent explained when transmitting this document to Claimant that "we send you a scan of the manufacturer's page with information on the discontinuation of production of Bliss pressing equipment," it appears to the tribunal that Sutherland Presses markets presses from multiple manufacturers and is not itself the manufacturer of Bliss equipment. Sutherland Presses may instead have been Respondent's anticipated supplier of the presses since (judging from the telephone number printed on the web page extract), Sutherland appears to be located in the Los



Angeles area, as was Respondent's principle subcontractor, MJC, and Mr. Provini referred in his witness statement to the fact that "our press equipment supplier, the distributor of Bliss press could no longer procure the required presses to us – Bliss USA had undergone a number of reorganizations and no longer produced press equipment suitable for the production of projectile bodies" (R 5, p. 3). However, since this web page extract – created by a company apparently unrelated to Bliss – did not indicate when BCN (or its predecessor) entered bankruptcy proceedings or when Schuler purchased BCN – it is unclear to the tribunal why Respondent twice provided this web page extract but provided no information published by BCN itself.

401. In the opinion of the tribunal, the evidence invoked, including testimony, does not prove that the unavailability of Bliss presses occurred after the signing of the Contract. Thus, Respondent has not demonstrated to the satisfaction of the tribunal that the factors forcing it to substitute an alternative equipment list arose after the Contract was signed and was unavoidable. Therefore, Respondent cannot successfully rely on the excuse of unforeseeability (see Article 25 and Article 79, CISG).

402. Pursuant to Article 25 CISG, another aspect of the dispute is, whether the new press solution offered by Respondent is equal to the press solution included in the Contract. If it is, this would bear on the question whether the breach is fundamental by substantially depriving Claimant of what he is entitled to under the Contract. The other factor bearing on this question is whether the revised timing of the equipment delivery also substantially deprived of what the Contract provided. It is sufficient to find in favor of Claimant with respect to either the equipment issue (quality of original equipment compared with the proposal) or the timing issue (delay) in order to conclude that Claimant was entitled to avoid the Contract for fundamental breach, absent amendments to the Contract as alleged by Respondent or bad faith by Claimant as invoked by Respondent.

403. In the opinion of the tribunal, it is questionable whether Claimant had demonstrated that the equipment offered by Respondent was such that it would substantially deprive Claimant of what the Contract provided. The testimony by Mr. Wernli, TD 2 105/8, and Mr. Lorentzen, TD 2 178/13, supports that the offered solution was as good or better than the original solution. The Borbulev report, R 61, supports that view although based on additional equipment being supplied. From the report as such it seems to the tribunal as if the author is knowledgeable in his field. However, the tribunal notes that no information has been supplied with respect to the qualifications of the author or the materials he has had as a basis for his report. Those factors will reduce the evidentiary value of the report. The value of the testimony by Mr. Choi and his report, C 20, is not such that the evidentiary value of the evidence just mentioned can be disregarded. With that said, the tribunal now turns to the issue of delay.

404. The Additional Agreement 1 was executed on 22 August 2018. According to the schedule the goods were to be delivered in Odessa during March - April 2019 leaving



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

May - November, *i.e.* 7 months, for delivery to site, installation, and the acceptance test. According to a proposal from Respondent on 16 November 2018, R 33, delivery in Odessa was changed to May-mid December 2019, and then a further clarification in December 2018 foresaw only that "delivery of the entire line" would occur by November (C 12). Under either revised schedule, this left installation at site, start-up and the factory acceptance tests to occur thereafter. Although Respondent's revised schedule envisioned these extending into January and February 2020, the tribunal notes that this is less than half the time (following the equipment's arrival in Odessa) that was allocated for these activities by the Contract originally. Moreover, the Contract terminated on 20 December 2019. Thus, Respondent's revised delivery proposal was likely to postpone initiation of the production line significantly.

405.    In April 2019 it was clear that the Parties had fundamentally different views about the project and the contract terms. At this point in time the delay was substantial in comparison with the Additional Agreement 1. Some of the delay may have been caused by requests and actions from Claimant. In the opinion of the tribunal, there is no doubt, however, that the main cause of the delay was Respondent's request to change the original equipment included in the Contract to another solution. The tribunal concludes that a substantial portion of the delay is attributable to Respondent. The change in delivery time is such that it must be deemed to substantially deprive Claimant of what Claimant was entitled to expect under the Contract.

406.    The delay constitutes a fundamental breach of contract by Respondent. Claimant is therefore entitled to avoid the Contract unless, as argued by Respondent, the Contract has been amended or Claimant has acted in bad faith.

## Does the practice between the parties entail that they are bound by Additional Agreements 2 and 3?

407.    Respondent claims that the Parties are bound by Additional Agreements 2 and 3. Respondent argues that is so, even though Claimant has not signed either Additional Agreement 2 or 3, because the Parties adopted a practice by which Additional Agreements were adopted without both parties' signing but rather by the Claimant indicating its assent by asking the Respondent to sign the document and then return it, following which the parties allegedly treated the Amendment tacitly as adopted (R II, 46). Respondent relies on Article 9 (1) CISG that states that party practice may become binding on the parties, which Respondent argues could even prevail over express contractual language such as para 18.1 in the Contract, requiring that all amendments to the Contract, to be valid, must be adopted in writing and signed by both parties. Should Respondent be successful with this line of defence, Claimant's avoidance of the Contract would be doubtful since Additional Agreement 2 and 3 changes the equipment to be supplied, and the parties understood that this, in turn, would prolong the delivery, installation, and testing schedule in comparison with the Contract. There are two questions to address: First - Has such a practice developed between the Parties such that



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

they are contractually bound by it? In such a scenario para 18.1 in the Contract is replaced by the practice. Second - If the conditions for applying Article 9 (1) are met, would such application still be precluded - as Claimant argues it must be - by the fact that Ukraine excluded application of Article 9 (1) by reservation when it ratified the CISG? The second issue will only need to be addressed if the answer to the first question is "yes".

408. Respondent has submitted legal authorities RL 4 and RL 5 in order to support its position. In summary the tribunal concludes that Respondent has the burden of proving that a practice existed between the Parties (RL 5 p 186). It is also important to note that consideration of practices under Article 9 (1) "occurs on the basis of the intent of the parties, determined under Article 8" (RL 5 p 181). Article 8 says that intent is what the other party could have been aware of. Lacking such intent, it is the understanding of a reasonable person of the same kind and in the same circumstances that matters. The practice must take place during a certain time and occur with a certain frequency (RL 4 p 166).

409. The Respondent relies primarily on two events to support its argument pursuant to Article 9 (1) in CISG. (R II item 46). They occurred on 24 September 2018 and 19 November 2018 when Claimant, through Mr. Baraboi, sent drafts of documents to Respondent with signing instructions. After Respondent signed, a countersigned copy was never returned by the Claimant, but the Parties tacitly agreed, according to Respondent, that the document was validly executed. Therefore, Respondent argues, the same practice and procedure is valid for Additional Agreement 3. When Mr. Baraboi sent Additional Agreement 3 to Respondent and Respondent returned it with its signature, Additional Agreement 3 was concluded (R II item 47).

410. The tribunal turns to the first document allegedly so treated. The record shows that the Parties met twice in September 2018, namely on 19 September 2018 and 26 September 2018 (C 8 and R 8). The minutes from the first meeting were forwarded by Mr. Baraboi on 24 September with a request for Respondent's signature (R 66). Although these minutes were ultimately signed by both parties, as shown in exhibit C 8, Respondent appears to argue that, because no countersigned copy was returned to it at the time, this illustrates a practice of documents being deemed "approved" solely on the basis of Respondent having been asked to sign and then returning to Claimant the signed copy. The tribunal does not find this example persuasive evidence of the kind of practice that might render the unilaterally signed copies of Additional Agreements 2 and 3 binding upon the parties.

411. First, whether or not Respondent was so informed at the time, the fact remains that the meeting minutes in question were jointly signed (C 8). Second, the "practice" that Respondent must prove that the parties developed is one that could derogate from para 18.1 of the Contract, which requires that *amendments to the contract* be in writing and signed by both parties in order to be valid. The parties' treatment of a single set of



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

meeting minutes cannot demonstrate a general practice of the parties' becoming bound by unilaterally signed contract amendments.

412. In this regard, the tribunal notes that the minutes from the 26 September 2018 meeting record that Claimant accepted the new equipment list. However, the minutes continue with the statement that the parties had agreed to draw up an attachment to the contract regarding the amendments. In the opinion of the tribunal, these minutes therefore support the view that minutes from a meeting are not enough in order to have a binding amendment to the Contract.

413. On 19 November 2018 Mr. Baraboi sent a draft Additional Agreement on the manufacturing line's expected power consumption to Respondent (R 64). In the cover email Mr. Baraboi says "…will be no objections I suggest we sign". In the opinion of the tribunal that email does not support the contention that a signature only by Respondent is enough in order to have a binding agreement. After all the email says, "I suggest we sign". "We" can hardly be construed as anything but the Parties to the Contract.

414. It is correct that Mr. Baraboi, with copy to Karpenko and Gryshchenko, on 27 February 2019 sent the last version of the Additional Agreement 3 to Respondent saying, "If everything is ok, sign with Chuck and send it to us" (R 17). In the opinion of the tribunal that message should be read in the context of several other messages from Mr. Baraboi, including one on 15 February 2018 (R 71), that says that "they" (in the understanding of the tribunal, Mr. Baraboi was referring to his bosses) are simply afraid to sign this Additional Agreement, another email from Mr. Baraboi on 19 February 2019 (R 72), in which he states that there is no other way but to sign an additional agreement on equipment changes and an email on 20 February 2019 (R 65) in which Mr. Baraboi says that he "thinks" that he will be able to "persuade" his bosses to sign. In the opinion of the tribunal the emails just referred to show that a signature by one party, *i.e.* the Respondent is not enough for the conclusion of an amendment to the Contract. The signature of both parties was required.

415. Respondent also points to other occasions when the parties agreed on discrete changes to technical specifications in the Contract's appendix 3 without appearing to require an Additional Agreement to implement those changes. Two particular instances are highlighted: the parties' acceptance of Claimant's proposal, as recorded in the meeting minutes of 21 August 2018 (R 70), that the hardness tester should use the Brinell (rather than the Rockwell) hardness index (this meant revising, *e.g.*, line 1.1.11 in Table 1 of the Contract's appendix 3) and the parties' agreement to Claimant's request (as recorded in the meeting minutes of 24 October 2018 (R 68)), that the billets used for shell formation should be round rather than square (this required changing the specification in clause 1.3A of appendix 3). For several reasons, the tribunal does not find these examples to demonstrate a "practice of the parties" (within the meaning of Article 9(1)



of the CISG) that derogated from the Contract's requirement (in clause 18.1) that any amendments adopted be by a signed writing.

416. To begin with, we note that Respondent, as the party not initiating these changes, evidently did not invoke its right to an Additional Agreement to confirm either of these Contract revisions. One might infer that Respondent did not do so because it already recognized that far greater changes in the Equipment were underway and that the minor modifications proposed by Claimant could thus readily be accommodated. But, in any event, the situation was quite different with respect to the revised equipment list – including replacement of the four Bliss 1800T presses – that Respondent unveiled in late September 2018. On that occasion, the parties quickly agreed (as stated in the unsigned minutes of the 26 September 2018 meeting (R 8) and not since disputed) that the "substantial" changes in Equipment that Respondent proposed required an "Attachment" to the Contract, which of course became Additional Agreement 3.

417. Ultimately, however, these two episodes that Respondent cites carry less weight than Respondent claims because the changes in technical specifications seemingly adopted at the 21 August and 24 October 2018 meetings were ultimately incorporated in the Additional Amendment 3 that Respondent signed in March 2019 (*see* C 14, p. 4 (specification of round billet); p. 6 (reference to Brinell hardness scale)). Thus, the tribunal cannot conclude from these episodes that the parties relied on mere meeting minutes to revise the Contract.

418. Although Respondent states in its pleadings that, when it returned the unilaterally signed copy of Additional Amendment 3 to Claimant, it "correctly understood that the Additional Agreement 3 had then been concluded," R II item 47, its contemporaneous actions do not seem to have reflected such an understanding. Thus, after returning the signed copy of Additional Amendment 3 in March 2019, Respondent met Claimant's representatives for a site visit at MJC in California and signed minutes on 5 April 2019 in which Respondent undertook to "provide a new delivery schedule", based on "stipulations that the signed addendum contract will be signed by the end of month of April 2019" (R 25). The "stipulations" for another signature on Additional Agreement 3 presumably came from Claimant at the request of Respondent, indicating that both parties still believed the "signed agreement" had to be also "signed" by the other party. As one of Respondent's legal authorities states in assessing what constitutes a binding "practice" within the meaning of CISG Article 9(1), "the course of conduct must have created a justified expectation that the parties will proceed correspondingly in the future. It is therefore necessary that the parties recognize their conduct as a practice", P. Schlechtriem & I. Schwenzer, Commentary on the UN Convention on the International Sale of Goods 185 (4th ed 2016 Oxford) (footnotes omitted) (RL 5) ("Schlechtriem & Schwenzer"). In the tribunal's view, the record does not sustain that the parties recognized such a practice at the time that Respondent signed Additional Agreement 3.



419.    The conclusion of the tribunal is therefore that Respondent has not demonstrated that the circumstances regarding Additional Agreement 2 and 3 are such that a practice between the parties has been established which pursuant to Article 9 (1) CISG would bind the Parties to Additional Agreement 3 despite the lack of signature from Claimant. Therefore, it is not necessary for the tribunal to address whether Article 9 (1) may be applied in the current dispute. Nor is it necessary to further investigate and discuss the authority of Mr. Baraboi. Here it is sufficient to note that Mr. Baraboi himself, when communicating with Respondent, stressed that he is a technician (R 72), and that Mr. Provini understood that to be the case (TD 2, 13/8).

### Has Claimant acted in bad faith in breach of among other things Article 7 (1) and Article 80 CISG ?

420.    In Respondent's opinion, Claimant has a duty to act in good faith during the execution of the Contract. That good faith undertaking follows from Article 7 (1) in CISG, *lex mercatoria* and the UNIDROIT principles. Claimant has, according to Respondent, acted in bad faith from as early as October 2018 and continuing to at least fall of 2019, SoD item 93. Respondent argues that Article 80 CISG is applicable in the current dispute. According to that Article, a party may not rely on a failure by the other party to perform to the extent that such failure was caused by the first party's act or omission (the Estoppel principle). The burden of proof rests on Respondent (RL 1 page 1162). If the Estoppel principle is applicable as argued by Respondent, it follows that Claimant is impeded from asserting any claim to the extent non-performance was caused by Claimant. Among other things the right to avoid the contract would not exist if the conditions for applying Article 80 were met, as argued by Respondent (RL 2 page 1085).

421.    Article 7 (1) CISG states that in the "interpretation of the Convention" regard is to be had to its international character and the observance of good faith in international trade.

422.    Article 80 CISG is said to be an example of the good faith principle. In simple terms, a party shall not be able to assert a claim based on non-performance from the other party, if he himself caused the non-performance, RL 1 p 1155. One example mentioned is a buyer's unjustified refusal to accept a substitute delivery of goods, RL 1, p 1157. The tribunal agrees with the conclusion expressed in RL 2, p 1080, that it would be contrary to the good faith principle if a party could rely on the other party's non-performance when such non-performance was created by its own acts or omissions. An example mentioned, when this Article may be applied, is when a buyer unjustifiably rejects the offer of the seller to cure nonconformity. In RL 2, p 1083, it is further stated "In order for an omission to be relevant under Art. 80, the obligee has to be under a duty to act or cooperate. The duty to engage in actions may arise from the contract, the CISG, any usage or practices established between the parties or from the principle of good faith in international trade".



423. The Contract includes the requirement that amendments to the Contract shall be in writing and signed by both parties, para 18.1. According to the Contract, Respondent undertook to deliver specified Equipment with a guarantee of a certain production volume on an annual basis. The Contract does not allow Respondent to decide unilaterally to replace this with different Equipment in whole or in part, even if the replacement parts would produce the guaranteed volume because doing so would still constitute an "amendment" to the Contract without having a jointly signed Additional Agreement. Thus, when Respondent understood that it could not deliver what it had agreed to deliver according to the Contract it was required, in the opinion of the tribunal, to change the Contract and to document those changes as agreed in para 18.1 in the Contract. The request for a change was driven by Respondent's inability to deliver according to the Contract and not by Claimant's wishes for replacement of the Equipment in whole or in part. When Respondent during the fall of 2018 decided to move ahead with the project on the basis of a revised equipment list without securing an agreement in writing approving this as the Contract required, Respondent exposed itself to a considerable risk - namely, that Claimant would ultimately not accept the changes and/or the delay of the project.

424. In the opinion of the tribunal any assessment of the Parties' activities during the relevant period must consider that the situation was triggered by Respondent's inability to deliver pursuant to the Contract. That inability to deliver pursuant to the Contract caused a postponement of the time for delivery as Respondent deemed it necessary and better to design a new press. It goes without saying that such a process is more time consuming than to buy a product off the shelf.

425. The tribunal believes that this fact highlights the flaw in Respondent's attempt to derive a violation of Article 80 CISG from Claimant's alleged failure to act in good faith. Article 80 bars Claimant from claiming against Respondent for non-performance if Claimant's own acts or omissions caused the non-performance. However, it is performance of the contract that forms the subject of Article 80. By contrast, Respondent appears to argue that Article 80 bars Claimant from claiming a fundamental breach of the existing Contract because it interfered with Respondent's performance of the revised Contract that Respondent proposed, which the tribunal has found substantially diverged from what was promised (especially in its required delay), and that was ultimately set forth in Additional Agreement 3, but which Claimant did not sign. This line of argument appears, for example, in paragraph 118 of Respondent's SoD:

*"118. The Claimant goes as far as to claim that the Respondent refused to deliver under the Contract which cannot be further from truth. As has been described in detail throughout this Defence, the Respondent has been (and still is) determined to deliver under the Contract. That is, however, impossible without the most basic collaboration from the Claimant. It has been mentioned that the duty to cooperate is one of the*



*standards forming the principle of good faith. Here we can clearly see the consequence of ignoring such duties."*

In the tribunal's view, Respondent thus seeks to deploy the obligation of good faith to compel the signing of Additional Agreement 3. In effect, Respondent argues in the passage just quoted that, by not agreeing to Additional Agreement 3, Claimant violated its obligation of good faith and thus breached Article 80 by preventing Respondent from carrying out the Contract on revised terms. The tribunal does not believe that the obligation of good faith can extend so far as to compel a party to agree to contractual changes, unilaterally proposed by the other party, particularly where the changes alter substantially the original obligations and where a signed agreement by the parties is required for any Contract amendment.

426. The situation might be different if the proposed changes became necessary because the unavailability of the Bliss presses arose after the Contract was signed and was unforeseeable and unavoidable. However, the tribunal is not persuaded that this was the case here. The tribunal notes that Respondent's initial arguments for the exchange of the Bliss presses were that the designed press would be a better solution for Claimant (C 9 and C 11). The tribunal also notes that, prior to those explanations, Respondent maintained during the beginning of September (C 7) that it could deliver the "original" press. The non-availability argument was not introduced by Respondent until December 2018 (R 34). However, already prior to that, on 25 September 2018 (R 69), Respondent had ordered the design of a new press solution from its subcontractor. If the Bliss presses were unavailable in August as argued by Respondent, SoD item 25, why was the "original" press solution confirmed on 5 September 2018? If the Bliss presses were unavailable in September, why did Respondent not say so in its letters in September and November 2018 (C 9 and C 11)? The actual events during the fall of 2018 are not completely coherent with the explanation offered for the exchange of the Bliss presses and much less proven by Respondent.

427. Based on the foregoing, the tribunal cannot conclude that Claimant acted in bad faith when it refused to sign Additional Agreements 2 and 3. Claimant may therefore rely on the non-conformity between the equipment offered by Respondent and the Equipment and planned delivery schedule required under the Contract as a ground for the avoidance of the Contract, and that non-conformity has not, as required for an application of Article 80 CISG, been caused by Claimant's acts or omissions.

428. Additional Agreement 1 stipulated delivery in Odessa during March-April 2019. The record shows that, as early as November 2018, Respondent envisioned that delivery in Odessa of the replacement equipment could not occur until May-November 2019 (R 32) and by December 2018 "delivery of the entire line" was only promised by November 2019 (R 14), with installation, start-up and acceptance tests to stretch into 2020. The crucial question is if that delay (or a substantial portion thereof) has been caused by Claimant? In the opinion of the tribunal, the delay foreseen as of November-



December 2018 – which postponed completion of delivery by seven months and pushed the completion of the installation, start-up and acceptance tests well past the contract's expiration in comparison with Additional Agreement 1 – has mainly been caused by the request from Respondent to change the Equipment. In the period thereafter, the situation is perhaps more mixed but not to an extent that would alter the tribunal's conclusion that Claimant was not compelled by any obligation of good faith to sign Additional Agreements 2 and 3.

429.   In the SoD, item 92-103, Respondent invokes ten (10) "clusters" of circumstances that, according to Respondent, demonstrate Claimant's bad faith and thereby evidence why "the delay in the delivery must be directly linked to the actions of Claimant," SoD item 122, for purposes of exempting Respondent from non-performance liability, pursuant to Article 80 of the CISG. According to Respondent, "[e]ach of them [*i.e.,* each "cluster" of bad faith circumstances] may be sufficient to fulfil this criterion, while all of them together require no further argumentation," SoD item 122. In the opinion of the tribunal, however, many of the circumstances identified, such as Claimant's alleged attitude at the meeting in Kiev on 4 June 2019, its alleged distribution of confidential information to a competitor, its refusal to accommodate Respondent's requested site visit in April 2019, its alleged use of "various methods" of amending the Contract, and Claimant's alleged recourse to the Ukrainian Security Service (SSU) to obtain Respondent's confidential banking information are not the kinds of acts (whether or not characterized by bad faith) that would have prevented Respondent from carrying out the Contract within the meaning of CISG Article 80.

430.   At least three alleged instances of Claimant's bad faith, however, sufficiently relate to the dispute over the replacement equipment and its postponed delivery to warrant further consideration. First, we consider Respondent's contention that Claimant in bad faith repeatedly asked for information about the replacement equipment that it had already received. Consideration of this charge requires a fairly detailed examination of the record. The second and third contentions of bad faith that may bear on the dispute – namely, Claimant's changes to the artillery shell drawings and its apparent acceptance at an early stage of delayed delivery of the replacement equipment – can be dealt with more summarily.

431.   First, Respondent contends that "Claimant kept requesting the same or even unnecessary documents over and over again" and thus "employed various dilatory tactics under the false pretences of ensuring the technical quality" of the replacement equipment, SoD item 94. Having examined the full record, the tribunal does not agree that Claimant's interactions with Respondent regarding the replacement equipment manifest bad faith in a way that could exempt Respondent from liability for not performing the Contract.

432.   To begin with, it took time – often, considerably more time than foreseen – for Respondent to provide all the information on the new equipment that Claimant sought in order to assess whether to accept the replacement equipment. And, obviously, Claimant



was entitled to know the details about the substantially revised production line that was unexpectedly proposed and to fairly evaluate that new information (including by follow-up inquiries).

433. The process began at the parties' meeting of 26 September 2018. Although the unsigned minutes from that date (R 8) state that "ARTEM company accepts the updated machine list", provided that "no more variations of the stipulated equipment will be accepted", this putative agreement appears – at most – to have been an agreement in principle, since it was predicated on adoption of an amendment to the Contract revising the Equipment and was accompanied by Respondent's commitment to provide much information about the proposed equipment changes, such as: "the revised feasible terms to supply the equipment to Ukraine" (by 3 October), which the tribunal anticipates would likely include a delivery schedule; "the drawing of special foundation for the" new press (by 2 October); a revised layout of the equipment in the production line" (by 2 October); "information regarding harmful emissions into the atmosphere and contamination during the production line operation" (by 28 September); and "information regarding heat output volume caused by cooling system operation" (by 2 October). The record contains an email of 3 October 2018 transmitting a 21-page document entitled "Machine Spec – All Machines", which sets forth technical details as to various components of the revised production line as well as comments on the particular reasons for proposed changes. Otherwise, however, no documents containing the other promised information have been included in the record from the period between 28 September and 3 October.

434. As the tribunal has noted – paragraphs 340 above – Respondent committed at the parties' meetings of 24 October 2018 and 7 November 2018 (R 68; R 11) to provide some of the same information promised in September, suggesting that transmission had been delayed. The minutes from those same meetings, however, record Respondent's undertakings to provide additional data, presumably at Claimant's request, including: consideration of "the sufficiency of 4 megawatt (MW) electric power required for the production site" (R 68, ¶3); "a complete list of the press characteristics and calculations of energy usage by each unit of the equipment" (R 68, ¶10); "corrected specifications of each unit of the production line as well as checking procedure of accuracy grade" pursuant to Contract clause 9.1.3 (R 68, ¶11); an "actual schedule of the equipment delivery, strictly following the terms stipulated by the Contract" (R 68, ¶12); "calculations of productivity per each unit, taking into account that productivity of the line is 1 pc/min (with minor errors)" (R 11, ¶3); "a justification for postponement of equipment delivery to Ukraine, as well as to approve the final list of the equipment and submit for approval a schedule for implementation of obligations in a timetable form (appendix 1 to the Contract)" (R 11, ¶7); and "recycled water consumption (l/min); compressed air consumption (l/min); oil consumption (l/year); argon consumption per item during surfacing of rotating bands; and volume and name of harmful emissions by each unit (kg/year)" (R 11, ¶5).



435.    Over the succeeding three months, the parties held a number of meetings (sometimes by electronic means) the minutes of which record additional (or sometimes repeated) requests for information and significant technical data that was exchanged. The tribunal has already described these interactions and need not repeat them in any detail here.

436.    The tribunal is able to draw five pertinent conclusions from the parties' interaction regarding the new equipment and new delivery schedule during the four months between late September 2018 and the end of January 2019. First, the Claimant sought throughout this period – and the Respondent provided – a broad range of information and technical data about the new equipment. While the record may not contain all the information requested, neither does it reflect objections from Claimant as to information not received. Second, although certain minutes reflect Claimant's requests for some information more than once, it appears this was only because Respondent was delayed in providing it. Nor does any of the information requested strike the tribunal as unnecessary. Prior to February 2019, therefor, the tribunal finds no evidence supporting Respondent's contention that "Claimant kept requesting the same or even unnecessary documents over and over again … under the false pretences of ensuring the technical quality", SoD, item 94.

437.    Third, while some buyers might have decided more quickly whether to accept the revised equipment and new delivery schedule, the tribunal does not believe that Claimant's failure so to decide by the end of January 2019 evidences a dilatory motive, given the extent of the details to be checked and insofar as some of the information was not immediately available. Fourth, the parties recognized at the outset that the changes in equipment were "substantial" and thus could only be approved by adoption of a Contract amendment revising the technical specifications in appendix 3. And while the various minutes during this period do not reflect any objection to the revised equipment by Claimant's representatives, it was acknowledged that the Contract amendment would require approval by Artem's supervisory board. Although Respondent contends that "the alleged [requirement of] approval of the Claimant's supervisory board is purely an internal affair of the Claimant which was conveniently mentioned for the first time only after the Additional Agreement 3 has already been concluded", R II, item 32, the minutes of meeting from 24 January 2019 contradict the argument by specifically referring to that requirement (R 41, ¶1.6). Nor does the tribunal find this requirement surprising, since the conditions for the Contract's initially coming into force included the parties' receipt of the "relevant permit from [the] Supervisory Board SJSHC ARTEM to execute this Contract", (C 3, para 18.9).

438.    Finally, the tribunal believes that Respondent must have realized its own financial exposure as the discussion of the proposed new equipment and delivery schedule persisted into 2019, since Respondent had already commissioned the replacement press at the end of September 2018, had apparently made its 10% advance payment to MJC in early October, and had been informed by its subcontractor MJC in early November that design work was well underway and that a final build drawing would be ready by the



83

end of the year (R 53). Thus, by January 2019, it appears that Respondent either had to postpone manufacture of the replacement press (which would have further delayed delivery beyond the revised schedule already provided) or move forward with manufacture without yet having Claimant's approval, perhaps augmenting its financial risk. It appears from a subsequent chart of these subcontracts' status, that Respondent chose the latter path, since the forging press was listed in that chart as "ready for shipment, September 2019", "conditional to additional down payment" and the readiness of Claimant's site for commissioning (R 26, p. 1).

439.    With that backdrop, the tribunal turns to the last two and a half months of the parties' interaction on the replacement equipment, assessing once again Respondent's claim that Claimant's bad faith actions prevented performance of the contract in such a way as to exempt Respondent from liability for non-performance, pursuant to CISG Article 80. This record again supports a number of conclusions.

440.    First, the legitimacy of some of Claimant's requests for further documents in March 2019 is hard to assess based on the limited record. The tribunal has in mind, for example, Claimant's request for apostilled copies of certain corporate records, for assurances that the production line could produce additional shell shapes, or for reinstatement of the Becker Quenching and Tempering machine. Such requests may have sought to anticipate questions or objections the supervisory board might raise prior to voting on Additional Amendment 3 (R 18; R 20). But these requests might equally have reflected, in Mr. Baraboi's words, his superiors' search "for some snags". The tribunal understands Mr. Baraboi to have meant that Artem's management sought to find (or perhaps to create) some shortcoming attributable to Respondent to justify rejection of Additional Amendment 3, without their (or the supervisory board's) having to reject the Amendment directly on its merits. The Tribunal need not resolve this point since it does not appear that Respondent's failure to meet these requirements ultimately caused Claimant's refusal to approve Additional Agreement 3. Rather, after Respondent made clear that its production line could not be expected to manufacture shell dimensions outside the contract and that it was too late to revisit the decision made six months earlier to dispense with the Quenching and Tempering machine, nothing further appears to have been said on these topics. Similarly, even if Respondent failed to provide the apostilled copies of the corporate documents (and the record is not definitive on this point), Claimant did not ultimately invoke this as a ground for rejecting Additional Agreement 3.

441.    Second, Claimant did not manifest bad faith in objecting that Respondent failed to "provide Artem with any evidence that the necessity to replace the Equipment arose for objective reasons beyond control of Gray Fox Logistics" (R 31). Indeed, the tribunal has itself found, above at paragraphs 391-401, that Respondent did not carry its burden of proving that the equipment change was required by developments outside its control that occurred after the Contract was signed. While this is only one of the factors Claimant invoked to justify not signing Additional Agreement 3, it carries particular significance



since Claimant could thus have concluded that Respondent was not excused from non-performance under CISG Article 79, contrary to what Gray Fox repeatedly claimed. As a result, Claimant could have regarded its own decision whether to accept Additional Agreement 3 as far less constrained.

442.    Third, it is true that, for example, the exchange between Respondent's Mr. Galver and Claimant's Mr. Baraboi on 24 February 2019 suggested that Claimant's comments during the meeting earlier that day revealed persistent concern about approving a change in technology (R 71). However, it appears to the tribunal that Claimant was more concerned about the delay in putting the production line in operation. Thus, as early as the November 7th meeting, when Ms. Gryshchenko made comments later characterized by her junior colleague, Mr. Baraboi, as "off topic with the schedule", Mr. Baraboi nonetheless explained that "the main point is that she wants a proper justification *as to why the equipment is arriving later!*" (R 12, p. 2 (emphasis added)). Subsequently, when Claimant mentioned the need for supervisory board approval at the January 24th meeting, it specifically referred to the need to approve revision of "the planned schedule" (R 41 ¶1.6). Similarly, when Mr. Baraboi described his bosses' fear of deciding on Additional Amendment 3, he explained that "*They are simply afraid to sign the alteration of the deadlines* and connect this to the changes in the list of the equipment!" (R 71 (emphasis added)). And, again, Claimant's final letter before initiating arbitration emphasized Claimant's distress concerning "[t]he specified delay in performance of [Respondent's] contractual obligations", which were said to undermine Ukraine's "defence capacity", risk non-fulfilment of the "State Defense Order" issued to Artem, and to expose Claimant to a penalty from the State Tax Authority for receiving goods from a foreign supplier more than one year after advance payment (R 31, p. 2). This reinforces the tribunal's impression that the primary cause of Respondent's fundamental breach, in Claimant's view, was prolongation of Respondent's obligations beyond the Contract's expiration.

443.    Finally, the tribunal finds that a number of the demands Claimant ultimately imposed as purported conditions to approving Additional Agreement 3 (or the grounds for not signing that Agreement) were not made in good faith. This does not mean that Claimant rejected Additional Amendment 3 while actually approving of it. Rather, the tribunal believes these particular reasons given were in bad faith because they appear pretextual. For example, with respect to demands that Claimant imposed, the tribunal finds no legal basis for Claimant's sudden demand for a bank guarantee to secure repayment of the advance "in case of … delivery delay" (R 31, p. 2) – a condition that was not even defined, leaving in doubt whether "delay" might be measured by the Contract's original schedule, which this same letter of April 23rd elsewhere invoked. Similarly, there was no basis for Claimant's demand for copies of Respondent's subcontracts. Respondent had identified for Claimant – twice – the seven subcontracts it had already entered into, and Claimant had just visited the principal subcontractor's premises to inspect the progress of much of that work. Thus, it is unclear what lingering concern could only be resolved by receiving these confidential contracts. The tribunal concludes that these requests



were likely of the type mentioned by Mr. Baraboi when he stated on February 14th that "My superiors are looking for some snags" (R 71). In other words, it appears that Claimant may have imposed new conditions that Claimant could characterize as redressing perceived risks and that Respondent could not reasonably be expected to meet. That result might then be invoked to justify rejection of Additional Amendment 3.

444.    Similarly, the tribunal does not believe that Claimant could in March condition approval of the revised equipment on *further* "[c]onfirmation that the updated equipment list complies with the performance requirements agreed by the Contract" without specifying what that might be. Since the new press was a bespoke machine, one of Respondent's few available methods of "confirming" its compliance "with the Contract's performance requirements", was to explain the Contract's terms. Yet, Respondent had already done this in its letter of 17 December 2018, pointing out that "the Seller guarantees compliance with the terms of manufacture and delivery of the Equipment in accordance with the conditions specified in clause 3.3. of this contract and annexes No. 1.2 to it" and declaring that "the [equipment] changes do not change the essential requirements of the contract" (R 15, pp. 1, 2). Furthermore, Respondent facilitated Claimant's early meeting with the engineers who were designing the replacement press, in October 2018, to allow direct interrogation of those engineers as to the new equipment's sufficiency.

445.    Likewise, Claimant's demand in March for specification of the production line's "required amount of accessories and their durability" so that Claimant could "start a production process of backup accessories in order to ensure the smooth operation of the line" (R 20) could not plausibly be a required condition for signing the Additional Agreement 3 in March 2019, since the production line's own operation was more than a year off. Alternatively, if more than a year's lead time was required, Claimant had had months before March 2019 to raise this request.

446.    In the tribunal's view, these and similar grounds for rejecting the Additional Amendment were raised in bad faith in the sense that they do not appear to be the real grounds for Claimant's decision not to approve the replacement equipment. Rather it appears to the tribunal that the real reason was closer to the one Mr. Baraboi identified in his message to Respondent's Mr. Galver of February 14th, namely that Claimant's management were "simply afraid to sign the alteration of the deadlines and connect this to the changes in the list of the equipment" (R 71) It appears that Claimant's managers could not accept a delay in the project's completion well past the original Contract's expiration and did not want to seem to share responsibility for that result by approving the change in equipment. At the same time, having entertained the prospect of a revised production line for months, including by visiting the subcontractor and spending weeks reviewing technical information on the replacement equipment, and after asking Respondent to sign a corrected version of Additional Agreement 3, Claimant evidently felt uncomfortable refusing to approve that Agreement on its own merits. Therefore, Claimant seems to have contrived new reasons to do so that might be characterized as reflecting Respondent's own defaults.



447.    The tribunal finds further evidence for this view in the fact that the reasons Claimant
        invoked in March and April 2019 that the tribunal has found were not in good faith did
        not reflect any new understanding about the revised production line; rather, each such
        objection could just as readily have been invoked in January or earlier. For example, the
        delay that Respondent announced in its letter of 14 December 2018 (informing Claimant
        that "we are shifting the delivery of the entire line to the port of Odessa from April 2019
        to November 19, 2019" (R 14)) evidently had not grown by the time the subcontractors'
        chart was signed during the April site visit (R 26, recording that all ordered equipment
        would arrive no later than September and unordered items would take no longer than 60
        days upon order). Thus, any demand for a bank guarantee to ensure return of the
        advance payment "in case of … delivery delay" would have been as justifiable in
        December 2018, yet the Claimant waited to demand this in April. Nor did the status of
        Respondent's subcontracts change between the status chart Respondent provided in
        January (R 40) and the chart it subscribed in April 2019 (R 26). Thus, to the extent that
        this status caused Claimant to require copies of those contracts, presumably this would
        have been just as necessary in January.

448.    Nevertheless, the tribunal does not believe Claimant's reliance on these contrived
        additional excuses served to exempt Respondent from liability for its non-performance
        of the original Contract.

449.    In finding that Claimant's contrivance of further excuses for rejecting Additional
        Agreement 3 does not exonerate Respondent from its non-performance of the original
        Contract, the tribunal takes note of what Respondent's legal authorities say concerning
        the proper application of Article 80 of the CISG: "If it was an omission which caused
        the non-performance, the obligor must in addition [to proving the omission and its
        causal impact] prove that the obligee was under a duty to cooperate and engage in an act
        instead of staying passive", S. Kröll, L Misteles & P. Perales (eds), *UN Convention on
        Contracts for the International Sale of Goods (CISG): A Commentary* 1088-89 (RL 2).
        Respondent does rely on an "omission" by Claimant (its failure to sign Additional
        Agreement 3) as allegedly having prevented it from performing the Contract. Yet,
        Respondent has not shown that Claimant was under a *duty* to sign Additional
        Agreement 3 – and to accept a substantial change in the Equipment and its delivery
        schedule – simply because the seller could not fulfil the original Contract it signed. This
        is confirmed when one looks at examples of interfering omissions cited in Respondent's
        legal authorities. The referenced treatise edited by Professors Kröll, Mistelis, and
        Perales, cites cases in which, since "the goods cannot be delivered due to a strike in the
        factory of the obligee, this is attributed to the obligee and he is estopped from invoking
        non-performance" or in which the buyer fails to "give the address the goods have to be
        delivered to" (RL 2, p. 1082-83) (footnotes omitted). Similarly, another of Respondent's
        authorities cites such omissions as "where the buyer fails to acquire the necessary
        import licence" or "the buyer's failure to call off or specify goods", Schlechtriem &
        Schwenzer 1556-57 (RL-1) (footnotes omitted). Claimant had no duty to accept
        replacement equipment on a delayed time schedule that could be compared to an



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

obligation to take delivery of purchased goods or to supply the delivery address for them.

450. For these reasons, the tribunal declines to hold that Claimant's failure to sign Additional Agreement 3 constituted an "omission" that exempted Respondent from liability for its non-performance. Rather, as their course of conduct from September 2018 to April 2019 makes clear, the parties always understood that incorporation of the replacement equipment on a new delivery schedule depended on adoption of an Additional Agreement. The problem was that Claimant's delay in rejecting Additional Agreement 3 fostered a hope (if not expectation) on Respondent's part that Additional Agreement 3 would be approved. Claimant's *delay* did not reflect the level of cooperation to be expected under the standard of good faith. Nevertheless, the tribunal finds no basis for expanding the reach of Article 80's estoppel principle so far as to effectively compel adoption of Additional Agreements 2 and 3 when these would substantially alter the performance required and the Contract expressly conditioned such adoption on the signed agreement of the parties.

451. It remains only to consider the two other "clusters" of bad faith conduct alleged by Respondent that may also bear on the dispute over the replacement equipment. First, there is the contention that Claimant improperly continued to change its shell drawings long past the point at which the revised production line equipment had been fixed, SoD item 96. The tribunal believes this is largely answered by the fact that, when Claimant's final request was made in March 2019 to accommodate other shell sizes beyond those specified in the Contract, Respondent made clear in its reply that this would require additional work and was not included in the existing project (R 21) at the same time that its engineers undertook to see whether a model of the 155 mm shell that differed from the M107 could be accommodated by the equipment as revised (R 24, email of 1 April from MJC engineer stating, "I think it is possible. It is just a little longer ... I will check ..."). Therefore, the tribunal does not believe this could have prevented Respondent from implementing the project, and indeed it appears that Respondent's principal objection was not so much to the belated attempt to change shell design but to Claimant's hypocrisy in, very soon thereafter, "accusing the Respondent of being in a delay with its performance", SoD item 96.

452. Finally, Respondent alleges that Claimant acted in bad faith on the timing of the project, underscoring Claimant's putative acceptance, when it made its site visit to MJC's premises in October 2018, that the replacement equipment "should be delivered to Ukraine at the utmost by the end of 2019" (R 68, ¶13). The tribunal notes, however, that this statement must be construed in the light of other, diverging statements on the issue of timing also recorded from that site meeting. For example, the minutes also reflect that Respondent undertook (with MJC) "to submit for endorsement to ARTEM company by October 30, 2018 [the] actual schedule of the equipment delivery, *strictly following the terms stipulated by the Contract*", which is difficult to reconcile with delivery by year's end (R 68, ¶12 (emphasis added)). Yet another sentence from those minutes records that



"[t]he Parties reached the agreement that the final date of the contract implementation should meet the dates stated in Supplementary Agreement that will be coordinated by the Parties after presentation of the updated press Specifications (in 14 days)" (R 68, ¶13). The tribunal thus concludes that, as of October 2018, Claimant had fully preserved its rights concerning delivery timing, pending further agreement both on the terms of Additional Agreement 3 and the corresponding planned schedule.

## SUMMARY

453.   The tribunal holds that Claimant was entitled to avoid the Contract. Respondent has not shown that a practice developed between the Parties that resulted in Claimant being bound by Additional Agreements 2 and 3 without having signed them. Neither has Respondent shown that Claimant caused the required changes of equipment or the major part of the delay. From those conclusions follows that the request by Respondent to declare the contract, as defined by Respondent, in force is denied and that Respondent shall repay the advance payment to Claimant. There is no dispute with respect to the amount of that advance, which was USD 8,289,500.00.

## INTEREST

454.   Claimant claims interest equal to the 12-months USD LIBOR as of 12 February 2020. Respondent does not object to that interest rate. Claimant seeks interest from 16 May 2018, *i.e.* the date of payment of the advance payment till the date of this award. Claimant invokes Article 84 (1) CISG in support of its claim. The position of Respondent is that interest, if any, should be calculated from 15 May 2019, *i.e.* the date of the commencement of this arbitration.

455.   If the seller is bound to refund the price, he must also pay interest on it, from the date on which the price was paid, CISG 84 (1).

456.   The tribunal has concluded that Respondent shall repay the advance payment, *i.e.* half of the agreed purchase price, to Claimant. There is no dispute with respect to the amount or the interest rate as such. In the opinion of the tribunal it follows directly from article 84 (1) that interest shall be paid as claimed by Claimant, *i.e.* from the date of payment 16 May 2018.

## LEGAL COSTS

457.   Article 49 (6) and article 50 of the SCC Rules state that costs of the arbitration and legal costs incurred by a party shall be distributed by the tribunal taking in account among other things the outcome of the case. The costs incurred by a party shall be reasonable.

458.   According to the articles referred to in the paragraph just above the tribunal may consider various circumstances when determining a party's liability for costs. In this case the tribunal finds no reason to deviate from the main rule namely to distribute the



89

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

costs based on the outcome of the case. Therefore, Respondent shall, as between the parties, carry the arbitration costs as established by the SCC. In addition, Respondent shall reimburse Claimant for its legal costs and expenses in this arbitration. Such costs and expenses amount to EUR 87,530. In the opinion of the tribunal such costs and expenses are reasonable.



For the reasons stated above the tribunal renders the following

### DECISION

Claimant to recover from the Respondent the amount of USD 8,289,500.00 (eight million two hundred and eighty-nine thousand five hundred) plus interest thereon pursuant to the USD LIBOR 12-month rate fixed as of 12 February 2020 from 16 May 2018 till the date of this award.

Claimant shall recover from Respondent EUR 87,530 for its legal costs and expenses.

The relief claimed by Respondent is denied.

The parties are jointly and severally liable to pay the Costs of the Arbitration. The Costs of the Arbitration have been set as follows.

> The Fee of Claes Zettermarck amounts to EUR 85,324 plus compensation for expenses SEK 3,900.

> The Fee of Peter J. Pettibone amounts to EUR 51,194 plus compensation for expenses USD 3,604,55 and SEK 579 plus per diem allowance EUR 2,500.

> The Fee of James Castello amounts to EUR 51,194 plus compensation for expenses EUR 1,158.49.

> The Administrative Fee of the SCC amounts to EUR 37,230.

As between the parties Respondent is liable to pay the entire Costs of the Arbitration.

A party may bring an action against the award regarding the decision on the fee(s) of the arbitrator(s) within two months from the date when the party received the award. This action should be brought before the Stockholm District Court.

Claes Zettermarck

Peter J. Pettibone                                James Castello

**ARBITRATION INSTITUTE OF THE STOCKHOLM CHAMBER OF COMMERCE**
Certified true copy of original

Date 27 July 2020

Christoffer Coello Hedberg

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE